IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN BERRY, FADER | § | |
| HIGHER, LLC, | § | |
| MEHMET C. PEKEROL, M.D., | § | |
| MEHMET C. PEKEROL, M.D., P.C., | § | CIVIL ACTION NO. 3-08CV0248-B |
| JAMIE HUGHES, STANTON | § | |
| GREENE, VALLEY VISTA | § | ECF |
| MORTGAGE, INC., | § | |
| ROBERT P. YOUNG, M.D., | § | |
| ROCKY MOUNTAIN | § | |
| DERMATOLOGY, INC. | § | |
| TYRONE M. SEILS, DP SEARCH, | § | |
| INC., ROBERT W.  MACMILLAN, | § | |
| MACMILLAN CONSTRUCTION | § | |
| COMPANY, INC., | § | |
| CHARLES R. BROWN, DDS, | § | |
| POULSBO CHILDREN'S | § | |
| DENTISTRY, YORAM HAKIMI, | § | |
| NOAM MAOR, PACIFIC HOME | § | |
| REMODELING, INC., | § | |
| DAVID GEORGE, DEBORAH | § | JURY TRIAL DEMANDED |
| GEORGE, AUDIO BOOK | § | |
| SERVICES, INC., | § | |
| DAVID R. HALLMAN, LYNN | § | |
| HALLMAN, ACCESSIBILITY | § | |
| UNLIMITED, INC., | § | |
| RICHARD  SARMIENTO,  RICHARD | § | |
| AND LEILANI SARMIENTO, | § | |
| A SOLE PROPRIETORSHIP, | § | |
| DOUGLAS A. DESALVO, | § | |
| DOUGLAS A. DESALVO | § | |
| CHIROPRACTIC, INC., | § | |
| BRIAN E. KILCOURSE, | § | |
| BEK CONSULTING LP, | § | |
| THOMAS A. JOHNSON, and | § | |
| DIRECT ELECTRIC OF | § | |
| WISCONSIN, INC., | § | |
| on their own behalf and on behalf | § | |
| of all others similarly situated, | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | |

|  |  |
|---|---|
| **INDIANAPOLIS LIFE** | § |
| **INSURANCE COMPANY,** | § |
| **HARTFORD LIFE AND ANNUITY** | § |
| **INSURANCE COMPANY,** | § |
| **HARTFORD FINANCIAL** | § |
| **SERVICES GROUP, INC.,** | § |
| **PACIFIC LIFE INSURANCE** | § |
| **COMPANY,** | § |
| **AMERICAN GENERAL LIFE** | § |
| **INSURANCE COMPANY,** | § |
| **ECONOMIC CONCEPTS, INC.,** | § |
| **ECI PENSION SERVICES, LLC, and** | § |
| **KENNETH R. HARTSTEIN,** | § |
|  | § |
| **Defendants.** | § |

## SECOND AMENDED COMPLAINT – CLASS ACTION[1]

Plaintiffs Stephen Berry, Fader Higher, LLC, Mehmet C. Pekerol, M.D., Mehmet C. Pekerol, M.D., P.C., Jamie Hughes, Stanton Greene, Valley Vista Mortgage, Inc., Robert P. Young, M.D., Rocky Mountain Dermatology, Inc., Tyrone M. Seils, DP Search, Inc., Robert W. MacMillan, MacMillan Construction Company, Inc., Charles R. Brown, DDS, and Poulsbo Children's Dentistry, Yoram Hakimi, Noam Maor, Pacific Home Remodeling, Inc., David George, Deborah George, Audio Book Services, Inc., David R. Hallman, Lynn Hallman, Accessibility Unlimited, Inc., Richard Sarmiento, Richard and Leilani Sarmiento, a Sole Proprietorship, Douglas A. DeSalvo, Douglas A. DeSalvo Chiropractic, Inc., Brian E. Kilcourse, BEK Consulting LP, Thomas A. Johnson, and Direct Electric of Wisconsin, Inc., individually and on behalf of all those similarly situated (collectively, "Plaintiffs" or "Class Representatives"), hereby file this Second Amended Complaint against Defendants Indianapolis Life Insurance Company, Hartford Life and Annuity Insurance Company, Hartford Financial

---

[1] Given the more limited conspiracy alleged herein, only the ILIC Plaintiffs (as defined in footnote 5) have amended their allegations and only as to Indianapolis Life and the Consultant Defendants (as defined herein), pursuant to the Court's two memorandum opinions dated February 19, 2009. The remaining Plaintiffs are prepared to re-plead their allegations, if necessary, against the remaining insurance company defendants and the Consultant Defendants, but have not yet been authorized to do so by the Court.

Services Group, Inc., Pacific Life Insurance Company, American General Life Insurance Company, Economic Concepts, Inc., ECI Pension Services, LLC, and Kenneth R. Hartstein (collectively, "Defendants"), and allege as follows:

## I. NATURE OF ACTION

1.      This is a putative nationwide class action in which Plaintiffs assert various state-law claims against four insurance companies and their consultants related to the design, marketing, and sale of specific life insurance policies used by Plaintiffs to fund defined benefit pension plans that purportedly complied with Section 412(i) of the Internal Revenue Code (the "Code"), but were examined by the Internal Revenue Service (the "IRS") and determined to be "listed transactions" and/or abusive tax shelters.

## II. JURISDICTION AND VENUE

2.      The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because this is a class action in which the citizenship of one or more members of the Classes (as defined below) differs from the citizenship of any Defendants, and the amount in controversy exceeds $5,000,000, excluding interest and costs.

3.      The Court also has personal jurisdiction, both general and specific, over Defendants.  Defendants have purposefully availed themselves of the privileges and benefits of conducting business in Texas.  Defendants, among other things, have (a) contracted by mail or otherwise with Texas residents, which contracts were to be performed in whole or in part in Texas; (b) committed certain torts, which are the subject of this action, in whole or in part in Texas; and (c) otherwise done business in Texas.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a)(1), 1391(a)(3), and/or 1391(c).  Many of the events and omissions giving rise to the claims herein occurred in substantial part in this judicial district.

### III. PARTIES

### A.   PLAINTIFFS

5.      Plaintiff Stephen Berry ("Berry") is a citizen and resident of the State of Arizona.

6.      Plaintiff Fader Higher, LLC ("Fader Higher") is a limited liability company organized under the laws of the State of Arizona, with its principal offices located at 9376 East Bahia, Suite D101, Scottsdale, Arizona 85260.  Berry is a managing member of Fader Higher.  Berry and Fader Higher are collectively referred to herein as the "Fader Higher Plaintiffs."

7.      Plaintiff Mehmet C. Pekerol, M.D. ("Dr. Pekerol") is a citizen and resident of the State of California.

8.      Plaintiff Mehmet C. Pekerol, M.D., P.C. ("Pekerol P.C.") is a professional corporation organized under the laws of the State of California, with its principal offices located at 9201 West Sunset Boulevard, Suite 616, West Hollywood, California 90069.  Dr. Pekerol is an officer and shareholder of Pekerol P.C.  Dr. Pekerol and Pekerol P.C. are collectively referred to herein as the "Pekerol Plaintiffs."

9.      Plaintiff Jamie Hughes ("Hughes") is a citizen and resident of the State of California.

10.     Plaintiff Stanton Greene ("Greene") is a citizen and resident of the State of California.

11.     Plaintiff Valley Vista Mortgage, Inc. ("Valley Vista") is a corporation organized under the laws of the State of California, with its principal offices located at 4747 Viewridge

Avenue, Suite 200, San Diego, California 92123.   Hughes and Greene are officers and shareholders of Valley Vista.  Hughes, Greene, and Valley Vista are collectively referred to herein as the "Valley Vista Plaintiffs."

12.     Plaintiff Robert P. Young, M.D. ("Dr. Young") is a citizen and resident of the State of Utah.

13.     Plaintiff Rocky Mountain Dermatology, Inc. ("Rocky Mountain.") is a professional corporation organized under the laws of the State of Utah, with its principal offices located at 550 East 1400 N, Suite Q, Logan, Utah 84341.  Dr. Young is an officer and shareholder of Rocky Mountain.  Dr. Young and Rocky Mountain are collectively referred to herein as the "Rocky Mountain Plaintiffs."

14.     Plaintiff Tyrone M. Seils ("Seils") is a citizen and resident of the State of California.

15.     Plaintiff DP Search, Inc. ("DP Search") is a corporation organized under the laws of the State of California, with its principal offices located at 73350 El Paseo, Suite 205, Palm Desert, California 92260.  Seils is an officer and shareholder of DP Search.  Seils and DP Search are collectively referred to herein as the "DP Search Plaintiffs."

16.     Plaintiff Robert W. MacMillan ("MacMillan") is a citizen and resident of the State of Arizona.

17.     Plaintiff MacMillan Construction Company, Inc. ("MacMillan Construction") is a corporation organized under the laws of the State of Arizona, with its principal offices located at 710 North Fifth Street, Prescott, Arizona 86301.  MacMillan is the President of MacMillan Construction.  MacMillan and MacMillan Construction are collectively referred to herein as the "MacMillan Plaintiffs."

18.     Plaintiff Charles R. Brown, DDS ("Dr. Brown") is a citizen and resident of the State of Washington.

19.     Plaintiff Poulsbo Children's Dentistry ("Poulsbo Children's Dentistry") is a sole proprietorship operated by Dr. Brown, with its principal offices located at 19365 7th Avenue NE, Suite D-108, Poulsbo, Washington 98370.   Dr. Brown and Poulsbo Children's Dentistry are collectively referred to herein as the "Poulsbo Children's Dentistry Plaintiffs."

20.     Plaintiff Yoram Hakimi ("Hakimi") is citizen and resident of the State of California.

21.     Plaintiff Noam Maor ("Maor") is a citizen and resident of the State of California.

22.     Plaintiff Pacific Home Remodeling, Inc. ("PHR") is a corporation organized under the laws of the State of California, with its principal offices located at 12658 West Washington Boulevard, Los Angeles, California 90066.  Hakimi and Maor are officers, directors, and shareholders of PHR.  Hakimi, Maor, and PHR are collectively referred to herein as the "PHR Plaintiffs."

23.     Plaintiff David George ("David George") is citizen and resident of the State of Colorado.

24.     Plaintiff Deborah George ("Deborah George") is a citizen and resident of the State of Colorado.

25.     Plaintiff Audio Book Services, Inc. ("ABS") is a corporation organized under the laws of the State of Colorado, with its principal offices located at 309 Sout Summit View Drive, Suite 14, Fort Collins, Colorado 80524.   David George and Deborah George are officers, directors, and shareholders of ABS.  David George, Deborah George, and ABS are collectively referred to herein as the "ABS Plaintiffs."

26.     Plaintiff David R. Hallman ("David Hallman") is citizen and resident of the State of Illinois.

27.     Plaintiff Lynn Hallman ("Lynn Hallman") is a citizen and resident of the State of Illinois.

28.     Plaintiff Accessibility Unlimited, Inc. ("AUI") is a corporation organized under the laws of the State of Illinois, with its principal offices located in Montgomery, Illinois.  David Hallman and Lynn Hallman are the sole shareholders of AUI.  David Hallman, Lynn Hallman, and AUI are collectively referred to herein as the "AUI Plaintiffs."

29.     Plaintiff Richard Sarmiento ("Sarmiento") is citizen and resident of the State of California.

30.     Plaintiff Richard and Leilani Sarmiento, a Sole Proprietorship ("Sarmiento Sole Proprietorship"), is a sole proprietorship operating under the laws of the State of California, with its principal offices located in Wilton, California.  Sarmiento and Sarmiento Sole Proprietorship are collectively referred to herein as the "Sarmiento Plaintiffs."

31.     Plaintiff Douglas A. DeSalvo ("DeSalvo") is citizen and resident of the State of California.

32.     Plaintiff Douglas A. DeSalvo Chiropractic, Inc. ("DeSalvo Chiropractic") is a corporation organized under the laws of the State of California, with its principal offices located in El Cerrito, California.   DeSalvo is an officer and shareholder of DeSalvo Chiropractic. DeSalvo and DeSalvo Chiropractic are collectively referred to herein as the "DeSalvo Plaintiffs."

33.     Plaintiff Brian E. Kilcourse ("Kilcourse") is citizen and resident of the State of California.

34.     Plaintiff BEK Consulting LP ("BEK Consulting") is a limited partnership organized under the laws of the State of California, with its principal offices located in Walnut Creek, California.  Kilcourse is partner in BEK Consulting.  Kilcourse and BEK Consulting are collectively referred to herein as the "BEK Plaintiffs."

35.     Plaintiff Thomas A. Johnson ("Johnson") is citizen and resident of the State of Wisconsin.

36.     Plaintiff Direct Electric of Wisconsin, Inc. ("Direct Electric") is a corporation organized under the laws of the State of Wisconsin, with its principal offices located in New Berlin, Wisconsin.  Johnson is an officer and shareholder of Direct Electric.  Johnson and Direct Electric are collectively referred to herein as the "Direct Electric Plaintiffs."

## B.     DEFENDANTS

37.     Defendant Indianapolis Life Insurance Company ("Indianapolis Life") is a corporation organized under the laws of the State of Indiana, with its principal offices located at 9200 Keystone Crossing, Suite 800, Indianapolis, Indiana 46240.

38.     Defendant Hartford Life and Annuity Insurance Company ("Hartford Life") is a corporation organized under the laws of the State of Connecticut, with its principal offices located at 200 Hopmeadow Street, Simsbury, Connecticut 06070.

39.     Defendant Hartford Financial Services Group, Inc. ("Hartford Financial") is a corporation organized under the laws of the State of Illinois, with its principal offices located at 9933 Lawler Avenue, Suite 105, Skokie, Illinois 60077.  Hartford Life and Hartford Financial are collectively referred to herein as "Hartford."

40.     Defendant Pacific Life Insurance Company ("Pacific Life") is a corporation organized under the laws of the State of Nebraska, with its principal offices located at 700 Newport Center Drive, Newport Beach, California 92660.

41.     Defendant American General Life Insurance Company ("American General") is a corporation organized under the laws of the State of Texas, with its principal offices located at 2727 Allen Parkway, Houston, Texas 77019.

42.     Defendants Indianapolis Life, Hartford, Hartford Financial, Pacific Life, and American General are collectively referred to herein as the "Insurance Defendants."

43.     Defendant Economic Concepts, Inc. ("ECI") is a corporation organized under the laws of the State of Arizona, with its principal offices located at 9316 Raintree Drive, Suite 100, Scottsdale, Arizona 85260.  ECI is a product marketing and consulting firm that specializes in the area of qualified pension plans.

44.     Defendant ECI Pension Services, LLC ("ECI Pension") is a limited liability company organized under the laws of the State of Arizona, with its principal offices located at 9316 Raintree Drive, Suite 100, Scottsdale, Arizona 85260.  ECI Pension is a product marketing and consulting firm that specializes in the area of qualified pension plans.

45.     Defendant Kenneth R. Hartstein ("Hartstein") is a citizen and resident of the State of Arizona, with a business address of 9316 Raintree Drive, Suite 100, Scottsdale, Arizona 85260.  Hartstein is the President, Chief Executive Officer, and primary shareholder of ECI, as well as the managing member of ECI Pension.

46.     Defendants ECI, ECI Pension, and Hartstein are collectively referred to herein as the "Consultant Defendants."

## C.     RELATED PARTIES

47.     Bryan Cave LLP ("Bryan Cave") is a limited liability partnership organized under the laws of the State of Missouri, with its principal offices located at One Metropolitan Square, 211 North Broadway, Suite 3600, St. Louis, Missouri 63102.  Bryan Cave is an international law

firm with more than 900 lawyers and other consulting professionals located in twenty-one offices throughout the world.

48.     Richard C. Smith ("Smith") is a citizen and resident of the State of Arizona, with a business address of One Renaissance Square, Two North Central Avenue, Suite 2200, Phoenix, Arizona 85004.  Smith is a licensed attorney and partner at Bryan Cave.  His practice focuses on the employee benefits area, including the design, implementation, and other aspects of pension, profit sharing, and other qualified plans.

49.     Bryan Cave and Smith are collectively referred to herein as the "Bryan Cave Parties."  Plaintiffs have asserted claims against the Bryan Cave Parties in *Phillips et al. v. Bryan Cave LLP et al.*, Civil Action No. 3:08-CV-02035, which was originally filed in the United States District Court for the District of Arizona, but subsequently transferred to this Court for pretrial proceedings pursuant to 28 U.S.C. § 1407.

### IV. <u>CLASS ALLEGATIONS</u>

50.     Plaintiffs bring this action on their own behalf and, pursuant to Federal Rules of Civil Procedure 23(b)(1)(A), (b)(2), and/or (b)(3), as a class action on behalf of themselves and the following four nationwide classes of similarly situated persons (the "Classes" or "Class Members"):

> a.     All persons who, between January 1, 1999 and the present, paid insurance premiums to Indianapolis Life on a PenPro policy, Vista PenPro policy, Executive VIP policy, Vista Executive VIP policy or a substantially similar policy that was used to fund a defined benefit plan under Section 412(i) of the Code.
>
> b.     All persons who, between January 1, 1999 and the present, paid insurance premiums to Hartford on a Stag Whole Life policy or a substantially similar policy that was used to fund a defined benefit plan under Section 412(i) of the Code.

c.      All persons who, between January 1, 1999 and the present, paid insurance premiums to Pacific Life on a Flex XII policy or a substantially similar policy that was used to fund a defined benefit plan under Section 412(i) of the Code.

d.      All persons who, between January 1, 1999 and the present, paid insurance premiums to American General on a Value Master 5+, Platinum Value Master 5+, VM5+ policy, Platinum VM5+ policy, or a substantially similar policy that was used to fund a defined benefit plan under Section 412(i) of the Code.

51.    The claims of the Class Members are so numerous that joinder of all members would be impracticable.  On information and belief, there are hundreds, if not thousands, of Class Members.

52.    The claims of the Class Representatives are typical of the claims of the Class Members in that they all arise by virtue of their purchase of specific life insurance policies issued by the Insurance Defendants and designed and/or marketed by the Consultant Defendants, which policies were used to fund defined benefit plans that purported to comply with Section 412(i) of the Code, but were later examined by the IRS and determined to be "listed transactions" and/or abusive tax shelters (the "Insurance Policies").

53.    The Class Representatives will fairly and adequately protect the interests of the Class Members, and the claims of the Class Representatives are consistent with and not antagonistic to those of the Class Members.

54.    The Class Representatives have engaged the undersigned counsel who have substantial experience in complex commercial litigation and class action litigation, and counsel will fairly, adequately, and vigorously represent the interests of the Class Representatives and Class Members.

55.    There are questions of law and fact that are common to the Class Members, which common questions predominate over any individual questions.  Upon information and belief, the

Consultant Defendants conspired with each of the Insurance Defendants to design, market, and sell the Insurance Policies for use in funding abusive 412(i) plans.  The Bryan Cave Parties blessed these Insurance Policies by providing legal opinions regarding their compliance with the requirements necessary to satisfy Section 412(i).  In marketing these specially designed policies, the Defendants created uniform marketing materials, which they distributed to licensed insurance agents working for the Insurance Defendants throughout the country.  These uniform marketing materials provided a scripted presentation for setting up a 412(i) plan and funding that plan with the Insurance Policies designed by the Defendants.  Agents for the Insurance Defendants then relayed the scripted presentation to the Class Members.  Because the uniform marketing materials mentioned nothing about the substantial tax risks and problems with these 412(i) arrangements, the agents failed to disclose such risks and problems to the Class Members.  These common questions include, but are not limited to, the following:

    a.    Whether Defendants designed the Insurance Policies to be used to fund 412(i) plans;

    b.    Whether Defendants knew or should have known that the Insurance Policies would be used by the Class Members to fund 412(i) plans;

    c.    Whether Defendants knew or should have known that the Insurance Policies contained provisions that, when used to fund 412(i) plans, could subject the plans to being deemed by the IRS to be abusive 412(i) plans or so-called abusive 412(i) plans and/or non-qualified plans by the IRS;

    d.    Whether the Insurance Policies issued to the Class Members by an Insurance Defendant were substantially similar to each other;

    e.    Whether the Insurance Defendants were negligent, reckless, and/or engaged in intentional misconduct in selling the Insurance Policies to the Class Members;

f.      Whether the Consultant Defendants provided actuarial, consulting, and/or marketing services to each of the Insurance Defendants in connection with the Insurance Policies;

g.      Whether the Consultant Defendants were negligent, reckless, and/or engaged in intentional misconduct in assisting with the design and marketing of the Insurance Policies;

h.      Whether the Defendants failed to disclose material information in marketing and selling the Insurance Policies to the Class Members;

i.      Whether the Insurance Policies were sold or marketed to the Class Members pursuant to standard scripts, marketing materials, or sales pitches provided by the Insurance Defendants and/or Consultant Defendants;

j.      Whether the misrepresentations made to the Class Members were materially uniform such that reliance could be established by generalized proof;

k.      Whether the Bryan Cave Parties provided legal services to the Consultant Defendants and/or the Insurance Defendants in connection with the Insurance Policies, including but not limited to legal opinions in which the Bryan Cave Parties rendered opinions regarding whether the Insurance Policies would comply with all requirements necessary to satisfy Section 412(i);

l.      Whether the legal opinions provided by the Bryan Cave Parties to the Consultant Defendants and/or the Insurance Defendants were substantially similar to each other;

m.      Whether the Bryan Cave Parties were negligent, reckless, and/or engaged in intentional misconduct in rendering the legal services and/or opinions;

n.      Whether the fees or commissions charged or earned by the Insurance Defendants, the Consultant Defendants, and/or the Bryan Cave Parties were excessive and unreasonable; and

o.      Whether Defendants conspired and/or aided and abetted each other in furtherance of the unlawful acts alleged herein.

56.      The prosecution of separate actions by individual Class Members would create a

risk of inconsistent or varying adjudications with respect to individual Class Members that would

establish inconsistent standards of conduct for Defendants, such that this class should be certified pursuant to Rule 23(b)(1)A).  Moreover, Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, making appropriate final injunctive or declaratory relief under Rule 23(b)(2).  In addition, common questions of fact and law predominate over individual questions and the benefits and efficiencies of a class action make this superior to other available methods for the fair and efficient adjudication of the controversy.  Thus, certification is appropriate under Rule 23(b)(3).

## V. <u>FACTUAL BACKGROUND</u>

### A.   TRADITIONAL 412(i) PLANS

57.     A 412(i) plan is a defined benefit pension plan created under Section 412(i) of the Internal Revenue Code (the "Code").[2]  Like any defined benefit pension plan, a 412(i) plan provides specified retirement and death benefits to its participants and must contain assets sufficient to pay those benefits.  A 412(i) plan differs from other defined benefit pension plans, however, in that it must be funded exclusively by the purchase of individual insurance contracts, such as life insurance policies or annuities.

58.     To create a 412(i) plan, an employer first establishes a trust to hold the plan's assets, and the trust uses employer contributions to purchase and maintain some combination of life insurance policies <u>and</u> annuities for the 412(i) plan.  Treasury regulations prohibit a pension plan from providing any benefits — such as death benefits under an insurance policy — that are more than "incidental" to the retirement benefits under the plan.[3]  Otherwise, it is no longer a

---

[2] Section 412(i) was recodified as 26 U.S.C. § 412(e)(3) in the 2006 amendments to the Code.

[3] Treas. Reg. § 1.401-1(b)(1)(i).

retirement plan, but an insurance plan. To comply with these regulations, a traditional 412(i) plan generally uses life insurance policies for no more than fifty percent (50%) of its funding.

59.     The employer funds the 412(i) plan by making regular cash contributions to that trust at least equal to the amount of the premiums due on the insurance policies and annuities, and the Code allows the employer to take a tax deduction in the amount of these contributions. As the plan participants retire, the trust will usually sell the policies for their present cash value and purchase additional annuities with the proceeds. The revenue stream from the annuities pays the specified retirement benefit to plan participants.

## B.     THE SCHEME TO SELL ABUSIVE 412(i) PLANS

### 1.  Overview of the Scheme

60.     Starting in mid-1999, Defendants formulated a structure for an abusive tax shelter built around Section 412(i) of Code. Specifically, the Consultant Defendants — working closely with the Insurance Defendants and the Bryan Cave Parties — designed a purported 412(i) plan called the Pendulum Plan. In reality, the Pendulum Plan was nothing more than a marketing vehicle for selling life insurance policies with excessively high premiums. Not only were the premiums for these policies excessive, but worse, the policies were not appropriate for their intended purpose — funding a 412(i) plan.

61.     The Pendulum Plan differed from a traditional 412(i) plan in several key respects. As an initial matter, the Pendulum Plan was funded entirely with life insurance policies (rather than a combination of life insurance policies and annuities like in a traditional 412(i) plan), which provided death benefits far in excess of the death benefits that can be paid to a participant under the retirement plan. These large life insurance amounts, in part, generated the large premiums that lead to the ostensible large tax deductions.

62.     The Pendulum Plan, however, could not be funded with any ordinary life insurance policy, but only with a specially designed life insurance policy issued by Indianapolis Life or a substantially similar policy that was later developed by the other Insurance Defendants. These special insurance policies required extremely high premium payments, which not only increased the tax deductions ostensibly available to the employer establishing the Pendulum Plan, but also grossly inflated the commissions and other remuneration paid to the Insurance Defendants and their agents.

63.     The Pendulum Plan also contemplated a short-term and tax-free extraction of the already tax-deductible dollars paid toward these specially designed insurance policies. Specifically, the Pendulum Plan called for the participant to purchase the specially designed insurance policy after five years of funding the plan.  By that point in time, the policy would have accumulated a substantial cash value as a result of its high premiums, but the policy employed a steep surrender charge to suppress its true cash value.  Thus, the participant would pay only the policy's surrender value (the present cash value of the policy reduced by the high surrender charge) in order to purchase the insurance policy from the Pendulum Plan.

64.     Within a few years after this purchase, the surrender charge would completely disappear under the terms of the insurance policy, triggering an immediate explosion in its cash value.  This is known as a springing cash value policy.  The Pendulum Plan contemplated that the participant would then take tax-free loans against the increased cash value of the policy.

65.     The extraordinarily high premiums coupled with the steep but disappearing surrender charge — resulting in a disconnect between the benefits provided by the insurance contracts and the benefits promised under the defined benefit plan — are the characteristics that most distinguish the Pendulum Plan (or a similarly abusive 412(i) plan) from a traditional 412(i)

plan.  The insurance policies bear no economic relation to the 412(i) plan's supposed function as a retirement program.

66.     The Pendulum Plan (and other similar 412(i) plans) and the specially designed insurance policies used to fund that plan did not comply with Section 412(i) and/or presented substantial tax risks to those who adopted such a plan.

## 2.  The Substantial Tax Risks of the Scheme

### a.  Springing Cash Value Policies

67.     The Pendulum Plan (and other similar 412(i) plans) relied upon springing cash value policies to achieve one of its most important purported tax benefits — the short-term and tax-free extraction of the already tax-deductible dollars from the plan.  The IRS, however, has criticized springing cash value policies since at least the late 1980s.  In 1988, the IRS issued Announcement 88-51, stating that the IRS was studying certain types of insurance contracts that appeared to have artificially low cash surrender values, including contracts that were generally referred to as "springing cash value" contracts.  The IRS noted that these contracts were often used by benefit plans "primarily as a means of reducing the tax on distribution of plan assets." The IRS cautioned that some "valuation method that more accurately reflects the fair market value of the rights distributed, rather than the cash surrender value, may have to be used."  The IRS further cautioned that, if the actual fair market value of the insurance contract was not used, any distribution in excess of the accrued benefits payable under the plan may result in the loss of the plan's qualified status and may be treated as a reversion of trust funds to the employer.

68.     In 1989, the IRS issued Notice 89-25, which addressed, among other things, the determination of the fair market value of an insurance policy whose value is substantially higher than the cash surrender value stated in the policy.  The IRS stated that the practice of using the

stated cash surrender value as the fair market value is not appropriate where the total policy reserves represent a much more accurate approximation of the fair market value of the policy. The IRS further stated that, if a distribution is made in excess of the participant's accrued benefit because the policy is valued at the cash surrender value and not the value of the reserves, the distribution would not be treated as a distribution to the participant from a qualified plan and could be treated as a reversion to the employer.  Such distributions could disqualify the plan because they raise a number of qualification issues concerning limitations on benefits and contributions, requirements that benefits be definitely determinable, and discrimination in contributions and benefits.

69.     As springing cash value policies changed, the IRS continued to assert its position that the method of valuing an insurance policy must constitute the fair market value of the policy.  In Announcement 94-101, the IRS finalized the examination guidelines that were developed "to be used by employee plans examiners when examining plans for . . . prohibited transactions . . . [and] the valuation of plan assets."  In addressing springing cash value policies then in existence, the IRS, citing Notice 89-25, stated that taxpayers might be seeking to be taxed on less than the full value of the policies with high death benefits and springing cash values because the cash surrender values of those policies do not reflect the premiums paid until after the policies are distributed.  The IRS further stated that the cash surrender value should reflect the replacement cost of the policy, which should be about equal to the premiums paid or the policy reserves, "ensuring that the value of the policy is included in gross income upon distribution of the policy to the recipient."  The IRS also stated that "a distribution could disqualify a plan if a plan inappropriately uses the cash surrender value in valuing the amount distributed, thereby allowing a distribution greater than the Section 415 limitations."

70.    In sum, the use of springing cash value policies in a purported 412(i) plan presented a number of material tax risks, including potential disqualification of the plan and the loss of a tax deduction for plan contributions.

### b.  Plan Permanency Requirement

71.    The Pendulum Plan (and other similar 412(i) plans) centered around a short-term exit strategy whereby the plan would distribute the policy to the participant within only a few years, thereby facilitating the short-term and tax-free extraction of the already tax-deductible dollars from the plan.

72.    For literally decades, it has been a fundamental requirement of federal law that a tax-qualified retirement plan must be intended to be permanent, not a temporary program.  This requirement is designed to guard against tax abuse.  Treasury Regulation § 1.401-1(b)(2) defines a qualified plan, in pertinent part, as follows:

> The term "plan" implies a permanent as distinguished from a temporary program.  Thus, although the employer may reserve the right to change or terminate the plan, and to discontinue contributions thereunder, the abandonment of the plan for any reason other than business necessity within a few years after it has taken effect will be evidence that the plan from its inception was not a bona fide program.  Especially will this be true if, for example, a pension plan is abandoned soon after pensions have been fully funded for persons in favor of whom discrimination is prohibited under section 401(a).

A plan that is merely a "temporary program" and not "permanent" would be disqualified and the deductions for plan contributions would be disallowed.

73.    Thus, the Pendulum Plan (and other similar 412(i) plans) presented a material risk that it would be deemed a "temporary program," resulting in disqualification of the plan and disallowance of deductions for plan contributions.

### c.  Section 412(i) Requirements

74.     Section 412(i) and its regulations allow only certain kinds of insurance contracts to fund a 412(i) plan.  These regulations — which were promulgated in July 1980 — require that the insurance contracts satisfy, *inter alia*, the following requirements:   (a) level premium payments that end no later than normal retirement age, or if earlier, on the date the individual ceases participation in the plan; (b) the benefits provided under the plan must be equal to the benefits provided under the individual insurance contract at the participant's normal retirement age; (c) the benefits provided by the plan for each individual participant must be guaranteed by the life insurance company issuing the individual contracts to the extent premiums have been paid; (d) no rights under the individual contracts may have been subject to a security interest at any time during the plan year; and (e) there can be no policy loans, including loans to individual participants, on any of the individual contracts.

75.     The specially designed policies used to fund the Pendulum Plan (and other similar 412(i) plans) appear to violate many, if not all, of these requirements.  For example, the policies appear to provide for premiums that are payable beyond normal retirement age.  The policies also appear to provide benefits at normal retirement age in excess of the benefits at normal retirement age under the terms of the plan.  Finally, the policies appear to permit loans to be taken against them.

76.     If the insurance policies do not satisfy the Section 412(i) requirements, there is a material risk that the premiums paid on such policies would not be deductible contributions to a tax-qualified retirement plan under Section 404 of the Code.

### d.  Non-Discrimination Rules

77.     In order to be a tax-qualified plan, the Pendulum Plan (and other similar 412(i) plans) had to meet certain eligibility and benefit requirements.  In particular, Section 401(a)(4) of the Code states that the plan must not discriminate in favor of highly compensated employees regarding the benefits, rights, and features provided under the plan.

78.     The Pendulum Plan (and other similar 412(i) plans) generally did not satisfy these non-discrimination rules.  First, the plan was marketed to and included only the most highly compensated employees.   Second, to the extent that the plan included any non-highly compensated employees, the specially designed insurance policies (including their springing cash values) were not available to such employees.

### 3.  <u>The Collaboration to Launch the Scheme</u>

79.     The Pendulum Plan (and other similar 412(i) plans) simply could not work without a specially designed life insurance policy.  The Consultant Defendants, by necessity, had to collaborate with the Insurance Defendants regarding the design, purpose, and use of this special insurance policy.  As Hartstein himself has explained:

> The product is a high priced whole life product.  That's what's dictating the size of the deduction. . . . And there's other life insurance whole life policies . . . that don't cost as much. . . . [But] I wouldn't use those other policies because I couldn't get the tax leverage that I could get in this type of policy, which used to be called the springing cash value policy.

80.     In early 1999, the Consultant Defendants contacted Indianapolis Life to discuss funding the Pendulum Plan with the Executive VIP policy.  Indianapolis Life had originally designed this policy in the mid-1990s.  It was a specialty product designed to allow the tax efficient transfer of money from pension plans or from corporations with excess retained earnings.  In an internal email dated January 30, 1997, Mark Steckbeck, an Indianapolis Life

representative, explained that the Executive VIP policy accomplishes this by "creating very high insurance costs and expense loads in the early years, thereby suppressing the cash surrender value.  After the fifth policy year, the plan is to transfer ownership of the policy to the individual executive or employee while the [cash surrender value] is low due to the high surrender charges.  Over the next 5 years, the surrender charges taper off to zero."  Steckbeck further acknowledged that the Executive VIP had "particular (peculiar) design features."

81.     One of these "peculiar" design features was the way in which the Executive VIP exploded in cash value as its surrender charge disappeared.  As explained above, the IRS has repeatedly criticized these types of springing cash value policies since at least the late 1980s, including in Announcement 88-51, Notice 89-25, and Announcement 94-101.

82.     Indianapolis Life was well aware of these IRS criticisms.  Indeed, Indianapolis Life internally discussed the risk that its Executive VIP policy might be deemed a springing cash value policy throughout the late 1990s, including in October 1996 and May 1997.  Indianapolis Life, therefore, clearly recognized the tax risks related to the Executive VIP and its "peculiar" design.  In fact, as reflected in Mark Steckbeck's January 1997 email, Indianapolis Life knew that the Executive VIP "push[ed] the limits" of existing standards for policies with high expense loads.  Indianapolis Life was concerned that the IRS could successfully challenge these large premium payments (as illegally diverted income) which would create "adverse tax consequences" for the pension plan or the individual policyholder.  Indianapolis Life also recognized that the Executive VIP was "designed specifically for use in only certain tax related situations."  In fact, Steckbeck explained this concern as follows in his January 1997 email:

> Because of the high premiums and expense loads, this product would be completely inappropriate for use in certain other situations.  We believe we need to take steps to prevent the inappropriate use of this product.  This may be accomplished through required agent training before the

agent can sell this product, or by screening the EVIP applications to determine whether the sale is being made to an existing pension plan or other appropriate entity. These options need further discussion and decisions.

83. Thus, Indianapolis Life had significant concerns regarding the Executive VIP. Despite these concerns, Indianapolis Life knew that the Executive VIP could be a very lucrative product given its enormous premiums and commissions. Indianapolis Life also knew that the Executive VIP had to be marketed to a special niche demographic — pension and benefit plans.

84. Indianapolis Life initially marketed its Executive VIP policy to fund multiple employer welfare benefit plans under the auspices of Section 419A(f)(6) of the Code. These purported 419A plans operated much like the Pendulum Plan. Specifically, the employer would purchase an Executive VIP policy to fund its participation in the 419A plan, record tax deductions for the high premiums paid toward that policy, and later purchase the policy from the plan for its artificially suppressed surrender value and then take tax-free loans against the policy as its cash value exploded due to the disappearing surrender charge.

85. The IRS, however, viewed these purported 419A plans as abusive tax shelters. The IRS originally targeted these purported 419A plans in Notice 95-34. In February 2000, the IRS issued Notice 2000-15, which announced that benefit plans with the characteristics identified in Notice 95-34 had been designated as "listed transactions." The IRS position on these plans was sustained in *Booth v. Commissioner*, 108 T.C. 524, (1997) and *Neonatology Associates, P.A. v. Commissioner*, 115 T.C. 43 (2000), *aff'd*, *Neonatology Associates, P.A. v. Commissioner*, 299 F.3d 211 (3d Cir. 2002). In July 2002, the Treasury Department issued proposed regulations which indicated that the federal government intended to adhere to its position and to challenge 419A plans being marketed in connection with the Executive VIP policy. The Treasury Department issued final regulations on this issue in July 2002.

86.   As the IRS increased its scrutiny of purported 419A plans in the late 1990s, Indianapolis Life looked for a new marketing vehicle for its lucrative, but risky, Executive VIP policy.  Indianapolis Life found that vehicle in the Pendulum Plan.

87.   In mid-March 1999, Indianapolis Life's Gary Ryan and Brent Kahl spoke with Hartstein about the "idea of using the Executive VIP product in a 412(i) plan."  Hartstein explained that using the Executive VIP as the "sole funding tool" for the Pendulum Plan would "generate incredibly substantial" tax deductions for their clients.  Hartstein also proposed that Indianapolis Life keep their discussions "confidential" and sign "some type of exclusivity agreement" with him.

88.   In late March 1999, Hartstein again contacted Gary Ryan at Indianapolis Life and proposed that the Executive VIP policy be used "exclusively" in the Pendulum Plan.  In addition, Hartstein stated:  "I would like to have total control of this product's distribution" because "I've only approached Indianapolis Life at this juncture."  Finally, Hartstein predicted that Indianapolis Life would reap enormous premiums through their joint efforts:

> Gary, I think you know that I can produce the business, and I believe that with this opportunity, we can generate millions of dollars of new commissionable premium.  Just give me the chance to run with this, and the results can be unbelievable.  In Phoenix alone, for example, our 'licensed' CPA's will be actively involved in supporting these types of pension plans for their clients.  Rest assured.

89.   In June 1999, Hartstein traveled to Indianapolis for meetings with various Indianapolis Life representatives, including Gary Ryan, Leonard Bielski, and Jim Cassel.  During these meetings, they discussed how to design and market the Pendulum Plan, including the allegedly tax-free exit strategy using the springing cash value characteristics built into the Executive VIP policy.  They also discussed the tax risks related to this purported 412(i) arrangement, including the risk that the Executive VIP was a springing cash value policy.

Nonetheless, upon information and belief, they agreed to market this policy in connection with the Pendulum Plan through Indianapolis Life's agents and producers nationwide by uniformly representing that: (1) this insurance policy was appropriate for use in funding a 412(i) plan; (2) the Pendulum Plan, as funded with this policy, was a qualified 412(i) plan; (3) the premiums paid on this policy were fully tax deductible; and (4) the plan participant could purchase the policy after a few years for its suppressed cash value, but take tax-free loans against the policy. They further agreed, upon information and belief, that the tax risks related to this purported 412(i) arrangement would not be disclosed in the marketing process.

90.    In addition, during this June 1999 meeting, Hartstein and the Indianapolis Life representatives explicitly discussed that the Pendulum Plan would be a very lucrative alternative marketing vehicle for the Executive VIP given the ongoing IRS attack on 419A plans. Indianapolis Life, in fact, became so enamored with this new marketing vehicle that the company even renamed the Executive VIP policy as the PenPro policy to recognize its close affiliation with the Pendulum Plan.

91.    During this June 1999 meeting, Indianapolis Life also agreed to compensate the Consultant Defendants for their substantial and ongoing assistance in launching this 412(i) marketing campaign. Specifically, in exchange for playing what Hartstein described as the "quarterback" in this campaign, the Consultant Defendants would be paid the following by Indianapolis Life: (a) approximately 20% of the commissions that would normally have been paid to Indianapolis Life's agents or producers selling the underlying insurance policy; and (b) an additional "override" of approximately 5% of all premiums paid in connection with these purported 412(i) arrangements.

92.     Later in June 1999, Hartstein proposed that the Consultant Defendants and Indianapolis Life jointly conduct a marketing seminar for Indianapolis Life agents and producers regarding the Pendulum Plan in October 1999.  In preparing for this seminar, the Consultant Defendants obtained a specimen Executive VIP and/or PenPro policy from Indianapolis Life, which they provided to the Bryan Cave Parties, in order to obtain a legal opinion for marketing purposes.

93.     After reviewing this specimen policy, the Bryan Cave Defendants delivered a legal opinion to the Consultant Defendants in September 1999 (the "Bryan Cave Opinion"), stating:  (a) it was "more likely than not" that the Pendulum Plan would be a qualified plan under Section 412(i) of the Code; (b) it was "more likely than not" that the specimen policy issued by Indianapolis Life or a "substantially similar policy" issued by another insurance company "can meet the requirements of Section 412(i) of the Code," when used as "the funding vehicle for the Plan"; and (c) the Pendulum Plan "should not be considered a tax shelter," which is "any plan or arrangement, if the principal purpose of the plan or arrangement, based on objective evidence, is the avoidance or evasion of Federal income tax."

94.     In the Bryan Cave Opinion, the Bryan Cave Parties not only made deliberately vague statements and unsupported legal conclusions, but also consciously ignored the tax and legal implications of the underlying scheme.  The Bryan Cave Opinion, for example, contains the following false or misleading statements or omissions:

      a.    The Bryan Cave Parties deliberately avoided any discussion as to whether and to what extent plan contributions would be tax-deductible.  The Bryan Cave Parties, however, knew that this purported 412(i) arrangement was being marketed as a fully tax-deductible plan.  The Bryan Cave Parties also knew that, given their conclusion that the insurance policy met the requirements of Section 412(i), the Bryan Cave Opinion falsely implied that premiums paid for such a policy would be fully tax-deductible.

b.     The Bryan Cave Parties suggested that the plan could limit the impact of any provisions of the insurance policy that might violate Section 412(i) and, therefore, achieve qualified plan status under Section 412(i).  However, there is little or no authority for this proposition, and certainly not sufficient authority to support their more-likely-than-not conclusions in the Bryan Cave Opinion.

c.     The Bryan Cave Parties relied on an unsubstantiated interpretation of a Treasury regulation to conclude that the plan satisfies Section 412(i), despite the insurance policy not having level premium payments and providing for premium payments to continue beyond normal retirement age.

d.     The Bryan Cave Parties failed to conclude that the benefits provided under the plan equal the benefits provided under the insurance policy at normal retirement age under plan provisions, even though this is required to satisfy Section 412(i).  Indeed, in the Bryan Cave Opinion, the Bryan Cave Parties seem to acknowledge the opposite conclusion.

e.     The Bryan Cave Parties stated that Section 412(i) "requires the guaranteed cash value to equal the benefit at normal retirement age."  This statement is not a proper reading of Section 412(i), as interpreted by the regulations, which provide that "the benefits provided by the plan . . . must be equal to the benefits provided under his individual contracts at his normal retirement age."  Nor is this statement in accordance with the accrual rules under Section 411(b)(1)(F) of the Code, which require that a participant's accrued benefit equal the cash surrender value.

f.     The Bryan Cave Parties failed to consider whether an in-kind distribution to a plan participant of an insurance policy that is "undervalued" would violate Section 415(b) of the Code, even though the IRS had discussed this potential problem in a recent announcement.

g.     The Bryan Cave Parties deliberately avoided any discussion of whether the insurance policy constituted a springing cash value policy, even though they and Defendants knew that:  (i) the policy would be purchased by the plan participant within a few years and then explode in value as the surrender charge disappeared; and (ii) the IRS had expressed its concerns regarding similar policies in related contexts for years.

95.     Armed with the Bryan Cave Opinion, the Consultant Defendants proceeded to work together with Indianapolis Life to further develop the Pendulum Plan and the Executive VIP and/or PenPro policy used to fund the plan.   The Consultant Defendants, for example, shared the Bryan Cave Opinion with Indianapolis Life and participated in meetings with its representatives regarding this purported 412(i) arrangement and the related tax risks throughout late 1999, including meetings in mid-October 1999.

96.     In mid-October 1999, upon information and belief, Indianapolis Life and the Consultant Defendants jointly conducted a marketing seminar in Phoenix, Arizona, in order to train Indianapolis Life agents and producers from various states how to market the Pendulum Plan and the Executive VIP and/or PenPro policy used to fund the plan.   Consistent with their prior agreement, upon information and belief, Hartstein and Indianapolis Life instructed the agents and producers to represent that:   (1) this insurance policy was appropriate for use in funding a 412(i) plan; (2) the Pendulum Plan, as funded with this policy, was a qualified 412(i) plan; (3) the premiums paid on this policy were fully tax deductible; and (4) the plan participant could purchase the policy after a few years for its suppressed cash value, but take tax-free loans against the policy.   Hartstein and Indianapolis Life, upon information and belief, did not instruct the agents and producers to disclose any tax risks related to this purported 412(i) arrangement in the marketing process.

97.     Following these meetings in late 1999, Indianapolis Life sought a second opinion from Robert G. Thurlow, a nationally recognized expert in the pension industry.   Mr. Thurlow is a licensed California attorney, as well as the former President of the National Institute of Pension Administrators and the recipient of its Lifetime Achievement Award.   In early December 1999, Mr. Thurlow met with several Indianapolis Life representatives, including Gary Ryan, at the

company's offices in Des Moines, Iowa.  During the meeting, Indianapolis Life provided Mr. Thurlow with materials related to the Pendulum Plan and the Executive VIP and/or PenPro policy used to fund the plan.  Indianapolis Life informed Mr. Thurlow that the Consultant Defendants had prepared many of these materials.

98.     Upon review of these materials, it was "immediately clear" to Mr. Thurlow that the Pendulum Plan and any other 412(i) plan funded with such a policy would not be a qualified plan for several reasons, including that the use of such high premium, high death benefit policies would violate the incidental death benefit rule under federal law.  Thus, in early December 1999, Mr. Thurlow explicitly warned Indianapolis Life that this purported 412(i) arrangement would not be a qualified plan and premiums paid toward the Executive VIP and/or PenPro policy would not be tax deductible.  Mr. Thurlow reiterated many of his concerns to Gary Ryan at Indianapolis Life in late March 2000.

99.     Prior to these discussions with Mr. Thurlow, the IRS had long criticized many of the same features that characterized the Pendulum Plan and the specially designed Indianapolis Life policy, including the springing cash value aspects of this policy.  Over the past twenty years, in fact, the IRS has issued numerous announcements and notices explaining that many of the above-described characteristics of the Pendulum Plan (and similarly abusive 412(i) plans) are contrary to federal tax laws and regulations.

100.    Indianapolis Life was well aware of the multiple IRS announcements and notices regarding these issues.  For example, even Indianapolis Life's own professional advisors admonished Gary Ryan and Leonard Bielski in the late 1990s that certain "considerations . . . should be taken into account prior to the use of the Executive VIP policy in connection with transactions associated with Qualified Plans," including the need to ensure that plan participants

were "aware of the potential income tax effects of a distribution of the Executive VIP policy . . . in light of . . . Notice 89-25."

101.    Indianapolis Life, however, was blinded by the lucrative prospect of reaping enormous premiums and commissions from the sale of its specially designed life insurance policy.  Accordingly, pursuant to their prior agreement, Indianapolis Life and the Consultant Defendants embarked on a nationwide campaign to market and sell the Pendulum Plan and the special Indianapolis Life policy used to fund that plan.

102.    In late 1999, Indianapolis Life invited Hartstein to make a presentation regarding the Pendulum Plan at a national training seminar to be held in early February 2000 for dozens of Indianapolis Life's top agents and producers across the country.  Hartstein accepted the invitation and soon began working with Gary Ryan, Karen Delgado, and others at Indianapolis Life to prepare for this seminar.  During these discussions in late 1999 and early 2000, upon information and belief, Hartstein and the Indianapolis Life representatives re-affirmed their prior agreement that Hartstein would not discuss the various tax risks associated with the Pendulum Plan — including the springing cash value aspects of the insurance policy — during the Indianapolis Life training seminar.

103.    In late January 2000, the Consultant Defendants and the Indianapolis Life representatives exchanged and revised drafts of the training materials to be used at this seminar, including sample marketing documents for the Pendulum Plan and the special Indianapolis Life policy used to fund that plan.  Pursuant to their prior agreement, upon information and belief, the Consultant Defendants and Indianapolis Life ensured that these jointly prepared training materials mentioned nothing about the tax risks associated with the Pendulum Plan or the Executive VIP and/or PenPro policy used to fund that plan.

104.   In early February 2000, dozens of Indianapolis Life's top agents and producers from nearly twenty different states attended the national training seminar in Indianapolis, Indiana.  Many of Indianapolis Life's officers, including Gary Ryan, Karen Delgado, and Jim Cassel, also attended this seminar.   During the seminar, Hartstein delivered a lengthy presentation described in the Indianapolis Life seminar materials as follows:  "The Newest and Hottest Idea Entry for Year 2000:  412(i) Plans—A Retirement Plan that Increases Maximum Deductions Five Times Greater than Traditional Plans."   Hartstein's presentation, upon information and belief, was reviewed and approved by Indianapolis Life.   With Indianapolis Life's blessing, Hartstein discussed, *inter alia*, the following issues during his presentation to Indianapolis Life's top agents and producers:

a.   He told the Indianapolis Life agents and producers to "offer something people want (tax deductions) and "don't sell them something they don't want (life insurance)."

b.   He encouraged the Indianapolis Life agents and producers to work with "The ECI Team," which included the Consultant Defendants, the Bryan Cave Parties, and Indianapolis Life.

c.   He said that other 412(i) plans "combine annuity and life insurance policies to maximize growth and minimize cost," but that the Pendulum Plan "uses a specially designed life insurance policy to maximize deductions and minimize income taxes."

d.   He explained that Indianapolis Life "specially designed" this policy to have "high premiums" and "'suppressed' early cash values" through operation of the hefty surrender charge.   He further explained that these unique features allowed the Indianapolis Life policy to explode in cash value after the fifth policy year in the Pendulum Plan.

e.   He also explained that the Pendulum Plan provided a special way to extract that exploding cash value from the Indianapolis Life policy after the fifth year.   Specifically, Hartstein said that the insured could (1) purchase the policy at its "suppressed" net cash value, which would be only "20% of premiums paid" due to the

high surrender charge; and (2) take "tax free" loans against the policy as it exploded in cash value.

f.   He mentioned nothing to the Indianapolis Life agents and producers about any of the potential tax risks associated with the Pendulum Plan, including the risk that the IRS might deem the Indianapolis Life policy to be a springing cash value policy. Instead, Hartstein assured them that the Pendulum Plan met all "IRC 412(i) requirements," was "IRS approved," and had been blessed by the Bryan Cave Opinion.

g.   He provided the Indianapolis Life agents and producers with sample marketing materials for the Pendulum Plan and the "specially designed" Indianapolis Life policy used to fund the plan.  These marketing materials stated that (1) the plan was "a fully insured qualified plan under Section 412(i) of the Internal Revenue Code"; (2) that the plan "satisfies each of the[] requirements" of Section 412(i); (3) all premiums paid toward the Indianapolis Life policy in the plan "are tax deductible to the business, and non-taxable to the participant"; (4) the participant could "purchase the policy from the plan for its net cash value" after the fifth policy year; and (5) take tax-free loans against the policy as its cash value exploded in the subsequent few years.

105.   Thus, consistent with their prior agreement, Indianapolis Life and the Consultant Defendants sent dozens of Indianapolis Life's top agents and producers out to market the Pendulum Plan, including the specially designed Indianapolis Life policy used to fund the plan, as a risk-free and tax-deductible 412(i) plan without any disclosure whatsoever of the serious tax risks associated with this plan.   Indianapolis Life and the Consultant Defendants jointly conducted other similar training seminars for Indianapolis Life's agents and producers, including a seminar held in September 2001 and/or September 2002 in Dallas, Texas.

106.   Not surprisingly, Indianapolis Life's agents experienced enormous success marketing the Pendulum Plan (as they were instructed to do) as a risk-free qualified 412(i) plan that allowed participants:  (a) to take a tax deduction for the enormous premiums paid toward the

special Indianapolis Life policy; and (b) to achieve a short-term and tax-free extraction of those already tax-deductible dollars within only a few years later.

107.    Emboldened by the immediate success of this campaign, the Consultant Defendants approached other insurance companies about getting involved in this burgeoning niche market.  Many insurance companies studied the issue, recognized the significant tax risks, and declined to get involved at all.  Three companies, however, decided to join the Consultant Defendants and Indianapolis Life in this endeavor:  (a) American General; (b) Pacific Life; and (c) Hartford.  Starting in 2001, the Consultant Defendants worked with American General to develop its own specially designed life insurance policy (the Value Master 5+ policy) to fund the Pendulum Plan.  Jeanmarie Jacoby, one of American General's officers, worked so closely with the Consultant Defendants on this special project that she soon joined ECI as its Director of Marketing.  By 2002, the Consultant Defendants had also convinced Pacific Life and Hartford to create their own specially designed policies (the Flex XII policy and the Stag Whole Life policy, respectively) to fund the Pendulum Plan.[4]

108.    The Consultant Defendants, therefore, functioned as the hub of a separate (but related) conspiracies with each of the Insurance Defendants to market abusive 412(i) plans.  The Consultant Defendants not only designed the Pendulum Plan, but assisted the Insurance Defendants in designing and marketing the special insurance policies needed to fund that plan.  The Consultant Defendants and the Insurance Defendants worked collectively throughout this process, often sharing critical information and assistance.  Despite the critical assistance from the Consultant Defendants, the Insurance Defendants did not market their newly designed policies only in connection with the Pendulum Plan.  Rather, the Insurance Defendants eventually

---

[4] The Non-ILIC Plaintiffs are prepared to plead additional allegations, if necessary, against these other Insurance Defendants, but have not yet been authorized to do so by the Court.

expanded their marketing efforts to include other purported 412(i) plans that operated almost identically to the Pendulum Plan.

109.    Nonetheless, the Consultant Defendants were rewarded handsomely for their substantial and ongoing assistance in this 412(i) marketing campaign.  Specifically, in exchange for presenting the initial concept and then serving as what Hartstein described as the "quarterback" of this national campaign, the Consultant Defendants were paid by the Insurance Defendants as follows:  (a) approximately 20% of the commissions that would normally have been paid to the individual agents selling the underlying insurance policies; and (b) an "override" of approximately 5% of all premiums paid in connection with these purported 412(i) arrangements.

110.    Defendants knew or should have known that the Pendulum Plan and other similar purported 412(i) arrangements would likely be scrutinized by the IRS, be deemed abusive tax avoidance transactions by the IRS, and/or expose those participating in such arrangements to costly IRS audits, including substantial tax liabilities, penalties, and interest.  As an initial matter, Defendants were well aware of the multiple IRS announcements and notices explaining that many of the characteristics of these purported 412(i) arrangements were contrary to federal tax laws and regulations.  More importantly, upon information and belief, the Insurance Defendants received explicit warnings from their professional advisors regarding the tax risks and problems associated with the use of their specially designed life insurance policies in funding 412(i) plans. Indianapolis Life, for example, received such warnings about the Pendulum Plan and the specific insurance policy used to fund that plan during meetings at its corporate headquarters with a nationally recognized expert in the pension industry as early as December 1999.  In addition, as Defendants began marketing the Pendulum Plan and other similar plans, many other experts in

the industry issued position papers and published articles in trade journals warning of the potential tax risks associated with these purported 412(i) plans.

111.    Defendants, however, were blinded by the lucrative prospect of reaping enormous premiums and commissions from the sale of their specially designed insurance policies. Accordingly, Defendants embarked on a nationwide campaign to market and sell such policies for use in funding 412(i) plans, but wholly failed to disclose the substantial risks and problems associated with these arrangements to Plaintiffs.

### C.    DEFENDANTS TARGET PLAINTIFFS AS PART OF THEIR SCHEME

112.    In order to launch their scheme, the Insurance Defendants employed the services of their licensed insurance agents throughout the country.  Upon information and belief, the Insurance Defendants provided their agents with uniform marketing materials that essentially provided a scripted presentation regarding the purported tax benefits of setting up a 412(i) plan and funding that plan with a life insurance policy specially designed by Defendants for such purposes.  As discussed above, the Insurance Defendants, with substantial assistance and participation from the Consultant Defendants, also hosted seminars to train their agents and producers to market these purported 412(i) arrangements.  Agents for the Insurance Defendants then relayed the scripted marketing presentation to individual clients throughout the country, including Plaintiffs.  Because the uniform marketing materials mentioned nothing about the substantial tax risks and problems with these purported 412(i) arrangements, the agents failed to disclose such risks and problems to their clients, including Plaintiffs.

### 1.  Defendant Indianapolis Life's Sale of Abusive 412(i) Plans

### a.  Sale to the Fader Higher Plaintiffs

113.    On or about September 13, 2000, Hartstein, as agent for Indianapolis Life, approached the Fader Higher Plaintiffs, who were represented through a power of attorney by

Glen Hinshaw ("Hinshaw"), at a meeting in Arizona to discuss setting up a 412(i) defined benefit plan funded by an Indianapolis Life insurance policy.  Hartstein proposed that the Fader Higher Plaintiffs establish a defined benefit plan, which would be funded through life insurance policies on the lives of eligible participants purportedly in compliance with Section 412(i) of the Code. Without explaining all the details in the first meeting, Hartstein told Hinshaw that the Fader Higher Plaintiffs would only have to fund the plan for five years to pay the insurance premiums after which Berry could get money out of the plan without paying tax on that money and if Berry waited a full five more years he would get back all or almost all of the money paid in premiums for the insurance without having to pay taxes on that money.  Hartstein informed Hinshaw that a legal opinion (he may or may not have informed Hinshaw at this time that it was from Bryan Cave) had been obtained explaining that what Hartstein had told Hinshaw was lawful.  Hartstein told Hinshaw that by using a 412(i) defined benefit plan the insurance premiums paid to Indianapolis Life for the insurance policy on Berry's life were tax deductible by Fader Higher, whereas if either Fader Higher or Berry bought an insurance policy on Berry's life the premiums would not be deductible.  Hartstein also told Hinshaw that Hartstein and Indianapolis Life had special expertise regarding defined benefit plans, insurance policies, and related federal income tax matters.

114.   On or about March 1, 2001, Hartstein again met with Hinshaw in Arizona to discuss setting up a 412(i) plan funded by an Indianapolis Life insurance policy.  Hartstein provided to Hinshaw a generic contribution schedule not specific to Fader Higher but which had sample numbers.  Hartstein told Hinshaw that the contribution schedule projected contributions to the 412(i) plan for payment of premiums only for five years.  As projected in the contribution schedule, Hartstein told Hinshaw that, at the beginning of the sixth year, Berry could buy from

the defined benefits plan Indianapolis Life's insurance policy on Berry for the exact amount of Indianapolis Life's stated cash value for the policy.  Hartstein emphasized what the contribution schedule stated: that Indianapolis Life's insurance policy for 412(i) plans had a very low cash value after five years – usually about 20% to 25% of the aggregate premiums.  Hartstein explained that by taking advantage of the low cash value at the end of the fifth year through Berry's purchase of the policy out of the 412(i) plan, as shown on the contribution schedule, Berry would not have to pay any additional premiums but could hold the policy for five more years after which it would have a cash value about equal to the total premiums paid at which point Berry could cash in the policy and obtain the entire value of the policy without paying tax on it since he would already own the policy.  Hartstein also told Hinshaw that the contribution schedule showed that the 412(i) plan could be terminated at the beginning of year six and what Berry had paid to buy the insurance policy could be rolled over into an IRA.  Hartstein told Hinshaw that an alternative to Berry purchasing the insurance policy was the plan distributing the insurance policy to Berry and Berry recognizing its low, cash value as taxable income.  In summary, Hartstein's main point that he represented to Hinshaw was that what Indianapolis Life offered an insurance policy that could be used with a 412(i) plan to lawfully distribute from Berry's company money to Berry without having to pay taxes on that money.  Hartstein supported this thrust of his pitch by telling Hinshaw that this entire arrangement was supported by a legal opinion from the international law firm of Bryan Cave LLP that the arrangement was lawful.

115.    On or about June 25, 2001, Hartstein delivered to Hinshaw the Pendulum Plan proposal prepared specifically for Fader Higher, which called for the creation of the Fader Higher, LLC 412(i) Defined Benefit Plan ("Fader Higher DBP").  Hartstein repeated what he had

told Hinshaw in the previous meeting but used the contribution schedule specific to Berry's situation projecting contributions to Fader Higher DBP for payment of premiums only for five years. As projected in the contribution schedule, Hartstein told Hinshaw that at the beginning of the sixth year Berry could buy from the Fader Higher DBP the Indianapolis Life's insurance policy on Berry for the exact amount of Indianapolis Life's stated cash value for the policy (shown as $210,629). Hartstein emphasized what the contribution schedule stated: that Indianapolis Life's insurance policy for 412(i) plans had a very low cash value after five years – about 20% (shown as $210,629) of the aggregate premiums (shown as $1,050,000) for a $3.8 million life insurance policy. Hartstein explained that by taking advantage of the low cash value at the end of the fifth year through Berry's purchase of the policy out of the Fader Higher DBP, as shown on the contribution schedule, Berry would not have to pay any additional premiums but he could hold the policy for five more years after which it would have a cash value about equal to the total premiums paid (shown as $1,066,734) at which point Berry could cash in the policy and obtain the entire value of the policy without paying tax on it since he would already own the policy. Hartstein also told Hinshaw that the contribution schedule showed that the 412(i) plan could be terminated at the beginning of year six and what Berry had paid to buy the insurance policy ($210,629) could be rolled over into an IRA. Hartstein told Hinshaw that an alternative to Berry purchasing the insurance policy was the plan distributing the insurance policy to Berry and Berry recognizing its low, cash value as taxable income. As before, Hartstein focused his presentation to Hinshaw on the fact that what Indianapolis Life offered was an insurance policy that could be used with the Fader Higher DBP to lawfully distribute from Berry's company about $1 million to Berry without having to pay taxes on that money. At either this meeting or the previous meeting, Hartstein provided a copy of the Bryan Cave Opinion to Hinshaw as further

support for his representations regarding the Fader Higher DBP and the insurance policies used to fund it.  Hartstein told Hinshaw that the Bryan Cave opinion supported what Hartstein had told Hinshaw.   At that meeting, Hartstein told Hinshaw that Indianapolis Life had special expertise regarding defined benefit plans, insurance policies, and related federal income tax matters.  Further, he told Hinshaw the following:

a.       That the life insurance policies to be issued by Indianapolis Life were appropriate for use in funding the Fader Higher DBP as a qualified 412(i) plan;

b.       That these policies provided a permissible death benefit under the Fader Higher DBP;

c.       That the premiums to be paid on these policies by Fader Higher qualified as a deduction for federal income tax purposes;

d.       That the Fader Higher DBP, including the insurance policies that would be used to fund it, complied with all federal tax laws and regulations;

e.       That the Fader Higher DBP would be a fully insured qualified plan under Section 412(i) of the Internal Revenue Code;

f.       That the Fader Higher DBP satisfies each of the requirements of Section 412(i);

g.       That contributions to the Fader Higher DBP are tax deductible to the business, and non-taxable to the participant;

h.       That Berry could eventually acquire the policy from the plan for its net cash value;

i.       That Berry could lawfully recover most, if not all, of the already tax-deductible premiums paid toward the policy without paying any taxes on such amounts through the special features built into the insurance policy; and

j.       That the Consultant Defendants had secured a letter opinion of 'more likely than not' from the international firm of Bryan Cave LLP with respect to the viability of this arrangement.

116.    Indianapolis Life's representations to Berry and Fader Higher through Hinshaw were false and fraudulent.  At the time of the representations, what was not lawful to do in a single step transaction without incurring and paying tax liability did not become lawful merely by doing the same thing in a sequence of pre-planned, complex steps to achieve the same result. In 2000 and 2001, it was not lawful for Fader Higher to pay income to Berry without Berry paying tax on that money and merely channeling the money through a series of pre-planned steps involving a 412(i) plan (and hiding the income in unrecognized excess fair market value of the insurance policy) instead of in one step did not make it lawful.  Specifically, Hartstein's representation that this could be done lawfully was false and/or misleading.

117.    Further, as explained above in Section V.B., the representations were false and/or misleading because;

a.    Indianapolis Life's insurance policy was not appropriate for use in funding the Fader Higher DBP as a qualified 412(i) plan in 2000 and 2001 and thereafter;

b.    Indianapolis Life's insurance policy did not provide a death benefit under the Fader Higher DBP that was permissible under Section 412(i) in 2000 and 2001 and thereafter;

c.    The premiums paid on Indianapolis Life's insurance policy by Fader Higher, LLC did not qualify as a deduction for federal income tax purposes in 2000 and 2001 and thereafter;

d.    Fader Higher DBP, including the insurance policy used to fund it, did not comply with all federal tax laws and regulations;

e.    Fader Higher DBP was not a fully insured qualified plan under Section 412(i) of the Internal Revenue Code;

f.    Fader Higher DBP did not satisfy each of the requirements of Section 412(i);

g.    The contributions to the Fader Higher DBP were not tax-deductible to the business, and non-taxable to the participant;

      h.     It was not lawful at the time to pre-plan to terminate the plan after just five years and for Berry to either purchase or receive as distribution the insurance policy for its net cash value.

118.    Further, Indianapolis Life or Hartstein never disclosed to the Hinshaw, Berry, Fader Higher, or Fader Higher DBP any of the following: (a) that the pre-planed series of steps together with the suppressed cash surrender values through the fifth year, the operation of the surrender charge, and the springing cash value, made this an abusive tax shelter; or (b) the IRS had already disallowed an essential component of the plan in several related contexts: using the stated cash surrender value of an insurance policy in a retirement plan where policy reserves represent a much more accurate approximation of the fair market value of the policy; or (c) the risks associated the tax treatment [are there words missing in the prior phrase?] of using Indianapolis Life's insurance policy as a funding mechanism for a 412(i) plan.  Indianapolis Life and Hartstein knew about these matters at each of the meetings, but did not disclose these problems to Hinshaw at any of the meetings and should have disclosed these matters at each and every meeting.  Instead Hartstein made the misrepresentations documented and explained above.

119.    In reliance upon the promises, representations, and omissions by Hartstein and Indianapolis Life, as well as the Bryan Cave Opinion, the Fader Higher Plaintiffs established the Fader Higher DBP, and purchased certain life insurance policies from Indianapolis Life in order to fund the Fader Higher DBP, including a PenPro policy on Berry's life, with the face amount of $3,889,984 (the "Berry Policy"), all as part of the pre-planned steps that Hartstein had represented were lawful.

120.    The Fader Higher Plaintiffs subsequently paid Indianapolis Life more than $200,000 in annual premiums with respect to the Berry Policy.  The total amount of these

premium payments exceeded $1 million over a five-year period.  Fader Higher also recorded federal income tax deductions related to these premiums.

121.    Thereafter the IRS commenced an audit on Berry and Fader Higher, disallowing the tax deductions for the premium payments to Indianapolis Life, and assessed taxes and penalties against the Fader Higher Plaintiffs.

### b.  Sale to the Rocky Mountain Plaintiffs

122.    On or about November 2, 2001, David L. West ("West"), acting as an agent for Indianapolis Life, met with Dr. Young in Utah.  West told Dr. Young that Dr. Young should establish a defined pension benefit plan (which ultimately was the Rocky Mountain Dermatology, Inc. Defined Benefit Plan ["Rocky Mountain Dermatology DBP"]) which would be funded through life insurance policies on the lives of eligible participants.  West told Dr. Young that this complied with Section 412(i) of the Code; was an IRS approved plan that had been used successfully for 12 years; was a conservative, safe, totally acceptable plan by the IRS. West represented to Dr. Young that by using a 412(i) plan the insurance premiums paid to Indianapolis Life for the insurance policy on Dr. Young's life were tax deductible and pointed out that life insurance premiums were not deductible if paid by either Rocky Mountain or Dr. Young.  West told Dr. Young that contributions to Rocky Mountain DBP for payment of premiums would only be needed for five years.  West told Dr. Young that at the beginning of the sixth year there were steps that could be taken so that Dr. Young would own the insurance policy and that Indianapolis Life's low, stated cash value for the policy was important to how that would happen.  West told Dr. Young that after he owned the Indianapolis Life insurance policy the increase in the policy's value would be his tax free.  West told Dr. Young that after Dr. Young owned the insurance policy, Dr. Young could start another 412(i) defined benefits plan

and repeat the process with another insurance policy.  At that meeting, West represented to Dr. Young that Indianapolis Life had special expertise regarding defined benefit plans, insurance policies, and related federal income tax matters.  West told Dr. Young that Indianapolis Life's insurance policy used in a 412(i) plan would provide the following benefits:

<blockquote>

a.    That the life insurance policies to be issued by Indianapolis Life were appropriate for use in funding the Rocky Mountain DBP as a qualified 412(i) plan;

b.    That these policies provided a permissible death benefit under the Rocky Mountain DBP;

c.    That the premiums to be paid on these policies by Rocky Mountain fully qualified as a deduction for federal income tax purposes; and

d.    That the Rocky Mountain DBP, including the insurance policies that would be used to fund it, complied with all federal tax laws and regulations.

</blockquote>

123.    West's representations to Dr. Young were false and fraudulent.  At the time of the representations, what was not lawful to do in a single step transaction without incurring and paying tax liability did not become lawful merely by doing the same thing in a sequence of pre-planned, complex steps to achieve the same result.  In 2000 and 2001, it was not lawful for Rocky Mountain to pay income to Dr. Young without Dr. Young paying tax on that money and merely channeling the money through a series of pre-planned steps involving a 412(i) plan (and hiding the income in unrecognized excess fair market value of the insurance policy) instead of in one step did not make it lawful.  Specifically, West's representation that this could be done lawfully was false and fraudulent.

124.    Further, as explained in Section V.B., the representations were false and/or misleading because;

a.  Indianapolis Life's insurance policy was not appropriate for use in funding the Rocky Mountain DBP as a qualified 412(i) plan in 2001, 2002 and thereafter;

b.  Indianapolis Life's insurance policy did not provide a death benefit under the Rocky Mountain DBP that was permissible under Section 412(i) in 2001, 2002 and thereafter;

c.  The premiums paid on Indianapolis Life's insurance policy by Rocky Mountain Inc. did not fully qualify as a deduction for federal income tax purposes;

d.  Rocky Mountain DBP, including the insurance policies that would be used to fund it, failed to comply with all federal tax laws and regulations;

e.  Rocky Mountain DBP was not a fully insured qualified plan under Section 412(i) of the Internal Revenue Code;

f.  Rocky Mountain DBP did not satisfy each of the requirements of Section 412(i);

g.  The contributions to the Rocky Mountain DBP were not tax-deductible to the business, and non-taxable to the participant;

h.  It was not lawful at the time to pre-plan to terminate the plan after just five years and for Dr. Young to either purchase or receive as distribution the insurance policy for its net cash value.

125.  Indianapolis Life or West never disclosed to the Dr. Young, Rocky Mountain or Rocky Mountain DBP any of the following: (a) that the pre-planed series of steps together with the suppressed cash surrender values through the fifth year, the operation of the surrender charge, and the springing cash value, made this an abusive tax shelter; or (b) the IRS had already disallowed an essential component of the plan in several related contexts: using the stated cash surrender value of an insurance policy in a retirement plan where policy reserves represent a much more accurate approximation of the fair market value of the policy; or (c) the risks

associated the tax treatment of using Indianapolis Life's insurance policy as a funding mechanism for a 412(i) plan. Indianapolis Life and West knew about these matters at each of the meetings, but did not disclose these problems to Dr. Young at any of the meetings and should have disclosed these matters at each and every meeting. Instead West made the misrepresentations documents and explained above.

126. In reliance upon the promises, representations, and omissions from West and Indianapolis Life, Dr. Young established the Rocky Mountain DBP, and caused Rocky Mountain to purchase certain life insurance policies from Indianapolis Life in order to fund the Rocky Mountain DBP, including a PenPro policy on Dr. Young's life, with the face amount of $1,186,957 (the "Young Policy").

127. Rocky Mountain subsequently paid substantial premiums to Indianapolis Life with respect to the Young Policy. Rocky Mountain also recorded federal income tax deductions related to these premiums.

128. Thereafter the IRS commenced an audit on Dr. Young and Rocky Mountain disallowing the tax deductions for the premium payments to Indianapolis, and assessed taxes and penalties and Rocky Mountain lost all premiums it paid to Indianapolis Life.

### c. Sale to the DP Search Plaintiffs

129. On or about June 28, 2001, Daniel R. Lewis ("Lewis"), acting as an agent for Indianapolis Life, approached the Seils in California regarding the establishment of a defined pension benefit plan. (Ultimately, as Lewis proposed, Seils establish the DP Search, Inc. Defined Benefit Plan [the "DP Search DBP"]). Lewis proposed that the 412(i) plan would be lawfully funded for tax purposes pursuant to Section 412(i) by using Indianapolis Life insurance polices on the lives of eligible participants. Lewis gave a general description that DP Search

would only have to fund the defined benefits plan for five years so that it would be able to pay the insurance premiums after which Seils could get money out of the plan without paying tax on that money.

130.    At the June 28, 2001 meeting in California, Lewis provided to Seils a contribution schedule.  Lewis told Seils that the contribution schedule projected contributions to DP Search DBP for payment of premiums only for five years.  As projected in the contribution schedule, Lewis told Seils that at the beginning of the sixth year Seils could buy from the defined benefits plan Indianapolis Life's insurance policy on Seils for the exact amount of Indianapolis Life's stated cash value for the policy.  Lewis emphasized what the contribution schedule stated that Indianapolis Life's insurance policy for 412(i) plans had a very low cash value after five years – only about 25% ($78,929) of the aggregate premiums paid by then ($337,515).  Lewis explained that by taking advantage of the low cash value at the end of the fifth year by Seils purchasing the policy out of the 412(i) plan, as shown on the contribution schedule, Seils would not have to pay any additional premiums but he could hold the policy for five more years after which it would have a cash value about equal to the total premiums paid ($311,692) at which point Seils could cash in the policy and obtain the entire value of the policy without paying tax on it since he would already own the policy.  Lewis also told Seils that the contribution schedule showed that the 412(i) plan could be terminated at the beginning of year six and what Seils had paid to buy the insurance policy ($78,929) could be rolled over into an IRA.  Lewis told Seils that an alternative to Seils purchasing the insurance policy was the plan distributing the insurance policy to Seils and Seils recognizing its low, cash value as taxable income.  In summary, Lewis represented to Seils that what Indianapolis Life offered was an insurance policy that could be used with a 412(i) plan to lawfully distribute from Seils' company more than $300,000 to Seils

without having to pay taxes on that money.  In addition, according to Lewis and the contribution schedule, at the end of the series of steps Seils would also have an IRA worth approximately $100,000.

131.    Also at the June 28, 2001 meeting in California, Lewis gave Seils the Bryan Cave opinion and an American Express related company's actuarial opinion and told Seils that these experts were assuring him that what Lewis explained to Seils was a lawful way to avoid tax liability and take deductions.  As part of Lewis' explanation, he represented to Seils that by using a 412(i) plan the insurance premiums paid to Indianapolis Life for the insurance policy on Seils' life were tax deductible and pointed out that life insurance premiums were not deductible if paid by either DP Search or Seils.  At that meeting, Lewis told Seils that Indianapolis Life had special expertise regarding defined benefit plans, insurance policies, and related federal income tax matters.

132.    On or about August 1, 2001, Lewis met again with Seils in California and reviewed the same material and made the same representations.  Lewis again told Seils –:

a.     That life insurance policies to be issued by Indianapolis Life were appropriate for use in funding the DP Search DBP as a qualified 412(i) plan;

b.     That these policies provided a permissible death benefit under the DP Search DBP;

c.     That the premiums to be paid on these policies by DP Search qualified as a deduction for federal income tax purposes;

d.     That the DP Search DBP, including the insurance policies that would be used to fund it, complied with all federal tax laws and regulations;

e.     That the DP Search DBP would be a fully insured qualified plan under Section 412(i) of the Internal Revenue Code;

> f.  That the DP Search DBP satisfies each of the requirements of Section 412(i);
>
> g.  That contributions to the DP Search DBP are tax-deductible to the business, and non-taxable to the participant;
>
> h.  That after five years Seils could purchase the policy from the plan for its net cash value or distribute the policy to Seils and Seils would report the policy's net cash value as the taxable income.

133.   On or about November 14, 2001, November 30, 2001 and February 6, 2002, there were more perfunctory meetings at which paperwork was processed and Lewis gave continued assurances that the plan was legitimate and reiterated the statements made earlier reported above.

134.   Indianapolis Life's representations to Seils through Lewis were false and fraudulent.   At the time of the representations, what was not lawful to do in a single step transaction without incurring and paying tax liability did not become lawful merely by doing the same thing in a sequence of pre-planned, complex steps to achieve the same result.   In 2000 and 2001, it was not lawful for DP Search to pay income to Seils without Seils paying tax on that money and merely channeling the money through a series of pre-planned steps involving a 412(i) plan (and hiding the income in unrecognized excess fair market value of the insurance policy) instead of in one step did not make it lawful.   Specifically, Lewis's representation that this could be done lawfully was false and fraudulent.

135.   Further, as explained in Section V.B., the representations were false and/or misleading because;

> a.  Indianapolis Life's insurance policy was not appropriate for use in funding the DP Search DBP as a qualified 412(i) plan;
>
> b.  Indianapolis Life's insurance policy did not provide a death benefit under the DP Search DBP permissible under Section 412(i) in 2000, 2001 and thereafter;

c.      The premiums paid on Indianapolis Life's insurance policy by DP Search did not qualify as a deduction for federal income tax purposes in 2000, 2001 and thereafter;

d.      DP Search DBP, including the insurance policies that would be used to fund it, did not comply with all federal tax laws and regulations in 2000, 2001 and thereafter;

e.      DP Search DBP was never a fully insured qualified plan under Section 412(i) of the Internal Revenue Code in 2000, 2001 and thereafter;

f.      DP Search DBP failed to ever satisfy each of the requirements of Section 412(i);

g.      Contributions to the DP Search DBP were not tax-deductible to the business, and non-taxable to the participant;

h.      It was not lawful to pre-plan and use a "retirement" plan as a mere five-year tax vehicle so that Seils could purchase the policy from the plan for its net cash value or distribute the policy to Seils and for Seils to do so treating the plan as qualifying under Section 412(i) or expect to treat his gain from the insurance policy as tax free paid for with tax deductible dollars.

136.    Indianapolis Life or Lewis never disclosed to the Seils, DP Search or DP Search DBP any of the following: (a) that the pre-planed series of steps together with the suppressed cash surrender values through the fifth year, the operation of the surrender charge, and the springing cash value, made this an abusive tax shelter; or (b) the IRS had already disallowed an essential component of the plan in several related contexts: using the stated cash surrender value of an insurance policy in a retirement plan where policy reserves represent a much more accurate approximation of the fair market value of the policy; or (c) the risks associated the tax treatment of using Indianapolis Life's insurance policy as a funding mechanism for a 412(i) plan. Indianapolis Life and Lewis knew about these matters at each of the meetings, but did not disclose these problems to Seils at any of the meetings and should have disclosed these matters at

each and every meeting.  Instead Lewis made the misrepresentations documents and explained above.

137.   In reliance upon such promises, representations, and omissions by Lewis and Indianapolis Life, as well as the Bryan Cave Opinion, the Seils established the DP Search DBP, and caused DP Search to purchase certain life insurance policies from Indianapolis Life in order to fund the DP Search DBP, including a PenPro policy on Seils' life, with the face amount of $384,315 (the "Seils Policy").

138.   Thereafter, Seils caused DP Search to pay Indianapolis Life approximately $372,000 in premiums with respect to the Seils Policy.  DP Search also recorded federal income tax deductions related to these premiums.

139.   Thereafter the IRS commenced an audit on Seils and DP Search disallowing DP Search's deductions for the Indianapolis Life premiums and assessing penalties and interest together with back taxes owed.  In addition, Seils has incurred professional fees to unwind the corporate and tax problems created by this 412(i) plan and Indianapolis Life's insurance product. At the present, the damages exceed one hundred thousand dollars.

### d.  Sale to the AUI Plaintiffs

140.   On or about August 7, 2002, Kevin Dermody ("Dermody") who was an authorized agent of Indianapolis Life met with Hallman in Illinois.  Dermody told Hallman that even though he had a 401k in place, if the 412(i) was initiated it had to be 100% funded through life insurance to be able to put the maximum amount of money in the plan.  Dermody generally described to Hallman that Hallman should establish a 412(i) plan (ultimately the Accessibility Unlimited, Inc. Defined Benefit Plan ["AUI DBP"]), which would be funded through life

insurance policies on the lives of eligible participants which Dermody represented would comply with Section 412(i).

141.   On or about August 12, 2002, Gary Thornhill ("Thornhill")  who was an authorized agent of Indianapolis Life called Hallman on the phone in which Dermody participated to discuss general aspects of Section 412(i) and a sample plan.  Hallman was in Illinois and he assumes that Thornhill was either in New York or California and that Dermody was in Illinois.  Thornhill proposed that the 412(i) plan would be lawfully funded for tax purposes pursuant to Section 412(i) by using Indianapolis Life insurance polices on the lives of eligible participants.  Thornhill gave a general description that AUI would only have to fund the defined benefits plan for five years so that it would be able to pay the insurance premiums after which Hallman could get money out of the plan without paying tax on that money.  Thornhill told Hallman that he must purchase the insurance policy in the sixth year and then close this plan but then he could start another plan and purchase another insurance policy if he wanted to do so. Thornhill assured Hallman that an international law firm had given an opinion stating that what Thornhill told Hallman about the tax aspects of the insurance and 412(i) plan were accurate.  As part of Thornhill's explanation, he represented to Hallman that by using a 412(i) plan the insurance premiums paid to Indianapolis Life for the insurance policy on Hallman' life were tax deductible and pointed out that life insurance premiums were not deductible if paid by either AUI or Hallman.  During that phone conversation, Thornhill represented to Hallman that Indianapolis Life had special expertise regarding defined benefit plans, insurance policies, and related federal income tax matters.  Thornhill told Hallman that Indianapolis Life's insurance policy was better for the 412(i) plan than Pacific Life's insurance policy.

142.    On or about August 19, 2002 Dermody again met with Hallman in Illinois. Dermody again discussed generally the benefits of a 412(i) for Hallman.  Dermody again mentioned the insurance funding and tax aspects of the 412(i) plan.

143.    During August 2002 in Illinois, Gary Thornhill had delivered to Hallman in Illinois a Pendulum Plan Proposal for AUI DBP showing a 5 year plan with a sixth year buy-out together with a Bryan Cave legal opinion.

144.    On or about September 10, 2002, Dermody again met with Hallman in Illinois and during that meeting they called Thornhill whom Hallman presumes to have been in California or New York.  The purpose of all three meeting was to discuss the proposed plan for Hallman.  Thornhill and Dermody told Hallman that the contribution schedule projected that AUI would fund AUI DBP for payment of premiums only for five years.  As shown in the contribution schedule for the Pendulum plan for the Hallmans, Thornhill and Dermody told Hallman that at the beginning of the sixth year Hallman and his wife must buy from the defined benefits plan Indianapolis Life's insurance policies on them for the exact amount of Indianapolis Life's stated cash value for the policy.  Thornhill and Dermody emphasized what the contribution schedule stated: that Indianapolis Life's insurance policy for 412(i) plans had a very low cash value after five years – only about 20% ($301,587) of the aggregate premiums paid by then ($1,503,010).  Thornhill and Dermody explained that by taking advantage of the low cash value at the end of the fifth year by Hallman purchasing the policy out of the 412(i) plan, as shown on the contribution schedule, Hallman would not have to pay any additional premiums but he could hold the policy for five more years after which it would have a cash value about equal to the total premiums paid ($1,533,608) at which point Hallman could cash in the policy and obtain the entire value of the policy without paying tax on it since he would already own the

policy.  Thornhill and Dermody also told Hallman that the contribution schedule showed that the 412(i) plan could be terminated at the beginning of year six and what Hallman had paid to buy the insurance policy ($301,587) could be rolled over into an IRA.  Thornhill and Dermody told Hallman that an alternative to Hallman purchasing the insurance policy was the plan distributing the insurance policy to Hallman and Hallman recognizing its low, cash value as taxable income. In summary, Thornhill and Dermody represented to Hallman that what Indianapolis Life offered was an insurance policy that could be used with a 412(i) plan to lawfully distribute from Hallman's company more than $1.5 million to Hallman and his wife without having to pay taxes on that money.  In addition, according to Thornhill and Dermody and the contribution schedule, at the end of the series of steps Hallman would also have an IRA worth approximately $400,000. Thornhill and Dermody further represented to Hallman that they had obtained a letter opinion of 'more likely than not' from the international firm of Bryan Cave LLP that the arrangement was lawful.

145.    On or about October 11, 2002, Dermody again met with Hallman in Illinois regarding 412(i).  Dermody reviewed and repeated many of the representations he had made as explained above because Hallman was having trouble with so much paid in premiums in five years but then at the end of the fifth year and start of the sixth year the policy's cash value was only $301,587.

146.    On or about October 21, 2002 – within a week before or after this date – Thornhill met with Hallman in Illinois.  Thornhill reviewed and repeated many of the representations he had made as explained above.  Thornhill told Hallman that the 412(i) plan funded with Indianapolis Life's insurance policies on his and his wife's life would provide the following benefits:

a.  That the premiums to be paid on these policies by AUI qualified as a deduction for federal income tax purposes;

b.  That the AUI DBP, including the insurance policies that would be used to fund it, complied with all federal tax laws and regulations;

c.  That the AUI DBP would be a fully insured qualified plan under Section 412(i) of the Internal Revenue Code;

d.  That the AUI DBP satisfies each of the requirements of Section 412(i);

e.  That contributions to the AUI DBP are tax-deductible to the business, and non-taxable to the participant;

f.  That the Hallmans could eventually purchase the policy from the plan for its net cash value and report the policy's net cash value as the taxable income;

g.  That they had secured a letter opinion of 'more likely than not' from the international firm of Bryan Cave LLP with respect to the viability of this arrangement;

h.  That if Hallman wanted to do so after buying the first policy and terminating the first plan he could open another 412(i) plan and purchase another insurance policy.

147.   Indianapolis Life's representations to Hallman were false and fraudulent.  At the time of the representations, what was not lawful to do in a single step transaction without incurring and paying tax liability did not become lawful merely by doing the same thing in a sequence of pre-planned, complex steps to achieve the same result.  In 2000 and 2001, it was not lawful for AUI to pay income to Hallman without Hallman paying tax on that money and merely channeling the money through a series of pre-planned steps involving a 412(i) plan (and hiding the income in unrecognized excess fair market value of the insurance policy) instead of in one step did not make it lawful.  Specifically, Thornhill's and Dermody's representation that this could be done lawfully was false and fraudulent.

148.    Further, as explained in Section V.B., the representations were false and/or misleading because;

a.    The premiums paid on Indianapolis Life's insurance policy by AUI did not qualify as a deduction for federal income tax purposes in 2000 and thereafter;

b.    AUI DBP, including the insurance policies that would be used to fund it, failed to comply with all federal tax laws and regulations in 2000 and thereafter;

c.    AUI DBP was not a fully insured qualified plan under Section 412(i) of the Internal Revenue Code at any time including from 2002 and thereafter;

d.    AUI DBP fails to satisfy the requirements of Section 412(i);

e.    The contributions to AUI DBP were not tax-deductible to the business, and non-taxable to the participant from 2002 and thereafter;

f.    It was never lawful for the Hallmans to use a pre-planned series of steps to purchase the policy from the plan for its net cash value and report the policy's net cash value as the taxable income;

g.    That they had secured a letter opinion of 'more likely than not' from the international firm of Bryan Cave LLP with respect to the viability of this arrangement;

h.    That if Hallman wanted to do so after buying the first policy and terminating the first plan he could open another 412(i) plan and purchase another insurance policy.

149.    Indianapolis Life or Thornhill and Dermody never disclosed to the Hallman, AUI or AUI DBP any of the following: (a) that the pre-planed series of steps together with the suppressed cash surrender values through the fifth year, the operation of the surrender charge, and the springing cash value, made this an abusive tax shelter; or (b) the IRS had already disallowed an essential component of the plan in several related contexts: using the stated cash surrender value of an insurance policy in a retirement plan where policy reserves represent a much more accurate approximation of the fair market value of the policy; or (c) the risks

associated the tax treatment of using Indianapolis Life's insurance policy as a funding mechanism for a 412(i) plan.  Indianapolis Life and Thornhill and Dermody knew about these matters at each of the meetings, but did not disclose these problems to Hallman at any of the meetings and should have disclosed these matters at each and every meeting.  Instead Thornhill and Dermody made the misrepresentations documents and explained above.

150.    In reliance upon such promises, representations, and omissions by Thornhill, Dermody, and Indianapolis Life, as well as the Bryan Cave Opinion, the Hallman established the AUI DBP, and purchased certain life insurance policies from Indianapolis Life in order to fund the AUI DBP, including PenPro policies on the lives of David Hallman and Lynn Hallman, with the face amount of approximately $3.7 million each (the "Hallman Policies").

151.    The AUI DBP subsequently paid Indianapolis Life more than $600,000 in premiums with respect to the Hallman Policies. AUI also recorded federal income tax deductions related to these premiums.

152.    Thereafter the IRS commenced an audit on Hallman and AUI disallowing AUI's contributions to it and assessed penalties to Hallman and AUI  Hallman and Accessibility Unlimited paid all taxes and penalties and lost all $600,000 paid to Indianapolis Life.

### e.  Sale to the Sarmiento Plaintiffs

153.    On or about August 1, 2002 — which could have been as early as June 1st —  at the corporate offices of Diablo Funding Group in San Ramon, California, Martin Smith ("Smith"), acting as an agent for Indianapolis Life, met with Richard and Leilani Sarmiento ("Sarmientos") and generally described what he could do for the Sarmientos.   Smith recommended the Sarmientos create a 412(i) plan which they ultimately did called Richard and Leilani Sarmiento, a Sole Proprietorship Defined Benefit Plan (the "Sarmiento DBP").   Smith

described how the 412(i) plan would be lawfully funded for tax purposes pursuant to Section 412(i) by using Indianapolis Life insurance polices on the lives of the Sarmientos. Smith gave a general description that the Sarmientos would only have to fund the defined benefits plan for five years so that it would be able to pay the insurance premiums after which the Sarmientos could get money out of the plan without paying tax on that money.

154.    On or about September 10, 2002 — which could have been a week or so before or after that date — in California, Smith acting as an agent for Indianapolis Life, met with the Sarmientos again and generally reviewed the advantages of a 412(i) plan funded by insurance. Smith again described how the 412(i) plan would be lawfully funded for tax purposes pursuant to Section 412(i) by using Indianapolis Life insurance polices on the lives of Sarmiento. Smith gave a general description that the Sarmientos would only have to fund the defined benefits plan for five years so that it would be able to pay the insurance premiums after which the Sarmientos could get money out of the plan without paying tax on that money.

155.    On or about November 21, 2002 — which could have been a week on or after that date – Smith again met with the Sarmientos in California. Smith provided to the Sarmientos a contribution schedule. Smith told the Sarmientos that the contribution schedule projected their contributions to Sarmiento DBP for payment of premiums only for five years. As projected in the contribution schedule, Smith told the Sarmientos that at the beginning of the sixth year the Sarmientos could buy from the defined benefits plan Indianapolis Life's insurance policy for the exact amount of Indianapolis Life's stated cash value for the policies. Smith emphasized what the contribution schedule stated that Indianapolis Life's insurance policies for the 412(i) plans had a very low cash value after five years – only about 20% ($97,366) of the aggregate premiums paid by then ($504,050). Smith explained that by taking advantage of the low cash

value at the end of the fifth year by the Sarmientos purchasing the policy out of the 412(i) plan, as shown on the contribution schedule, the Sarmientos would not have to pay any additional premiums but they could hold the policies for five more years after which it would have a cash value about equal to the total premiums paid ($499,646) at which point the Sarmientos could cash in the policies and obtain the entire value of the policy without paying tax on it since they would already own the policies.  Smith also told the Sarmientos that the contribution schedule showed that the 412(i) plan could be terminated at the beginning of year six and what the Sarmientos had paid to buy the insurance policies ($97,366) could be rolled over into an IRA. Smith told the Sarmientos that an alternative to the Sarmientos purchasing the insurance policy was the plan distributing the insurance policy to the Sarmientos and the Sarmientos recognizing its low, cash value as taxable income.  In summary, Smith represented to the Sarmientos that what Indianapolis Life offered was an insurance policy that could be used with a 412(i) plan to lawfully distribute from the Sarmientos' business more than $500,000 to the Sarmientos without having to pay taxes on that money.  In addition, according to Smith and the contribution schedule, at the end of the series of steps the Sarmientos would also have an IRA worth approximately $140,000.

156.    During the November 21st meeting, Smith used this diagram depicting the pre-planned, early termination as part of his explanation that the Sarmientos should plan to early terminate after the fifth year of the plan:



The contribution projection, however, only projected numbers for a rollover into an IRA.

157.   During the November 21st meeting in California, Smith also told the Sarmientos that Indianapolis Life had special expertise regarding defined benefit plans funded by insurance policies, and related federal income tax matters.  In addition, Smith also told the Sarmientos:

a.   That life insurance policies to be issued by Indianapolis Life were appropriate for use in funding the Sarmiento DBP as a qualified 412(i) plan;

b.   That these policies provided a permissible death benefit under the Sarmiento DBP;

c.   That the premiums to be paid on these policies by the Sarmiento Plaintiffs qualified as a deduction for federal income tax purposes;

d.   That the Sarmiento DBP, including the insurance policies that would be used to fund it, complied with all federal tax laws and regulations;

e.   That the Sarmiento DBP would be a fully insured qualified plan under Section 412(i) of the Internal Revenue Code;

f.   That the Sarmiento DBP satisfies each of the requirements of Section 412(i);

g.    That contributions to the Sarmiento DBP are tax-deductible to the business, and non-taxable to the participant;

h.    That the Sarmiento Plaintiffs could eventually purchase the policy from the plan for its net cash value and report the policy's net cash value as the taxable income; and

i.    That the Consultant Defendants had secured a letter opinion of 'more likely than not' from the international firm of Bryan Cave LLP with respect to the viability of this arrangement.

158.   Indianapolis Life's representations to the Sarmientos through Smith were false and fraudulent.  At the time of the representations, what was not lawful to do in a single step transaction without incurring and paying tax liability did not become lawful merely by doing the same thing in a sequence of pre-planned, complex steps to achieve the same result.  In 2000 and 2001, it was not lawful for the Sarmientos to avoid recognizing income by taking a deduction without the Sarmientos paying tax on that money when received personally and merely channeling the money through a series of pre-planned steps involving a 412(i) plan (and hiding the income in unrecognized excess fair market value of the insurance policy) instead of in one step did not make it lawful.  Specifically, Smith's representation that this could be done lawfully was false and fraudulent.

159.   Further, as explained in Section V.B., the representations were false and/or misleading because;

a.    Indianapolis Life's insurance policy was not appropriate for use in funding the Sarmiento DBP as a qualified 412(i) plan in 2002 or thereafter;

b.    Indianapolis Life's insurance policy did not provide a death benefit under the Sarmiento DBP that was permissible under Section 412(i) in 2002 and thereafter;

c.    The premiums that the Sarmientos paid on Indianapolis Life's insurance policy was not qualified as a deduction for federal income tax purposes in 2002 and thereafter;

      d.      Sarmiento DBP, including the insurance policies that would be used to fund it, failed to comply with all federal tax laws and regulations in 2002 and thereafter;

      e.      Sarmiento DBP was not ever a fully insured qualified plan under Section 412(i) of the Internal Revenue Code in 2002 and thereafter;

      f.      Sarmiento DBP did not satisfies each of the requirements of Section 412(i) in 2002 and thereafter;

      g.      The contributions to the Sarmiento DBP were not tax-deductible to the business, and non-taxable to the participant in 2002 and thereafter; and

      h.      It was not lawful in 2002 and thereafter for the Sarmientos to pre-plan to purchase Indianapolis Life's insurance policy from the plan for its net cash value and to terminate the plan and thereby avoid income tax.

160.    Indianapolis Life or Smith never disclosed to the Sarmientos any of the following: (a) that the pre-planed series of steps together with the suppressed cash surrender values through the fifth year, the operation of the surrender charge, and the springing cash value, made this an abusive tax shelter; or (b) the IRS had already disallowed an essential component of the plan: using the stated cash surrender value of an insurance policy in a retirement plan where policy reserves represent a much more accurate approximation of the fair market value of the policy; or (c) the risks associated the tax treatment of using Indianapolis Life's insurance policy as a funding mechanism for a 412(i) plan.  Indianapolis Life and Smith knew about these matters at each of the meetings, but did not disclose these problems to the Sarmientos at any of the meetings and should have disclosed these matters at each and every meeting.  Instead Smith made the misrepresentations documents and explained above.

161.    In reliance upon the representations and omissions by Smith and Indianapolis Life, as well as the Bryan Cave Opinion, the Sarmientos established the Sarmiento DBP, and

purchased a Vista PenPro life insurance policy from Indianapolis Life in order to fund the Sarmiento DBP, with the face amount of approximately $3.5 million (the Sarmiento Policies).

162.    The Sarmientos subsequently paid Indianapolis Life approximately $500,000 in premiums with respect to the Sarmiento Policies. The Sarmiento Policies also recorded federal income tax deductions related to these premiums.

163.    Subsequently, the Sarmientos have been audited by the IRS, the deductions for the Sarmiento Policies have been disallowed and the IRS is seeking to impose penalties but the Sarmientos have requested reduction or relief from the penalties based primarily on hardship.

### 2.   Defendant Hartford's Sale of Abusive 412(i) Plans

#### a.   Sale to the MacMillan Plaintiffs

164.    On or about June 19, 2003, Duane A. Allen ("Allen") and Kelli Stiles ("Stiles"), acting as agents for Hartford, approached the MacMillan Plaintiffs regarding the establishment of a defined pension benefit plan. More specifically, Allen and Stiles proposed that the MacMillan Plaintiffs establish the MacMillan Construction Company, Inc. Defined Benefit Pension Plan ("MacMillan Construction DBP"), which would be funded through life insurance policies on the lives of eligible participants purportedly in compliance with Section 412(i) of the Code. Allen and Stiles also participated in a series of follow-up discussions with the MacMillan Plaintiffs regarding these issues throughout late 2003, including discussions on or about September 12, 2003; October 9, 2003; and December 8, 2003.

165.    During these discussions, Allen and Stiles promoted to the MacMillan Plaintiffs certain amounts and types of insurance that would be required to fund the MacMillan Construction DBP. To that end, Allen and Stiles recommended that the MacMillan Construction DBP be funded with specific life insurance policies issued by Hartford.

166.     Allen and Stiles promised and represented to the MacMillan Plaintiffs that such a plan would provide the following benefits:  (a) certain retirement benefits to MacMillan and MacMillan Construction's employees and their beneficiaries, and (b) federal income tax deductions for MacMillan Construction related to its insurance premiums paid to Hartford in connection with the MacMillan Construction DBP.  Allen and Stiles also represented to the MacMillan Plaintiffs that Allen and Hartford had special expertise regarding defined benefit plans, insurance policies, and related federal income tax matters.

167.     In addition, Allen and Stiles made, *inter alia*, the following oral and/or written representations to the MacMillan Plaintiffs during the above-referenced discussions:

    a.    That the life insurance policies to be issued by Hartford were appropriate for use in funding the MacMillan Construction DBP as a qualified 412(i) plan;

    b.    That these policies provided a permissible death benefit under the MacMillan Construction DBP;

    c.    That the premiums to be paid on these policies by MacMillan Construction qualified as a deduction for federal income tax purposes; and

    d.    That the MacMillan Construction DBP, including the insurance policies that would be used to fund it, complied with all federal tax laws and regulations.

168.     At no time did Allen, Stiles, or Hartford ever disclose to the MacMillan Plaintiffs any of the following:  (a) the risks associated with this type of investment activity; (b) the potentially abusive nature of the program (including operation of the surrender charge); or (c) the IRS refusal to recognize the purported tax benefits of this kind of program.  Allen, Stiles, and Hartford knew about, but did not disclose, these problems to the MacMillan Plaintiffs.  Instead, Allen and Stiles promised the MacMillan Plaintiffs that they would receive large, tax-free returns from this arrangement.

169.     In reliance upon such promises and representations from Allen, Stiles, and Hartford, the MacMillan Plaintiffs established the MacMillan Construction DBP, and purchased certain life insurance policies from Hartford in order to fund the MacMillan Construction DBP, including a Stag Whole Life policy on MacMillan's life, with the face amount of $2,569,382 (the "MacMillan Policy").

170.     The MacMillan Plaintiffs subsequently paid approximately $885,000 in premiums to Hartford with respect to these insurance policies.  MacMillan Construction also recorded federal income tax deductions related to these premiums.

171.     Hartford marketed and sold life insurance policies that are apparently not appropriate or legally permissible for MacMillan Construction DBP as a 412(i) plan.  For example, the MacMillan Policy appears to have an excessively high surrender charge and springing cash value component that characterize an abusive 412(i) plan.  Upon information and belief, Hartford acted knowingly in marketing and selling such inappropriate or impermissible policies.

**b.  Sale to the Poulsbo Children's Dentistry Plaintiffs**

172.     In September 2002, Alvin McGill ("McGill") and Tom Edwards ("Edwards"), acting as agents for Hartford, approached the Poulsbo Children's Dentistry Plaintiffs regarding the establishment of a defined pension benefit plan.  More specifically, McGill and Edwards proposed that the Poulsbo Children's Dentistry Plaintiffs establish the Poulsbo Children's Dentistry Defined Benefit Pension Plan ("Poulsbo DBP"), which would be funded through life insurance policies on the lives of eligible participants purportedly in compliance with Section 412(i) of the Code.  McGill and Edwards also participated in a series of follow-up discussions with the Poulsbo Children's Dentistry Plaintiffs regarding these issues in late 2002 and early

2003, including discussions in October 2002; November 2002; and April 9, 2003, April 23, 2003; May 2003.

173.    McGill and Edwards promoted to the Poulsbo Children's Dentistry Plaintiffs certain amounts and types of insurance that would be required to fund the Poulsbo DBP.  To that end, McGill and Edwards recommended that the Poulsbo DBP be funded with specific life insurance policies issued by Hartford.

174.    McGill and Edwards promised and represented to the Poulsbo Children's Dentistry Plaintiffs that such a plan would provide the following benefits:  (a) certain retirement benefits to Dr. Brown and Poulsbo Children's Dentistry's employees and their beneficiaries, and (b) federal income tax deductions for Poulsbo Children's Dentistry related to its insurance premiums paid to Hartford in connection with the Poulsbo DBP.  McGill and Edwards also represented to the Poulsbo Children's Dentistry Plaintiffs that Hartford had special expertise regarding defined benefit plans, insurance policies, and related federal income tax matters.

175.    In addition, McGill and Edwards made, *inter alia*, the following oral and/or written representations to the Poulsbo Children's Dentistry Plaintiffs during the above-referenced discussions:

    a.    That the life insurance policies to be issued by Hartford were appropriate for use in funding the Poulsbo DBP as a qualified 412(i) plan;

    b.    That these policies provided a permissible death benefit under the Poulsbo DBP;

    c.    That the premiums to be paid on these policies by Poulsbo Children's Dentistry qualified as a deduction for federal income tax purposes; and

    d.    That the Poulsbo DBP, including the insurance policies that would be used to fund it, complied with all federal tax laws and regulations.

176.     At no time did Hartford, McGill, or Edwards ever disclose to the Poulsbo Children's Dentistry Plaintiffs any of the following:  (a) the risks associated with this type of investment activity; (b) the potentially abusive nature of the program (including operation of the surrender charge); or (c) the IRS refusal to recognize the purported tax benefits of this kind of program.  Hartford knew about, but did not disclose, these problems to the Poulsbo Children's Dentistry Plaintiffs.  Instead, Hartford, McGill, and Edwards promised the Poulsbo Children's Dentistry Plaintiffs that they would receive large, tax-free returns from this arrangement.

177.     In reliance upon such promises and representations from Hartford, McGill, and Edwards, the Poulsbo Children's Dentistry Plaintiffs established the Poulsbo DBP, and purchased certain life insurance policies from Hartford in order to fund the Poulsbo DBP, including a Stag Whole Life policy on Dr. Brown's life, with the face amount of $1,307,012 (the "Brown Policy").

178.     The Poulsbo Children's Dentistry Plaintiffs subsequently paid substantial premiums to Hartford with respect to these insurance policies.  Poulsbo Children's Dentistry also recorded federal income tax deductions related to these premiums.

179.     Hartford, McGill, and Edwards marketed and sold life insurance policies that are apparently not appropriate or legally permissible for Poulsbo DBP as a 412(i) plan.  For example, the Brown Policy appears to have an excessively high surrender charge and springing cash value component that characterize an abusive 412(i) plan.  Upon information and belief, Hartford acted knowingly in marketing and selling such inappropriate or impermissible policies.

### c.  Sale to the PHR Plaintiffs

180.     Beginning in May and/or June 2003, Kenneth Scoop ("Scoop") and Gary Thornhill ("Thornhill"), acting as agents for Hartford and/or Hartford Financial, approached the

PHR Plaintiffs regarding the establishment of a defined pension benefit plan. More specifically, Scoop and Thornhill proposed that the PHR Plaintiffs establish the Pacific Home Remodeling Defined Benefit Pension Plan ("PHR DBP"), which would be funded through life insurance policies on the lives of eligible participants purportedly in compliance with Section 412(i) of the Code. Scoop and Thornhill also participated in a series of follow-up discussions with the PHR Plaintiffs regarding these issues throughout 2003, including discussions on or about July 1, 2003.

181. During these discussions, Scoop and Thornhill promoted to the PHR Plaintiffs certain amounts and types of insurance that would be required to fund the PHR DBP. To that end, Scoop and Thornhill recommended that the PHR DBP be funded with specific life insurance policies issued by Hartford and/or Hartford Financial.

182. Scoop and Thornhill promised and represented to the PHR Plaintiffs that such a plan would provide the following benefits: (a) certain retirement benefits to Hakimi, Maor, and PHR's employees and their beneficiaries, and (b) federal income tax deductions for PHR related to its insurance premiums paid to Hartford and/or Hartford Financial in connection with the PHR DBP. Scoop and Thornhill also represented to the PHR Plaintiffs that Scoop, Thornhill, and Hartford Financial had special expertise regarding defined benefit plans, insurance policies, and related federal income tax matters.

183. In addition, Scoop and Thornhill made, *inter alia*, the following oral and/or written representations to the PHR Plaintiffs during the above-referenced discussions:

  a.    That the life insurance policies to be issued by Hartford and/or Hartford Financial were appropriate for use in funding the PHR DBP as a qualified 412(i) plan;

  b.    That these policies provided a permissible death benefit under the PHR DBP;

      c.      That the premiums to be paid on these policies by PHR qualified as a deduction for federal income tax purposes;

      d.      That the PHR DBP, including the insurance policies that would be used to fund it, complied with all federal tax laws and regulations;

184.    At no time did Scoop, Thornill, Hartford, or Hartford Financial ever disclose to the PHR Plaintiffs any of the following:  (a) the risks associated with this type of investment activity; (b) the potentially abusive nature of the program (including operation of the surrender charge); or (c) the IRS refusal to recognize the purported tax benefits of this kind of program. Scoop, Thornhill, Hartford, and Hartford Financial knew about, but did not disclose, these problems to the PHR Plaintiffs.  Instead, Scoop and Thornhill promised the PHR Plaintiffs that they would receive large, tax-free returns from this arrangement.

185.    In reliance upon such promises and representations from Scoop, Thornhill, Hartford, and/or Hartford Financial, the PHR Plaintiffs established the PHR DBP, and purchased certain life insurance policies from Hartford and/or Hartford Financial in order to fund the PHR DBP, including Stag Whole Life policies on the lives of Hakimi and Maor (the "Hakimi/Maor Policies").

186.    The PHR Plaintiffs subsequently paid Hartford and/or Hartford Financial approximately $1.2 million premiums with respect to the Hakimi/Maor Policies.  PHR also recorded federal income tax deductions related to these premiums.

187.    Hartford and/or Hartford Financial marketed and sold life insurance policies that are apparently not appropriate or legally permissible for the PHR DBP as a 412(i) plan.  For example, the Hakimi/Maor Policies appear to have an excessively high surrender charge and springing cash value component that characterize an abusive 412(i) plan.  Upon information and

belief, Hartford and/or Hartford Financial acted knowingly in marketing and selling such inappropriate or impermissible policies.

### 3.  Defendant Pacific Life's Sale of Abusive 412(i) Plans

#### a.  Sale to the Pekerol Plaintiffs

188.    In early 2003, Dana Goldinger ("Goldinger"), acting as an agent for Pacific Life, approached the Pekerol Plaintiffs regarding the establishment of a defined pension benefit plan. More specifically, Goldinger proposed that the Pekerol Plaintiffs establish the Mehmet C. Pekerol, M.D., P.C. 412(i) Defined Benefit Plan ("Pekerol DBP"), which would be funded through life insurance policies on the lives of eligible participants purportedly in compliance with Section 412(i) of the Code.  Goldinger also participated in a series of follow-up discussions with the Pekerol Plaintiffs regarding these issues in early 2003, including discussions on or about March 20, 2003 and March 25, 2003.

189.    Goldinger promoted to the Pekerol Plaintiffs certain amounts and types of insurance that would be required to fund the Pekerol DBP.  To that end, Goldinger recommended that the Pekerol DBP be funded with specific life insurance policies issued by Pacific Life.

190.    Goldinger promised and represented to the Pekerol Plaintiffs that such a plan would provide the following benefits:  (a) certain retirement benefits to Dr. Pekerol and Pekerol P.C.'s employees and their beneficiaries, and (b) federal income tax deductions for Pekerol P.C. related to its insurance premiums paid to Pacific Life in connection with the Pekerol DBP. Goldinger also represented to the Pekerol Plaintiffs that Goldinger and Pacific Life had special expertise regarding defined benefit plans, insurance policies, and related federal income tax matters.

191.   In addition, Goldinger made, *inter alia*, the following oral and/or written representations to the Pekerol Plaintiffs during the above-referenced discussions:

a.   That the life insurance policies to be issued by Pacific Life were appropriate for use in funding the Pekerol DBP as a qualified 412(i) plan;

b.   That these policies provided a permissible death benefit under the Pekerol DBP;

c.   That the premiums to be paid on these policies by Pekerol P.C. qualified as a deduction for federal income tax purposes; and

d.   That the Pekerol DBP, including the insurance policies that would be used to fund it, complied with all federal tax laws and regulations.

192.   At no time did Goldinger ever disclose to the Pekerol Plaintiffs any of the following:  (a) the risks associated with this type of investment activity; (b) the potentially abusive nature of the program (including operation of the surrender charge); or (c) the IRS refusal to recognize the purported tax benefits of this kind of program.   Pacific Life and Goldinger knew about, but did not disclose, these problems to the Pekerol Plaintiffs.  Instead, Goldinger promised the Pekerol Plaintiffs that they would receive large, tax-free returns from this arrangement.

193.   In reliance upon such promises and representations from Pacific Life and its agent, the Pekerol Plaintiffs established the Pekerol DBP, and purchased certain life insurance policies from Pacific Life in order to fund the Pekerol DBP, including a policy on the life of Dr. Pekerol, with the face amount of $1,382,187 (the "Pekerol Policy").

194.   The Pekerol Plaintiffs subsequently paid Pacific Life substantial premiums with respect to these insurance policies, including more than $278,000 with respect to the Pekerol Policy.  Pekerol P.C. also recorded federal income tax deductions related to these premiums.

195.    Pacific Life marketed and sold life insurance policies that are apparently not appropriate or legally permissible for Pekerol DBP as a 412(i) plan.  For example, the Pekerol Policy appears to have an excessively high surrender charge and springing cash value component that characterize an abusive 412(i) plan.  Upon information and belief, Pacific Life acted knowingly in marketing and selling such inappropriate or impermissible policies.

### b.  Sale to the Direct Electric Plaintiffs

196.    In early 2003, David Lake ("Lake"), acting as an agent for Pacific Life, approached the Direct Electric Plaintiffs regarding the establishment of a defined pension benefit plan.  More specifically, Lake proposed that the Direct Electric Plaintiffs establish the Direct Electric of WI, Inc. 412(i) Defined Benefit Plan ("Direct Electric DBP"), which would be funded through life insurance policies on the lives of eligible participants purportedly in compliance with Section 412(i) of the Code.  Lake also participated in a series of follow-up discussions with the Direct Electric Plaintiffs regarding these issues in early 2003, including discussions on or about March 28, 2003; April 1, 2003; and July 30, 2003.

197.    Lake promoted to the Direct Electric Plaintiffs certain amounts and types of insurance that would be required to fund the Direct Electric DBP.  To that end, Lake recommended that the Direct Electric DBP be funded with specific life insurance policies issued by Pacific Life.

198.    Lake promised and represented to the Direct Electric Plaintiffs that such a plan would provide the following benefits:  (a) certain retirement benefits to Johnson and Direct Electric's employees and their beneficiaries, and (b) federal income tax deductions for Direct Electric related to its insurance premiums paid to Pacific Life in connection with the Direct Electric DBP.  Lake also represented to the Direct Electric Plaintiffs that Lake and Pacific Life

had special expertise regarding defined benefit plans, insurance policies, and related federal income tax matters.

199.     In addition, Lake made, *inter alia*, the following oral and/or written representations to the Direct Electric Plaintiffs during the above-referenced discussions:

    a.     That the life insurance policies to be issued by Pacific Life were appropriate for use in funding the Direct Electric DBP as a qualified 412(i) plan;

    b.     That these policies provided a permissible death benefit under the Direct Electric DBP;

    c.     That the premiums to be paid on these policies by Direct Electric qualified as a deduction for federal income tax purposes; and

    d.     That the Direct Electric DBP, including the insurance policies that would be used to fund it, complied with all federal tax laws and regulations.

200.     At no time did Lake or Pacific Life ever disclose to the Direct Electric Plaintiffs any of the following:  (a) the risks associated with this type of investment activity; (b) the potentially abusive nature of the program (including operation of the surrender charge); or (c) the IRS refusal to recognize the purported tax benefits of this kind of program.  Pacific Life knew about, but did not disclose, these problems to the Direct Electric Plaintiffs.  Instead, Lake and Pacific Life promised the Direct Electric Plaintiffs that they would receive large, tax-free returns from this arrangement.

201.     In reliance upon such promises and representations from Pacific Life and its agent, the Direct Electric Plaintiffs established the Direct Electric DBP, and purchased certain life insurance policies from Pacific Life in order to fund the Direct Electric DBP, including a policy on the life of Johnson, with the face amount of approximately $1 million (the "Johnson Policy").

202.    The Direct Electric Plaintiffs subsequently paid Pacific Life substantial premiums with respect to the Johnson Policy.  Direct Electric also recorded federal income tax deductions related to these premiums.

203.    Pacific Life marketed and sold life insurance policies that are apparently not appropriate or legally permissible for Direct Electric DBP as a 412(i) plan.  For example, the Johnson Policy appears to have an excessively high surrender charge and springing cash value component that characterize an abusive 412(i) plan.  Upon information and belief, Pacific Life acted knowingly in marketing and selling such inappropriate or impermissible policies.

### 4.  Defendant American General's Sale of Abusive 412(i) Plans

### a.  Sale to the Valley Vista Plaintiffs

204.    In late 2003, Dennis Cunning ("Cunning") and Elizabeth Sanders ("Sanders"), acting as agents for American General, approached the Valley Vista Plaintiffs regarding the establishment of a defined pension benefit plan.  More specifically, Cunning and Sanders proposed that the Valley Vista Plaintiffs establish the Valley Vista Mortgage, Inc. 412(i) Defined Benefit Plan ("Valley Vista DBP"), which would be funded through life insurance policies on the lives of eligible participants purportedly in compliance with Section 412(i) of the Code.  Cunning and Sanders also participated in a series of follow-up discussions with the Valley Vista Plaintiffs regarding these issues in late 2003 and early 2004, including discussions on or about March 17, 2004.

205.    Cunning and Sanders promoted to the Valley Vista Plaintiffs certain amounts and types of insurance that would be required to fund the Valley Vista DBP.  To that end, Cunning and Sanders recommended that the Valley Vista DBP be funded with specific life insurance policies issued by American General.

206.    Cunning and Sanders promised and represented to the Valley Vista Plaintiffs that such a plan would provide the following benefits:  (a) certain retirement benefits to Hughes, Greene, and Valley Vista's employees and their beneficiaries, and (b) federal income tax deductions for Valley Vista related to its insurance premiums paid to American General in connection with the Valley Vista DBP.  Cunning and Sanders also represented to the Valley Vista Plaintiffs that they and American General had special expertise regarding defined benefit plans, insurance policies, and related federal income tax matters.

207.    In addition, Cunning and Sanders made, *inter alia*, the following oral and/or written representations to Hughes, Greene, and Valley Vista during the above-referenced discussions:

      a.    That the life insurance policies to be issued by American General were appropriate for use in funding the Valley Vista DBP as a qualified 412(i) plan;

      b.    That these policies provided a permissible death benefit under the Valley Vista DBP;

      c.    That the premiums to be paid on these policies by Valley Vista qualified as a deduction for federal income tax purposes; and

      d.    That the Valley Vista DBP, including the insurance policies that would be used to fund it, complied with all federal tax laws and regulations.

208.    At no time did American General, Cunning, or Sanders ever disclose to the Valley Vista Plaintiffs any of the following:  (a) the risks associated with this type of investment activity; (b) the potentially abusive nature of the program (including operation of the surrender charge); or (c) the IRS refusal to recognize the purported tax benefits of this kind of program. American General, Cunning, and Sanders knew about, but did not disclose, these problems to the

Valley Vista Plaintiffs.  Instead, Cunning and Sanders promised the Valley Vista Plaintiffs that they would receive large, tax-free returns from this arrangement.

209.    In reliance upon such promises and representations from American General and its agents, the Valley Vista Plaintiffs established the Valley Vista DBP, and purchased certain life insurance policies from American General in order to fund the Valley Vista DBP, including policies:  (a) on the life of Hughes, with the face amounts of $2,092,477 and $893,000 (the "Hughes Policies"); and (b) on the life of Greene, with the face amounts of $1,393,465 and $844,600 (the "Greene Policies").

210.    The Valley Vista Plaintiffs subsequently paid substantial premiums to American General with respect to these insurance policies.  Valley Vista also recorded federal income tax deductions related to these premiums.

211.    American General marketed and sold life insurance policies that are apparently not appropriate or legally permissible for Valley Vista DBP as a 412(i) plan.  For example, the Hughes Policies and the Greene Policies appear to have an excessively high surrender charge and springing cash value component that characterize an abusive 412(i) plan.  Upon information and belief, American General acted knowingly in marketing and selling such inappropriate or impermissible policies.

### b.  Sale to the ABS Plaintiffs

212.    On or about September 9, 2002, Phil Trujillo ("Trujillo") and Earl Kemper ("Kemper"), acting as agents for American General, approached the ABS Plaintiffs regarding the establishment of a defined pension benefit plan.  More specifically, Trujillo and Kemper proposed that the ABS Plaintiffs establish the Audio Book Services, Inc. Defined Benefit Pension Plan (the "ABS DBP"), which would be funded through life insurance policies on the

lives of eligible participants purportedly in compliance with Section 412(i) of the Code.  Trujillo and Kemper also participated in a series of follow-up discussions with the ABS Plaintiffs regarding these issues throughout late 2002 and early 2003, including discussions on or about September 24, 2002; September 26, 2002; October 1, 2002; October 23, 2002; November 8, 2002; November 19, 2002; December 10, 2002; December 18, 2002; and May 20, 2003.

213.    During these discussions, Trujillo and Kemper promoted to the ABS Plaintiffs certain amounts and types of insurance that would be required to fund the ABS DBP.  To that end, Trujillo and Kemper recommended that the ABS DBP be funded with specific life insurance policies issued by American General.

214.    Trujillo and Kemper promised and represented to the ABS Plaintiffs that such a plan would provide the following benefits:  (a) certain retirement benefits to the ABS Plaintiffs and their beneficiaries, and (b) federal income tax deductions for the ABS Plaintiffs related to the insurance premiums paid to American General in connection with the ABS DBP.  Trujillo and Kemper also represented to the ABS Plaintiffs that Trujillo, Kemper, and American General had special expertise regarding defined benefit plans, insurance policies, and related federal income tax matters.

215.    In addition, Trujillo and Kemper made, *inter alia*, the following oral and/or written representations to the ABS Plaintiffs during the above-referenced discussions:

    a.    That the life insurance policies to be issued by American General were appropriate for use in funding the ABS DBP as a qualified 412(i) plan;

    b.    That these policies provided a permissible death benefit under the ABS DBP;

    c.    That the premiums to be paid on these policies by the ABS Plaintiffs qualified as a deduction for federal income tax purposes;

      d.     That the ABS DBP, including the insurance policies that would be used to fund it, complied with all federal tax laws and regulations; and

      e.     That the Consultant Defendants had "secured a letter opinion of 'more likely than not' from the international firm of Bryan Cave LLP" with respect to the viability of this arrangement.

216.    At no time did American General, Trujillo, or Kemper ever disclose to the ABS Plaintiffs any of the following: (a) the risks associated with this type of investment activity; (b) the potentially abusive nature of the program (including operation of the surrender charge); or (c) the IRS refusal to recognize the purported tax benefits of this kind of program. American General, Trujillo, and Kemper knew about, but did not disclose, these problems to the ABS Plaintiffs. Instead, Trujillo and Kemper promised the ABS Plaintiffs that they would receive large, tax-free returns from this arrangement.

217.    In reliance upon such promises, representations, and omissions by Trujillo, Kemper, and American General, the ABS Plaintiffs established the ABS DBP, and purchased a Platinum VM5+ life insurance policy from American General in order to fund the ABS DBP (the "ABS Policy").

218.    The ABS Plaintiffs subsequently paid American General substantial premiums with respect to the ABS Policy. The ABS Plaintiffs also recorded federal income tax deductions related to these premiums.

219.    American General marketed and sold life insurance policies that are apparently not appropriate or legally permissible for the ABS DBP as a 412(i) plan. For example, the ABS Policy appears to have an excessively high surrender charge and springing cash value component that characterize an abusive 412(i) plan. Upon information and belief, American General acted knowingly in marketing and selling such inappropriate or impermissible policies.

### c.  Sale to the DeSalvo Plaintiffs

220.    In late 2002, Josh Jenkins ("Jenkins") and Dennis Cunning ("Cunning"), acting as agents for American General, approached the DeSalvo Plaintiffs regarding the establishment of a defined pension benefit plan.  More specifically, Jenkins and Cunning proposed that the DeSalvo Plaintiffs establish the Douglas DeSalvo 412(i) Defined Benefit Plan and Trust (the "DeSalvo DBP"), which would be funded through life insurance policies on the lives of eligible participants purportedly in compliance with Section 412(i) of the Code.  Jenkins and Cunning also participated in a series of follow-up discussions with the DeSalvo Plaintiffs regarding these issues throughout late 2002 and early 2003, including discussions on or about February 5, 2003; February 10, 2003; and February 11, 2003.

221.    During these discussions, Jenkins and Cunning promoted to the DeSalvo Plaintiffs certain amounts and types of insurance that would be required to fund the DeSalvo DBP.  To that end, Jenkins and Cunning recommended that the DeSalvo DBP be funded with specific life insurance policies issued by American General.

222.    Jenkins and Cunning promised and represented to the DeSalvo Plaintiffs that such a plan would provide the following benefits:  (a) certain retirement benefits to the DeSalvo Plaintiffs and their beneficiaries, and (b) federal income tax deductions for the DeSalvo Plaintiffs related to the insurance premiums paid to American General in connection with the DeSalvo DBP.  Jenkins and Cunning also represented to the DeSalvo Plaintiffs that Jenkins, Cunning, and American General had special expertise regarding defined benefit plans, insurance policies, and related federal income tax matters.

223.    In addition, Jenkins and Cunning made, *inter alia*, the following oral and/or written representations to the DeSalvo Plaintiffs during the above-referenced discussions:

a.      That the life insurance policies to be issued by American General were appropriate for use in funding the DeSalvo DBP as a qualified 412(i) plan;

b.      That these policies provided a permissible death benefit under the DeSalvo DBP;

c.      That the premiums to be paid on these policies by the DeSalvo Plaintiffs qualified as a deduction for federal income tax purposes; and

d.      That the DeSalvo DBP, including the insurance policies that would be used to fund it, complied with all federal tax laws and regulations.

224.    At no time did American General, Jenkins, or Cunning ever disclose to the DeSalvo Plaintiffs any of the following:  (a) the risks associated with this type of investment activity; (b) the potentially abusive nature of the program (including operation of the surrender charge); or (c) the IRS refusal to recognize the purported tax benefits of this kind of program. American General, Jenkins, and Cunning knew about, but did not disclose, these problems to the DeSalvo Plaintiffs.  Instead, Jenkins and Cunning promised the DeSalvo Plaintiffs that they would receive large, tax-free returns from this arrangement.

225.    In reliance upon such promises, representations, and omissions by Jenkins, Cunning, and American General, the DeSalvo Plaintiffs established the DeSalvo DBP, and purchased a Platinum VM5+ life insurance policy from American General, with a face amount of approximately $2.1 million, in order to fund the DeSalvo DBP (the "DeSalvo Policy").

226.    The DeSalvo Plaintiffs subsequently paid American General substantial premiums with respect to the DeSalvo Policy.  The DeSalvo Plaintiffs also recorded federal income tax deductions related to these premiums.

227.    American General marketed and sold life insurance policies that are apparently not appropriate or legally permissible for the DeSalvo DBP as a 412(i) plan.  For example, the

DeSalvo Policy appears to have an excessively high surrender charge and springing cash value component that characterize an abusive 412(i) plan.  Upon information and belief, American General acted knowingly in marketing and selling such inappropriate or impermissible policies.

### d.  Sale to the BEK Plaintiffs

228.    In December 2002, John Hohman ("Hohman"), acting as an agent for American General, approached the BEK Plaintiffs regarding the establishment of a defined pension benefit plan.  More specifically, Hohman proposed that the BEK Plaintiffs establish the BEK Consulting 412(i) Defined Benefit Plan (the "BEK DBP"), which would be funded through life insurance policies on the lives of eligible participants purportedly in compliance with Section 412(i) of the Code.  Hohman also participated in a series of follow-up discussions with the BEK Plaintiffs regarding these issues throughout late 2002 and early 2003, including discussions on or about December 16, 2002; December 30, 2002; and May 9, 2003.

229.    During these discussions, Hohman promoted to the BEK Plaintiffs certain amounts and types of insurance that would be required to fund the BEK DBP.  To that end, Hohman recommended that the BEK DBP be funded with specific life insurance policies issued by American General.

230.    Hohman promised and represented to the BEK Plaintiffs that such a plan would provide the following benefits:  (a) certain retirement benefits to the BEK Plaintiffs and their beneficiaries, and (b) federal income tax deductions for the BEK Plaintiffs related to the insurance premiums paid to American General in connection with the BEK DBP.  Hohman also represented to the BEK Plaintiffs that Hohman and American General had special expertise regarding defined benefit plans, insurance policies, and related federal income tax matters.

231.    In addition, Hohman made, *inter alia*, the following oral and/or written representations to the BEK Plaintiffs during the above-referenced discussions:

a.      That the life insurance policies to be issued by American General were appropriate for use in funding the BEK DBP as a qualified 412(i) plan;

b.      That these policies provided a permissible death benefit under the BEK DBP;

c.      That the premiums to be paid on these policies by the BEK Plaintiffs qualified as a deduction for federal income tax purposes; and

d.      That the BEK DBP, including the insurance policies that would be used to fund it, complied with all federal tax laws and regulations.

232.    At no time did American General or Hohman ever disclose to the BEK Plaintiffs any of the following:  (a) the risks associated with this type of investment activity; (b) the potentially abusive nature of the program (including operation of the surrender charge); or (c) the IRS refusal to recognize the purported tax benefits of this kind of program.  American General and Hohman knew about, but did not disclose, these problems to the BEK Plaintiffs.  Instead, Hohman promised the BEK Plaintiffs that they would receive large, tax-free returns from this arrangement.

233.    In reliance upon such promises, representations, and omissions by Hohman and American General, the BEK Plaintiffs established the BEK DBP, and purchased a Platinum VM5+ life insurance policy from American General, with a face amount of approximately $1.4 million, in order to fund the BEK DBP (the "BEK Policy").

234.    The BEK Plaintiffs subsequently paid American General substantial premiums with respect to the BEK Policy.  The BEK Plaintiffs also recorded federal income tax deductions related to these premiums.

235.    American General marketed and sold life insurance policies that are apparently not appropriate or legally permissible for the BEK DBP as a 412(i) plan.  For example, the BEK Policy appears to have an excessively high surrender charge and springing cash value component that characterize an abusive 412(i) plan.  Upon information and belief, American General acted knowingly in marketing and selling such inappropriate or impermissible policies.

### D.    THE IRS AUDITS PLAINTIFFS

236.    The IRS had long criticized many of the same features that characterized the 412(i) plans and insurance policies that were marketed by Defendants.  Beginning in the early 2000s, however, the IRS began to focus its scrutiny directly on these specific plans and policies.  IRS officials, for example, began giving speeches at benefits conferences expressing concern that 412(i) plans were being funded in a way that did not meet the letter or spirit of the Code.  The officials warned that the IRS intended to take steps to prevent the misuse of insurance products in qualified plans, especially insurance policies designed to have low cash surrender values and high premium costs for a fixed number of years.  The IRS officials also expressed concern about the sale or distribution of these policies to participants at artificially suppressed values.

237.    In late October 2002, senior Treasury and IRS officials explicitly discussed each of these concerns at the ASPA Annual Conference held by the American Society of Pension Actuaries in Washington, DC.   James Holland, the IRS Chief Actuary, was introduced as follows:

> Jim has agreed to talk about 412(i) . . . . [A]ll of [a] sudden for some strange reason there is a resurgence in this thing that has been around forever[;] it's not new.  For all of you that don't know what it is, it is the 412(i), a fully insured defined benefit plan[,] which is basically where you can put away $800,000 to $1,000,000 for your 55 year old doctor and fully deduct it and not violate any of the rules.  Is that how it works, Jim?

238.   Mr. Holland scoffed at this notion, saying "I don't think so!"  He went on to explain the problem as follows:

> You hear the old story that there are no new schemes or ideas, but old ideas recycled in different packages, and that is actually true here. . . . When you start to look at these, what you see here is what some of us refer to as "hidden values" or to put it another way, "springing values."  Does this sound familiar?
>
> [T]hat concept underlies a lot of those proposals.  And what I have to say is, it doesn't work. . . . [P]eople seem to forget that just because you have a 412(i) contract, and that you are exempt from minimum funding, it does not mean the premium that you want . . . is deductible.

239.   The Insurance Defendants not only attended this October 2002 conference, but also openly discussed the IRS concerns with the Consultant Defendants.   During one such discussion with Pacific Life in mid-November 2002, the Consultant Defendants pointed out that the IRS was primarily concerned with the use of springing cash value policies, which was a risk that Defendants had expressly contemplated from the inception of the Pendulum Plan and other similar 412(i) plans.

240.   On January 31, 2003, senior Treasury and IRS officials gave a presentation on "aggressive tax practices" at the Annual Los Angeles Benefits Conference, which was sponsored by the American Society of Pension Actuaries and the IRS Tax Exempt/Government Entities Division.  The Treasury and IRS officials made the following remarks during their presentation: (a) the IRS is giving "very high priority" to "abusive insurance-funded defined benefit plans" that misuse Section 412(i); (b) the IRS will "not be gentle" when it retroactively examines "illegal Section 412(i) schemes"; and (c) "there is a criminal side to such schemes, beyond any eventual tax penalties or fines."  Importantly, the Treasury and IRS officials indicated that these 412(i) arrangements violated existing tax laws and regulations.

241.    Defendants, upon information and belief, knew about these and other similar remarks by the Treasury and IRS officials as early as October 2002.  In November 2002, the Consultant Defendants — with the likely assistance of the Bryan Cave Parties — prepared a short statement seeking to downplay these concerns as "absurd," "purely speculative," and based on "misleading references to revenue rulings and regulations."   The Insurance Defendants discussed the IRS concerns internally in late 2002 and early 2003, but wholly failed to disclose these issues to Plaintiffs or any other victims of the scheme.  Indianapolis Life even reprinted a summary of the January 2003 remarks by the Treasury and IRS officials on a password-protected website for its agents, but failed to instruct its agents to disclose any of these issues to Plaintiffs.

242.    After reaping premiums from these purported 412(i) arrangements for several more months, Defendants eventually acknowledged that they could no longer market these arrangements without disclosing the serious tax risks posed by them.  Defendants recognized, however, no one would purchase and invest in a purported retirement plan with the knowledge of such risks.   Accordingly, in mid-2003, Defendants decided to stop marketing these 412(i) arrangements altogether.

243.    In April 2003, Pacific Life announced that it would no longer allow its Flex XII policy to be used in the Pendulum Plan or a similar 412(i) plan where more than 60% of the annual plan contribution consists of life insurance premiums.  In a related document, Pacific Life also discussed the circumstances under which the IRS seemed to be most concerned about springing cash value policies:

> The factual scenario in which the commentators generally refer to as raising the springing cash value issue is when the purchase of the life insurance policy is solely for the purpose of transferring it out of the 412(i) plan when the cash surrender value is less than the tax reserve value and generally before the participant has retired.   While Flex XII potentially could be used in such a strategy, we do not advocate such a

strategy in our sales material.  Additionally, we review the sales material of 412(i) providers, when submitted, to assure that such a strategy is not advocated by them.

Nevertheless, some clients may wish to use Flex XII in such a strategy and doing so will involve risk.  In some circumstances the risk can be reduced, but not entirely eliminated.  For example, the most egregious risk would be to use 100% life insurance as the funding for the 412(i) on a participant who is more than five years from retirement, transfer the policy out of the 412(i) several years before retirement – and terminate the 412(i) entirely.  The potentially less aggressive strategy would be to only use life insurance up to the incidental benefit limits, purchase the policy out for its tax reserve value, and not terminate the qualified plan immediately thereafter.

To summarize the issue:  if a pre-retirement exit strategy is contemplated, there will be risk.  This risk is amplified if (1) the life insurance death benefit exceeds the incidental benefit limits, (2) the participant is several years from retirement when the policy is transferred from the plan, (3) cash surrender value rather than the higher tax reserve value is used as the fair market value for tax purposes, or (4) the plan is terminated after the Flex XII is transferred from the plan.

244.    Of course, this was exactly how the Pendulum Plan and other purported 412(i) arrangements were marketed by the Insurance Defendants.  Even the Consultant Defendants noted this fact and Pacific Life's transparent efforts to redefine their actual involvement and knowledge related to these purported 412(i) plans.  In a June 2003 email, ECI's Sandy Klewicki forwarded Pacific Life's announcement to Hartstein, stating:

In my opinion, this is Pacific Life's CYA letter.  Of course they never intended a 5th year rollout!  (sarcasm dripping here)  That must be why they also promote this for retained earnings access, overfunded plans, etc.

245.    On June 11, 2003, American General announced that it would no longer allow its VM5+ policy to be used as the funding mechanism in the Pendulum Plan and other similar 412(i) plans.  One day later, the Consultant Defendants announced that they would no longer market the Pendulum Plan because some of the insurance companies "with whom we have had solid long term relationships have . . . had to evaluate their own exposure and potential liability,

and have or will be soon announcing their own modifications and changes as to the funding methodology for 412(i) plans that they will accept."  These actions by Defendants indicate that they viewed the Treasury and IRS comments as an interpretation of existing law, not simply a warning about a potential future change in the law.

246.    On February 13, 2004, the IRS issued a press release, two revenue rulings, and proposed regulations that confirmed what industry observers (including Defendants) had long recognized — that the 412(i) plans and policies being marketed by Defendants appeared to constitute illegal and abusive tax shelters.  The press release stated, in pertinent part, as follows:

### Treasury and IRS Shut Down
### Abusive Life Insurance Policies in Retirement Plans
. . .
Today, the Treasury Department and the Internal Revenue Service issued guidance to shut down abusive transactions involving specially designed life insurance policies in retirement plans, section "412(i) plans."   The guidance designates certain arrangements as "listed transactions" for tax-shelter reporting purposes.
. . .
"The guidance targets specific abuses occurring with section 412(i) plans," stated Assistant Secretary for Tax Policy Pam Olson. "There are many legitimate section 412(i) plans, but some push the envelope, claiming tax results for employees and employers that do not reflect the underlying economics of the arrangements."

"Again and again, we've uncovered abusive tax avoidance transactions that game the system to the detriment of those who play by the rules," said IRS Commissioner Mark W. Everson. "Today's action sends a strong signal to those taking advantage of certain insurance policies that these abusive schemes must stop."

247.    The proposed regulations addressed the valuation of insurance contracts "that are structured in a manner that results in a temporary period during which neither a contract's reserves nor its cash surrender value represents the fair market value of the contract," in many cases due to the operation of a large surrender charge that exists at the time that the contract is

transferred to the beneficiary, but which later disappears.  Since the distribution of such contracts

to beneficiaries understates the fair market value of those contracts, the IRS regulations restated

the principle that such insurance contracts are to be valued at their fair market value (by taking

into account the policy cash and all other rights under the contract).  The proposed regulations

that the IRS issued on February 13, 2004 were later finalized in August 2005.

248.    Pursuant to Revenue Ruling 2004-20, the IRS stated that the issuance of life

insurance policies greatly in excess of the permissible death benefit under a 412(i) plan

constitutes a "listed transaction," which the IRS considers to be an abusive tax shelter or

transaction.  The IRS also indicated that a defined benefit plan holding such policies cannot

qualify as a Section 412(i) plan.  Finally, the IRS stated that premiums in excess of the amount

required to provide the permissible death benefit will be disallowed as a current tax deduction.

249.    Pursuant to Revenue Ruling 2004-21, the IRS stated that funding a 412(i) plan

with a different type of insurance policy for highly compensated employees than for non-highly

compensated employees will result in impermissible discrimination and disqualification of such

a plan.

250.    These actions by the IRS did _not_ represent a change in the law.  The IRS, of

course, cannot make law.  It is merely a government agency within the executive branch that is

responsible for tax collection and tax law enforcement.  A revenue ruling is only the IRS

interpretation of existing tax law.  *See, e.g.*, Rev. Proc. 89-14, 1989-1 C.B. 814 at § 3.01 ("A

'revenue ruling' is an official interpretation by the Service of the internal revenue laws and

related statutes, treatises, and regulations . . . .").  And IRS regulations simply carry out the will

of Congress as expressed in existing tax law.  *See Manhattan Gen. Equip. Co. v. Commissioner*,

297 U.S. 129, 134 (1936) ("The power of administrative officer or board to administer a federal

statute and to prescribe rules and regulations to that end is not the power to make law . . . but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute."). Moreover, the particular IRS regulations here simply restated the principle — first stated by the IRS more than fifteen years earlier in Announcement 88-51 and Notice 89-25 — that insurance contracts in a qualified plan are to be valued at their fair market value, not at some artificially suppressed cash value.

251.    In the wake of these IRS actions, the Bryan Cave Parties advised the Consultant Defendants about ways to avoid IRS scrutiny.  In a memorandum dated March 16, 2004, the Bryan Cave Parties informed the Consultant Defendants that employers sponsoring certain abusive 412(i) plans were required to file Form 8886 with the IRS, disclosing their participation in a listed transaction.  This disclosure statement, according to the Bryan Cave Parties, "could lead to heightened scrutiny" by the IRS because "the employer is deemed to have engaged in a tax avoidance transaction."  In order "to avoid such scrutiny," the Bryan Cave Parties suggested that employers not file Form 8886, but instead simply file amended tax returns to reverse their deductions.  To further induce employers not to file Form 8886, the Bryan Cave Parties stated "[t]here are no specific monetary penalties if an employer does not file Form 8886 when required to do so."

252.    The Bryan Cave Parties, upon information and belief, knew that the Consultant Defendants would distribute this memorandum to their clients, including Plaintiffs.  Indeed, the Consultant Defendants even posted this memorandum on their website.  The Bryan Cave Parties, upon information and belief, also knew that hundreds of 412(i) plan sponsors, including Plaintiffs, would rely on this memorandum and not file Form 8886 with the IRS.

253.   Later in 2004, Congress enacted Section 6707A of the Code, which imposed harsh penalties — $100,000 per tax year for individuals and $200,000 per tax year for all other taxpayers — for failing to file Form 8886 regarding participation in a listed transaction.  The IRS stated that these penalties would certainly apply to all returns filed after October 22, 2004, though it was entirely possible that the penalties could be applied to those who filed tax returns prior to that date without the requisite disclosure in Form 8886.

254.   Neither Defendants nor the Bryan Cave Parties did anything to alert Plaintiffs as to these harsh new penalties for several months.   In January 2005, the Bryan Cave Parties provided another memorandum for the Consultant Defendants.   In this memorandum, the Bryan Cave Parties discussed Section 6707A and the new penalties for failing to disclose a listed transaction, but then re-summarized their alternative strategy of filing amended tax returns in lieu of filing Form 8886.   The Bryan Cave Parties made little or no effort to dissuade anyone from adopting this strategy.   In fact, the Bryan Cave Parties concluded that an employer filing such amended returns "should not be considered to have engaged in a listed transaction, and it would not be required to file a disclosure statement."   Interestingly, the Bryan Cave Parties saved this memorandum in a "marketing" directory on their internal computer system.

255.   The Consultant Defendants did not distribute this January 2005 memorandum to their clients, including Plaintiffs, until March 2005.  Even then, upon information and belief, the Consultant Defendants did not distribute the memorandum as widely as the first memorandum regarding Form 8886.   In any event, the Consultant Defendants, upon information and belief, knew that hundreds of 412(i) plan sponsors, including Plaintiffs, would rely on this memorandum (as well as the prior memorandum) and not file Form 8886 with the IRS.

256.    Beginning in 2005, the IRS commenced a nationwide audit campaign directed at abusive 412(i) plans and those who had sponsored them.  The IRS has commenced (or will likely commence) audits of Plaintiffs, which has caused (or will cause) them to incur substantial audit-related fees and expenses.  In addition, these IRS audits have resulted (or will likely result) in significant tax liability for Plaintiffs, including disallowed deductions for the enormous premiums paid to Defendants, penalties, and interest.  The IRS, moreover, has imposed the especially harsh Section 6707A penalties for those who failed to file Form 8886, including Plaintiffs.

## VI. <u>CAUSES OF ACTION</u>

## COUNT 1:  CIVIL CONSPIRACY
### (Against All Defendants)

257.    Plaintiffs repeat and re-allege the allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

258.    Defendants, upon information and belief, agreed to join in a conspiracy related to the design, marketing, and sale of life insurance polices for defined benefit pension plans seemingly in compliance with Section 412(i) of the Code.

259.    Defendants, upon information and belief, knew that the object of this conspiracy was (a) to market and sell defined pension benefit plans, such as those held by Plaintiffs, (b) to design, market, and sell life insurance policies that were not appropriate or legally permissible for such plans, and (c) to market and sell life insurance policies to be used in funding purported 412(i) plans without disclosing the known risks associated with such arrangements.  Defendants, upon information and belief, further knew that this object was both unlawful and would be accomplished by unlawful means, such as fraud and other misrepresentations.

260.     Defendants, upon information and belief, had a meeting of the minds on the object of or course of action for this conspiracy.  Defendants knew and agreed upon the unlawful object or course of action for this conspiracy.  Defendants knew and agreed upon the unlawful object and purpose of this conspiracy.  Defendants also knew that their wrongful actions would inflict injury upon the targets of the conspiracy, including Plaintiffs.

261.     As described above, Defendants committed multiple unlawful and overt acts to further the object or course of action for this conspiracy.

262.     These unlawful acts proximately caused the damages suffered by Plaintiffs.

263.     Accordingly, Plaintiffs are entitled to recover their actual damages, plus costs, attorneys' fees, and pre-judgment interest and post-judgment interest.

## COUNT 2:  COMMON-LAW FRAUD
### (Against the Insurance Defendants)

264.     Plaintiffs repeat and re-allege the allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

265.     The Insurance Defendants made or caused to be made, *inter alia*, the following material misrepresentations, omissions, or misleading statements to Plaintiffs regarding the insurance policies issued by the Insurance Defendants:

   a.     That the life insurance policies to be issued by the Insurance Defendants were appropriate for use in funding a qualified 412(i) plan;

   b.     That these policies provided a permissible death benefit under the 412(i) plan;

   c.     That the premiums to be paid on these policies qualified as a deduction for federal income tax purposes; and

   d.     That the 412(i) plan, including the insurance policies that would be used to fund it, complied with all federal tax laws and regulations.

266.    The Insurance Defendants also failed to disclose the following material facts to

Plaintiffs:

      a.      That there were significant tax risks associated with funding a 412(i) plan with the insurance policies issued by the Insurance Defendants;

      b.      That professional advisors for the Insurance Defendants had expressly warned them about such risks and advised them not to market these insurance policies for use in a 412(i) plan;

      c.      That this 412(i) program might be deemed abusive by the IRS; and

      d.      That the IRS had issued numerous announcements and notices over the years addressing many of the same characteristics of this 412(i) program and explaining that such characteristics are contrary to federal tax laws and regulations.

267.    The Insurance Defendants knew that their misrepresentations were false when they made them.  Alternatively, the Insurance Defendants made these representations with a conscious disregard of the rights and interests of Plaintiffs, and for the purpose of enriching themselves and jeopardizing the financial well being of Plaintiffs.  The Insurance Defendants acted maliciously, oppressively, and with the intent to defraud Plaintiffs.

268.    The Insurance Defendants intended for Plaintiffs to rely on each of these misrepresentations and/or omissions.

269.    Plaintiffs justifiably relied on each of these misrepresentations and/or omissions by the Insurance Defendants.

270.    The misrepresentations and/or omissions by the Insurance Defendants proximately caused the damages suffered by Plaintiffs.

271.    Accordingly, Plaintiffs are entitled to recover their actual damages as well as punitive or exemplary damages.

## COUNT 3:  NEGLIGENT MISREPRESENTATION
### (Against the Insurance Defendants)

272.    Plaintiffs repeat and re-allege the allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

273.    The Insurance Defendants made or caused to be made the following false representations to Plaintiffs in the course of the Insurance Defendants' business or in a transaction in which they had a pecuniary interest:

        a.      That the life insurance policies to be issued by the Insurance Defendants were appropriate for use in funding a qualified 412(i) plan;

        b.      That these policies provided a permissible death benefit under the 412(i) plan;

        c.      That the premiums to be paid on these policies qualified as a deduction for federal income tax purposes; and

        d.      That the 412(i) plan, including the insurance policies that would be used to fund it, complied with all federal tax laws and regulations.

274.    The Insurance Defendants did not exercise reasonable care or competence in obtaining or communicating the information contained in these false representations.

275.    Plaintiffs justifiably relied on each of these representations by the Insurance Defendants.

276.    The negligent misrepresentations by the Insurance Defendants proximately caused the damages suffered by Plaintiffs.

277.    Accordingly, Plaintiffs are entitled to recover their actual damages.

**COUNT 4:  UNLAWFUL BUSINESS ACTS AND PRACTICES
IN VIOLATION OF CALIFORNIA BUSINESS
AND PROFESSIONS CODE SECTION 17200, *et seq*.
(By California Class Members Against the Insurance Defendants and
By All Class Members Against Pacific Life (the "17200 Plaintiffs"))**

278.    The 17200 Plaintiffs repeat and re-allege the allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

279.    The 17200 Plaintiffs have standing to assert these claims against Pacific Life by virtue of the fact that Pacific Life is a California corporation with its principal place of business in California.

280.    California Business and Professions Code § 17200, *et seq*. prohibits acts of unfair competition, which means and includes any "unlawful . . . business act or practice."

281.    The policies, acts, and practices alleged herein violate numerous provisions of law as set forth below.

282.    The Insurance Defendants' dissemination of uniformly deceptive advertisements and statements, including the failure to disclose material facts regarding the nature and risks of their insurance polices, violates California Business and Professions Code § 17500, *et seq*.

283.    Members of the public were likely to be deceived by these acts.  Specifically, members of the public who received the standard marketing pitch from the Insurance Defendants were likely to be (and actually were) deceived into believing that the specially designed insurance policies and the purported 412(i) plans:   (a) allowed participants to take a tax deduction for the premiums paid toward the insurance policies; (b) allowed participants to take tax-free loans against the increasing cash value in those policies only a few years later; (c) complied fully with Section 412(i), as well as all other federal tax laws and regulations; and (d)

presented no material tax risks.  Indeed, hundreds of members of the public, upon information and belief, were deceived in this manner by the acts of the Insurance Defendants.

284.    These acts constitute unlawful business acts or practices based on the violations of law alleged above.

285.    The 17200 Plaintiffs are entitled to all relief available under the Business and Professions Code § 17200, *et seq*., as detailed below.

**COUNT 5:  FRAUDULENT BUSINESS ACTS AND PRACTICES
IN VIOLATION OF CALIFORNIA BUSINESS
AND PROFESSIONS CODE SECTION 17200, *et seq*.
(By California Class Members Against the Insurance Defendants and
By All Class Members Against Pacific Life (the "17200 Fraud Plaintiffs"))**

286.    The 17200 Fraud Plaintiffs repeat and re-allege the allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

287.    The 17200 Fraud Plaintiffs have standing to assert these claims against Pacific Life by virtue of the fact that Pacific Life is a California corporation with its principal place of business in California.

288.    California Business and Professions Code § 17200, *et seq*. prohibits acts of unfair competition, which means and includes any "fraudulent business act or practice."  Conduct which is "likely to deceive" is "fraudulent" within the meaning of Section 17200.

289.    As more fully described above, the Insurance Defendants' acts and practices are likely to deceive, constituting a fraudulent business act or practice.

290.    The 17200 Fraud Plaintiffs are entitled to the relief available under Business and Professions Code § 17200, *et seq*., as detailed below.

## VII. <u>DISCOVERY RULE/FRAUDULENT CONCEALMENT DOCTRINE</u>

291.    Plaintiffs did not discover that Defendants had engaged in the false, misleading, or deceptive acts or practices set forth above until long after their improper conduct began.  Nor should Plaintiffs have discovered such acts or practices prior to that time.  Defendants' false, misleading, or deceptive acts or practices related to a variety of complex legal and/or tax issues, which were well beyond the knowledge and understanding of Plaintiffs.  For that reason, Plaintiffs justifiably relied on the advice and expertise of Defendants and their agents.

292.    In addition, Defendants fraudulently concealed their wrongdoing from Plaintiffs. Despite having actual knowledge that they had engaged in false, misleading, or deceptive acts or practices, Defendants concealed their wrongdoing from Plaintiffs by making misrepresentations and/or by remaining silent when they had a duty to disclose such wrongdoing to Plaintiffs. Defendants made or caused to be made specific misrepresentations to Plaintiffs, including but not limited to the following:

   a.    That the Insurance Policies issued by the Insurance Defendants were appropriate for use in funding a qualified 412(i) plan;

   b.    That Insurance Policies provided a permissible death benefit under the 412(i) plan;

   c.    That the premiums to be paid on the Insurance Policies qualified as a deduction for federal income tax purposes; and

   d.    That the 412(i) plan, including the insurance policies that would be used to fund it, complied with all federal tax laws and regulations.

293.    The Insurance Defendants also failed to disclose the following material facts to Plaintiffs:

   a.    That there were significant tax and other risks associated with funding a 412(i) plan with the Insurance Policies issued by the Insurance Defendants;

b.     That professional advisors for the Insurance Defendants had expressly warned them about such risks and advised them not to market these Insurance Policies for use in a 412(i) plan;

c.     That this 412(i) program might be deemed abusive by the IRS; and

d.     That the IRS had issued numerous announcements and notices over the years addressing many of the same characteristics of this 412(i) program and explaining that such characteristics are contrary to federal tax laws and regulations.

294.    Defendants had a fixed purpose to conceal their wrongdoing.  Plaintiffs, moreover, reasonably relied on Defendants' misrepresentations and/or silence to their detriment.

## VIII.  CONDITIONS PRECEDENT

295.    All conditions precedent to Plaintiffs' claims for relief have occurred, have been performed, or have been waived.

296.    Plaintiffs are excused from providing written notice of their claims to Defendants under Section 17.505(b) of the Texas Business and Commerce Code.  Defendants may argue that the statute of limitations may soon expire as to some or all of Plaintiffs' claims.  Accordingly, Plaintiffs are not required to give written notice of their claims to Defendants prior to filing suit.

## IX.  JURY DEMAND

297.    Plaintiffs hereby demand a trial by jury in this action.

## X.  PRAYER

WHEREFORE, Plaintiffs respectfully request that Defendants be cited to appear and answer, and that Plaintiffs have judgment against Defendants for the following:

a.     Compensatory damages in an amount to be ascertained at trial and/or rescission;

b.     Punitive or exemplary damages in an amount to be ascertained at trial;

c.      Additional or treble damages pursuant to applicable state or federal law;

d.      Pre-judgment and post-judgment interest at the maximum rate permitted by contract, law, or equity;

e.      Reasonable attorneys' fees and costs; and

f.      All other relief, in law or in equity, to which Plaintiffs may be entitled.

DATED:  March 11, 2009.


Respectfully submitted,


**DIAMOND MCCARTHY LLP**


  _/s/ Eric D. Madden_____
Eric D. Madden
State Bar No. 24013079
Brandon V. Lewis
State Bar No. 24060165
1201 Elm Street, Suite 3400
Dallas, Texas  75270
(214) 389-5300 (telephone)
(214) 389-5399 (facsimile)


-and-

**MCKOOL SMITH, PC**
Gary Cruciani
State Bar No. 05177300
Michael P. Fritz
State Bar No. 24036599
300 Crescent Court, Suite 1500
Dallas, Texas 75201
(214) 978-4000 (telephone)
(214) 978-4044 (facsimile)


**COUNSEL FOR ALL PLAINTIFFS,
EXCEPT ILIC PLAINTIFFS**[5]

**THE LAW OFFICES OF
STEPHEN F. MALOUF, PC**


  _/s/ Stephen F. Malouf_____
Stephen F. Malouf
State Bar No. 12888100
David Evans
State Bar No. 06714500
Jonathan Nockels
State Bar No. 24056047
3811 Turtle Creek Blvd., Suite 1600
Dallas, Texas 75219
(214) 969-7373 (telephone)
(214) 969-7648 (facsimile)

**COUNSEL FOR ILIC PLAINTIFFS**

---

[5] The "ILIC Plaintiffs" are Stephen Berry, Fader Higher, LLC, Robert P. Young, M.D., Rocky Mountain Dermatology, Inc., Tyrone M. Seils, DP Search, Inc., David R. Hallman, Lynn Hallman, Accessibility Unlimited, Inc., Richard Sarmiento, and Richard and Leilani Sarmiento, a sole proprietorship.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 11, 2009, a copy of the foregoing *Second Amended Complaint – Class Action* was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

*/s/ Eric D. Madden*
Eric D. Madden