UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN BERRY, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. 3:08-CV-0248-B |
| v. | § | |
| | § | |
| INDIANAPOLIS LIFE INSURANCE | § | |
| COMPANY, et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM ORDER

Before the Court are: Defendant Pacific Life Insurance Company's Motion for Summary Judgment, filed June 23, 2008 (doc. 38); Hartford Life and Annuity Insurance Company's Motion for Summary Judgment, filed June 23, 2008 (doc. 43); and Plaintiffs' Rule 56(f) Motion for Continuance to Conduct Discovery, filed January 12, 2009 (doc. 97). Having considered the motions, responses, replies, supplemental briefing, evidence, record and applicable law, and for the reasons set forth below, the court **GRANTS in part and DENIES in part** Defendant Pacific Life's Motion for Summary Judgment (doc. 38); **GRANTS in part and DENIES in part** Hartford Life and Annuity Insurance Company's Motion for Summary Judgment (doc. 43); and **DENIES** Plaintiffs' Rule 56(f) Motion for Continuance to Conduct Discovery (doc. 97).

I.

BACKGROUND

This case concerns the design, adoption, and implementation of certain employee retirement defined benefit plans, known as "412(i) plans," that were funded with life insurance policies, and

1

designed to minimize income tax liability for the plan sponsor.[1]  Plaintiffs allege that the plans they set up and funded with life insurance policies were actually tax shelters that Defendants knew or should have known would be scrutinized by the IRS and deemed abusive and illegal.  (Pl.'s First Am. Compl. ¶¶ 59–60 ("Compl." (doc. 34))).  The  motions before the Court concern the life insurance policies used to fund 412(i) plans purchased from Defendants Hartford Life and Annuity Insurance Company ("Hartford") and Pacific Life Insurance Company ("Pacific Life").[2]

In the First Amended Complaint, Plaintiffs assert claims for civil conspiracy, common law fraud, negligent misrepresentation, violations of California Business and Professions Code section 17200 for violation of the California Consumer Legal Remedies Act and False Advertising Act, violations of the Texas Insurance Code and the Texas Deceptive Trade Practices Act, and unjust enrichment.  On June 23, 2008, Pacific Life and Hartford each filed a motion to dismiss Plaintiffs' First Amended Complaint (docs. 38, 43), and each submitted an appendix in support containing the insurance policies, as well as related transaction documents.  (docs. 39, 46).  Moving for dismissal of the insured Plaintiffs' fraud-based claims pursuant to FED. R. CIV. P. 12(b)(6), Pacific Life and Hartford contended that the transaction documents, wherein the insured Plaintiffs' expressly

---

[1] The Court takes judicial notice that a "412(i)" plan under the Internal Revenue Code is an employer-sponsored pension plan that, upon meeting certain requirements, qualifies for favorable tax treatment.  *See* 26 U.S.C. § 412(e)(3) (West 2008).  The Pension Protection Act of 2006, Pub. L. No. 109-280, amended section 412, and relocated it to section 412(e)(3).  The amendments are applicable to plan years beginning after December 31, 2007.

[2] Plaintiffs have also sued two other insurance companies, Indianapolis Life Insurance Company and American General Life Insurance Company, as well as two consultant companies, one individual consultant and one law firm.  Plaintiffs allege that Hartford, Pacific Life and the other Defendants conspired to market these plans and to sell the life insurance policies used to fund them by making fraudulent or negligent misrepresentations about the tax benefits of the plans and without disclosing any of the risk that the IRS would deem the plans illegal.  (Compl. ¶¶ 59, 73–74.)

disclaim any reliance on Pacific Life and Hartford for tax or legal advice, demonstrated, as a matter of law, that Plaintiffs could not have justifiably relied on purported oral representations by insurance agents to the contrary.  Plaintiffs filed a motion to strike the transaction documents as outside the pleadings.  (doc. 66).

Pursuant to FED. R. CIV. P. 12(d), on December 17, 2008, the Court converted Defendants Pacific Life's and Hartford's respective Motions to Dismiss into Motions for Summary Judgment, informing the parties of its intent "to consider certain documents attached in support of the Motions that the Court considers 'matters outside the pleadings.'" (doc. 93).  The Court further noted that although discovery had been stayed pending resolution of the motions, "the Court [would] consider a narrowly-tailored Rule 56(f) Motion(s)" by Plaintiffs.  The Court also instructed the parties to submit any additional materials pertinent to the motions by January 12, 2009, and advised Pacific Life and Hartford to "resubmit the evidence previously submitted with their Motions in a form admissible for the purpose of summary judgment no later than January 12, 2009."

In response to the Court's directive, Plaintiffs filed their Supplemental Response to Recently Converted Motions for Summary Judgment and Alternative Rule 56(f) Motion for Continuance to Conduct Discovery and Brief in Support  ("Supp. Resp.," docs. 97, 98), advising the Court that "Plaintiffs understand that the Court converted the Rule 12(b)(6) motions into Rule 56 motions as to only one argument – whether Plaintiffs justifiably relied upon representations by Hartford and Pacific Life. To the extent that their understanding is incorrect, Plaintiffs expressly reserve the right to supplement this motion and its supporting brief." (Supp. Resp. at 1, n.1 (doc. 97).)  Attached to the Supplemental Response are affidavits of the individual Plaintiffs who purchased insurance policies from Pacific Life and Hartford regarding the formation of the insurance policies at issue.

3

Defendants Pacific Life and Hartford filed oppositions to Plaintiffs' Supplemental Response, and also resubmitted their evidence in a form admissible for summary judgment purposes, similarly limiting their legal arguments to whether, in the face of disclaimers to the contrary, Plaintiffs could have justifiably relied upon representations regarding the legal viability and tax consequences of the 412(i) plans they established.  (docs. 105, 107).  In light of the parties' interpretation of the Court's December 17, 2008 Order as limited to the issue of "justifiable reliance," and the fact that supplemental briefing pertains only to "justifiable reliance," the Court's will similarly limit its analysis.[3]

Two of the 412(i) plans at issue were funded with life insurance policies issued by Defendant Pacific Life, namely, (i) the Mehmet C. Pekerol, M.D., P.C. Defined Benefit Plan and (ii) the Direct Electric Defined Benefit Plan.  Three of the 412(i) plans at issue were funded with life insurance policies issued by Defendant Hartford, namely, (i) the MacMillan Construction Defined Benefit Plan, (ii) the Poulsbo Defined Benefit Plan, and (iii) the Pacific Home Remodeling Defined Benefit Plan.  In all instances, Plaintiffs are the employer-sponsors of the above-listed defined benefit plans, as well as principal employees and individual participants in the plans.

A.   **The 412(i) Plans Funded with Pacific Life Policies** [4]

1.   *The Pekerol Defined Benefit Plan*

Plaintiff Mehmet C. Pekerol, M.D. ("Dr. Pekerol"), a California resident, owns and operates

---

[3]As set forth below in the conclusion (*see infra* Sec. IV), in light of the Court's determination that summary judgment motions at this time are limited to the issue of "justifiable reliance," the Court will allow further briefing of remaining claims.

[4]As set forth in Section II (*see infra*), all facts are presented in the light most favorable to Plaintiffs, the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

4

Mehmet C. Pekerol, M.D. , P.C., a California professional corporation in West Hollywood, California ("Pekerol P.C.") (sometimes collectively referred to as the "Pekerol Plaintiffs"). (Pl.'s Summ. J. App. at Tab 8 (Pekerol Aff. ¶ 2) (doc. 98).) According to Dr. Pekerol, in early 2003, his outside accountant introduced him to attorney Dana Goldinger, who told him she specialized in benefit plans, insurance policies, and related federal income tax matters. (*Id.* at ¶ 4.) At the initial meeting, Goldinger did not identify herself as a Pacific Life agent. (*Id.*)[5] At that meeting and subsequent meetings, Goldinger advised Dr. Pekerol to decrease Pekerol P.C.'s tax liability by creating a 412(i) defined benefit pension plan funded by special life insurance policies issued by Pacific Life, which would not only provide certain retirement benefits to himself and his employees, but also provide federal income tax deductions to Pekerol P.C. in the amount of insurance premiums paid to Pacific Life in connection with the defined benefit plan. (*Id.* at ¶¶ 5–6.) With regard to the recommended establishment of Pekerol P.C.'s defined benefit plan (the "Pekerol DBP"), Goldinger represented to Dr. Pekerol that: "(a) the life insurance policies to be issued by Pacific Life were appropriate for use in funding the Pekerol DBP as a qualified 412(i) plan; (b) these policies provided a permissible death benefit under the Pekerol DBP; (c) the premiums to be paid on these policies by Pekerol P.C. qualified as a deduction for federal income tax purposes; and (d) the Pekerol DBP,

---

[5]Dr. Pekerol's affidavit testimony that he did not know that Goldinger was a Pacific Life agent is in conflict with the allegations in Plaintiffs' First Amended Complaint. In the First Amended Complaint, Dr. Pekerol alleged that "[i]n reliance upon . . . promises and representations from Pacific Life and its agent, the Pekerol Plaintiffs established the Pekerol DBP, and purchased certain life insurance policies from Pacific Life in order to fund the Pekerol DBP." (Compl. ¶ 152 (doc. #34).) Dr. Pekerol now states that "[a]t no point during this series of follow-up discussions did Goldinger identify herself as a Pacific Life agent[,]" and he believed he had merely retained her as his attorney to "advise [him] regarding the creation of a defined benefit plan for Pekerol P.C." (Pl.'s Summ. J. App. at Tab 8 (Pekerol Aff. ¶9).) Although pointing out the discrepancy, Pacific Life has not moved to strike the testimony. As the Court must view all evidence in the light most favorable to Dr. Pekerol and Pekerol P.C., *see Anderson*, 477 U.S. at 248, the Court accepts Dr. Pekerol's affidavit testimony as true.

including the insurance policies that would be used to fund it, complied with federal tax laws and regulations." (*Id.* at ¶ 7.)  Goldinger also told him that even were the IRS to issue new regulations affecting 412(i) plans, such regulations would not impact the Pekerol DBP. (*Id.* at ¶ 8.)  No one ever told Dr. Pekerol that there were risks associated with this type of investment activity or that the Internal Revenue Service might not recognize the tax benefits of the program.  (*Id.*)

In March 2003, based on Goldinger's representations, Dr. Pekerol established the Pekerol DBP which was funded with two Pacific Life Flex XII contracts, the first insuring the life of Dr. Pekerol and the second insuring the life of Gloria Z_____,[6] Dr. Pekerol's office manager. (Pac. Life Summ. J. App. at Ex.'s 2, 4 (doc. 96).) In setting up the Pekerol DBP, as required by California law, *see* CAL. INS. CODE § 10509.954(c), Goldinger provided Dr. Pekerol with the Flex XII Pacific Life insurance contracts and an Illustration relating to each of the insurance contracts (sometimes referred to as the "transaction documents").  (*See id.* at Ex. 3 (Illustration to Dr. Pekerol's insurance contract), 5 (Illustration to Gloria Z_____'s insurance contract).)

The Illustration, presented by Goldinger to Dr. Pekerol, and signed by Dr. Pekerol on March 25, 2003, provides:

> Pacific Life makes no determination or representation as to whether the Flex XII and Quest II contracts, when used together, automatically exempts a qualified plan from minimum funding requirements, or meets any of the requirements of IRC Sec. 412(i). Any such determination, like all other qualified design and administration issues, must be made by the qualified plan administrator, plan trustee, or the plan's other legal or tax advisers.
>
> By signing below, you are stating that you have obtained from your independent tax and legal advisers whatever advice you deem necessary or appropriate concerning your qualified benefit plan's risks and benefits.

---

[6]The office manager's full name is concealed to protect her identity.

> I have received and read a copy of this illustration and understand that any non-guaranteed elements illustrated are subject to change and could be higher or lower. The producer has told me they are not guaranteed. I understand this is an illustration and not a contract. For full policy details, I will refer to the contract.

(*Id.*, Ex. 3 at 73.)

> The transaction documents signed by Dr. Pekerol also informed him that:

> Life Insurance owned by a qualified plan is subject to complex income and estate tax rules. Assistance of private legal counsel is required to prepare all documents and to provide legal or tax advice when implementing this or any similar arrangement. Pacific Life does not provide such advice.

> The cash surrender value of the policy may not be the appropriate measure of the value of a life insurance policy transferred from a qualified plan to the participant. Your attorney or tax advisor can determine the appropriate tax treatment in your particular situation.

(*Id.*, Ex. 3 at 57, 61; Ex. 5 at 121, 124.) The illustration also provided that funding by more than fifty percent (50%) of the plan with life insurance contracts may result in increased scrutiny by the IRS. (*Id.*, Ex. 3 at 71–72; Ex. 5 at 134–35.) Page eight (8) of the twelve-page illustration provided, in italics and in a box separate from the text: "*Neither Pacific Life nor its representatives offer legal or tax advice. Consult your attorney or tax advisor for complete up-to-date information concerning federal and state laws in this area.*" (*Id.*, Ex. 3 at 72; Ex. 5, at 135.) Dr. Pekerol executed the transaction documents in Los Angeles, California, where Goldinger witnessed his signature. (*Id.*, Ex. 2 at 53.)

With regard to the transaction documents, Dr. Pekerol testifies in his affidavit that, in setting up the Pekerol DBP, Goldinger presented him with "many pages of documents" and requested his signature on several pages at a meeting that lasted approximately "20 minutes." (Pl.'s Summ. J. App. at Tab 8 (Pekerol Aff. ¶ 11) (doc. 98).) Dr. Pekerol also testifies that neither his accountant nor Goldinger told him they were not providing tax or legal advice, nor did they ever inform him he

7

could not rely on their advice and other representations regarding the tax benefits of the Plan.  (*Id.* at ¶ 12.)  The transaction documents were presented to him as "boilerplate documents" that he had to sign to set up the Pekerol DBP.  (*Id.*)  Dr. Pekerol testifies that his "knowledge and sophistication in business matters is limited."  (*Id.* at ¶ 15.)

### 2.    *The Direct Electric Defined Benefit Plan*

Plaintiff Thomas A. Johnson ("Mr. Johnson"), a Wisconsin resident, is an officer and shareholder of Plaintiff Direct Electric of Wisconsin, Inc. ("Direct Electric"), which Johnson founded in 1999.  (Pl.'s Summ. J. App. at Tab 6 (Johnson Aff. ¶ 2) (doc. 98).)  In early 2003, Mr. Johnson's accountant set up a meeting with David Lake ("Lake"), a Pacific Life representative, to discuss possible vehicles for lowering Direct Electric's taxable income and providing him with retirement savings.  (*Id.* at ¶¶ 4–5.)  Lake advised Mr. Johnson to decrease Direct Electric's tax liability by creating a 412(i) defined benefit pension plan funded by special life insurance policies issued by Pacific Life, which would not only provide certain retirement benefits to himself and his employees, but also provide federal income tax deductions to Direct Electric in the amount of insurance premiums paid to Pacific Life in connection with the defined benefit plan.  (*Id.* ¶¶ 6–7.)  With regard to the recommended establishment of Direct Electric's defined benefit plan ("Direct Electric DBP"), Lake represented to Mr. Johnson that: "(a) the life insurance policies to be issued by Pacific Life were appropriate for use in funding the Direct Electric DBP as a qualified 412(i) plan; (b) these policies provided a permissible death benefit under the Direct Electric DBP; (c) the premiums to be paid on these policies by Direct Electric qualified as a deduction for federal income tax purposes; and (d) the Direct Electric [DBP], including the insurance policies that would be used to fund it, complied with federal tax laws and regulations."  (*Id.* at ¶ 8.)  Mr. Johnson also testifies in his affidavit that no one

8

ever told him that there were risks associated with this type of investment activity or that the IRS might not recognize the tax benefits of the program. (*Id.* at ¶ 9.) He testifies that Lake assured him "that funding the Direct Electric DBP with the Pacific Life life insurance policies he recommended buying was safe and posed no risk." (*Id.*)

In March 2003, based on the above-described representations, Dr. Johnson agreed to establish the Direct Electric DBP which was funded with a Pacific Life Flex XII policy insuring the life of Mr. Johnson. (Pac. Life Summ. J. App. at Ex. 8 (doc. 96).) In setting up the Direct Electric DBP, and to promote compliance with state insurance laws requiring purchasers of certain types of life insurance contracts be provided with illustrations for such contracts at the point of sale, Lake provided Mr. Johnson with the Flex XII Pacific Life insurance contract and an Illustration relating to the insurance contract (sometimes referred to as the "transaction documents"). (*See id.*, Ex. 9 (Illustration to Mr. Johnson's insurance contract).)

The Illustration, presented by Lake and signed by Mr. Johnson on July 30, 2003, contains identical disclaimer language as that signed by Dr. Pekerol. (*Compare* Ex. 3 *with* Ex. 9.) Like Dr. Pekerol, Mr. Johnson does not dispute that at the time he purchased his policy, he received and signed the illustration which provided:

> (i) Pacific Life was not providing him with tax and legal advice, and he should obtain his own tax and legal advice;
>
> (ii) For tax purposes, the cash surrender value of his insurance policy may not be the appropriate measure of the value of the policy upon distribution from his § 412(i) plan;
>
> (iii) Funding more than 50% of his plan with life insurance contracts may result in increased scrutiny by the IRS, and he should obtain his own legal or tax advice regarding that issue; and

(iv) Pacific Life was making no representations to him as to whether his plan would satisfy § 412(i) of the tax code.

(Pac. Life Summ. J. App., Ex. 9 at 195, 198, 202–04.)   Mr. Johnson, witnessed by Lake, executed the transaction documents in the State of Wisconsin.  (*Id.* at 190.)

With regard to the establishment of the Direct Electric DBP, Mr. Johnson states that on April 1, 2003, Lake came to his home in Wisconsin with the transaction documents and requested his signature on several pages, including the illustration, in a meeting lasting less than one hour. (Pl.'s Summ. J. App. at Tab 6 (Johnson Aff. ¶ 11) (doc. 98).)   Mr. Johnson states that Lake never told him he was not providing tax or legal advice, nor did Lake ever inform him he could not rely on Lake's advice and other representations regarding the tax benefits of the Plan.  (*Id.* at ¶ 12.) Lake never told him to consult an accountant or an attorney regarding establishing the plan of funding it with insurance policies.  (*Id.*)   The transaction documents were presented to Mr. Johnson as "boilerplate documents" that he had to sign to set up the Direct Electric DBP, and the language was never negotiated with him.  (*Id.*)   Mr. Johnson testifies that his "knowledge and sophistication in business matters is limited[]" and he does not hold a college degree.  (*Id.* ¶ 14.)  Mr. Johnson states that he has little familiarity with defined benefit plans.  (*Id.*)

**B.     The 412(i) Plans Funded with Hartford Policies**

*1.     The MacMillan Construction Defined Benefit Plan*

Robert W. MacMillan ("Mr. MacMillan"), an Arizona resident, is the President of MacMillan Construction Co., Inc.  ("MacMillan Construction").  (Pl.'s Summ. J. App. at Tab 7 (MacMillan Aff. ¶ 2) (doc. 98).)  In 2003, MacMillan Constuction's long-time accountant, Duane A. Allen ("Allen") contacted Mr. MacMillan about creating a defined benefit plan for MacMillan Construction.  (*Id.*

at ¶ 3.)  On or about June 19, 2003, Mr. MacMillan met with Allen and Kelli Stiles ("Stiles"), a representative of Hartford.  (*Id.*)  At the first meeting and subsequent meetings, Stiles and Allen suggested that MacMillan Construction establish a 412(i) defined benefit plan funded with special life insurance policies on the lives of eligible participants, and recommended purchasing the life insurance policies from  Hartford.  (*Id.* at ¶ 4.)  Stiles and Allen represented that creating the MacMillan Construction DBP and funding it with Hartford life insurance policies would not only provide certain retirement benefits to Mr. MacMillan and his employees, but also provide federal income tax deductions to MacMillan Construction in the amount of insurance premiums paid to Hartford in connection with the defined benefit plan.  (*Id.* at ¶ 5.)  Allen and Stiles represented to Mr. MacMillan that: "(a) the life insurance policies to be issued by Hartford were appropriate for use in funding the MacMillan Construction DBP as a qualified 412(i) plan; (b) these policies provided a permissible death benefit under the MacMillan Construction DBP; (c) the premiums to be paid on these policies by MacMillan Constuction qualified as a deduction for federal income tax purposes; and (d) the MacMillan Construction [DBP], including the insurance policies that would be used to fund it, complied with federal tax laws and regulations."  (*Id.* at ¶ 6.)  No one ever told Mr. MacMillan that there were risks associated with this type of investment activity or that the IRS might not recognize the tax benefits of the program; rather, Allen and Stiles assured him that funding the MacMillan Construction DBP with Hartford policies was safe and had been approved by the IRS.  (*Id.* at ¶ 7.)

In October 2003, based on the representations made to him by Allen and Stiles, Mr. MacMillan agreed to establish the MacMillan Construction DBP, funded with a Hartford life insurance policy insuring his life.  On October 9, 2003, he signed an application for life insurance

11

and, as part of the application process, signed a 412(i) Plan Disclosure and Acknowledgment Statement ("Disclosure Statement"). (*See* Decl. of Lenore J. Paoli in Supp. of Hartford's Mot. for Summ. J. at Ex. 1 (MacMillan Policy and Application), Ex. 2 (MacMillan Disclosure Statement) (doc. 95).) The Hartford life insurance policy, insuring the life of Mr. MacMillan, was issued to the MacMillan DBP on November 25, 2003. (*Id.*, Ex. 1.)

The Disclosure Statement signed by Mr. MacMillan began by advising him:

> The design, adoption and implementation of a 412(i) plan can be complicated and depends upon the particular facts and circumstances applicable to You. So, in designing and implementing the plan, You should consult with Your legal and tax advisors.

(*Id.*, Ex. 2 at A49.) The Disclosure Statement also informed him, in relevant part, that:

> •Neither we (nor anyone on Our behalf) have made representations to You regarding the federal and state tax consequences (to You or others) of participation in or termination from the Plan, transactions involving the Contracts, or any ERISA or other legal issues, including but not limited to any other Section 412(i) funding limitations and requirements.

> •You are solely responsible for complying with the tax disclosure requirements of the Internal Revenue Code and determining whether this is a reportable transaction for which disclosure is required on any applicable tax returns.

> •We [Hartford] are bound only by those promises in the Contracts and no others. We do not endorse the Plan, its design, its adoption or implementation. Decisions on the advisability of the Plan, its adoption, implementation and design are decision that are made by You, the Plan sponsor and Plan actuaries in consultation with Your legal and tax advisers.

> • You have read this form, understand its provisions or have sought legal advice concerning it.

(*Id.*, Ex. 2 at A49–A50.) With regard to Hartford's requirement that the participating employer name its tax and/or legal advisor with regard to the 412(i) plan, MacMillan Construction listed Allen & Chen, P.C. (*Id.*, Ex. 2 at A50.) Mr. MacMillan executed the transaction documents in Prescott,

Arizona, where Allen signed as a witness.  (*Id.*, Ex. 1 at A43.)

Mr. MacMillan states that, in setting up the MacMillan Construction DBP, Allen and Stiles presented him with many pages of documents and requested his signature on several of them, including the Disclosure Statement.  (Pl.'s Summ. J. App. at Tab 7 (MacMillan Aff. ¶ 9) (doc. 98).) He further states that no part of the Disclosure Statement was ever negotiated or discussed, and Allen and Stiles presented him with a boilerplate document that he had to sign to create the MacMillan Construction DBP.  (*Id.* at ¶ 10.)  According to Mr. MacMillan, Allen and/or Stiles also told him that the documents he was signing were not tax or legal documents.  (*Id.*)  Mr. Johnson states that Allen and Stiles never told him they were not providing tax or legal advice, nor did they ever inform him he could not rely on their advice and other representations regarding the tax benefits of the Plan.  (*Id.*)  Mr. MacMillan states that he was not represented by independent legal counsel, and when he asked Allen and Stiles if he needed to consult MacMillan Construction's accountant, they told him he did not.  (*Id.* at ¶ 11.)  Mr. MacMillan testifies that his "knowledge and sophistication in business matters is limited[]" and he does not hold a degree in law, finance or accounting.  (*Id.* at ¶ 12.)  Mr. MacMillan owns MacMillan Construction, and prior to creating the MacMillan Construction DBP, he had invested in money market funds and purchased bonds.  (*Id.*) Mr. MacMillan states that he has little familiarity with defined benefit plans.  (*Id.*)

## 2.    *The Poulsbo Dentistry Defined Benefit Plan*

Charles R. Brown, D.D.S. ("Dr. Brown"), a resident of the State of Washington, has been operating Poulsbo Children's Dentistry ("Poulsbo Dentistry") as a sole proprietorship since approximately 2001, when he retired from active military duty.  (Pl.'s Summ. J. App. at Tab 5 (Brown Aff. ¶ 2) (doc. 98).)  In September 2002, his long-time personal banker at Bank of America,

13

Liann Baker ("Baker"), introduced him to her colleague, Tom Edwards ("Edwards").  (*Id.* at ¶ 3.)

Baker and Edwards suggested that Dr. Poulsbo establish a 412(i) plan for his dentistry practice, and

all contributions would be tax deductible for Poulsbo Dentistry.  (*Id.* at ¶ 4.)  In 2002, Edwards

introduced Dr. Brown to Alvin McGill ("McGill"), a Hartford representative, and Edwards and

McGill suggested that Poulsbo Dentistry establish a 412(i) defined benefit plan funded with special

life insurance policies issued by Hartford.  (*Id.* at ¶ 5.)  McGill and Edwards represented that creating

the Poulsbo Dentistry DBP and funding it with Hartford life insurance policies would not only

provide certain retirement benefits to Dr. Brown and his employees, but also provide federal income

tax deductions to Poulsbo Dentistry related to insurance premiums paid to Hartford in connection

with the defined benefit plan.  (*Id.* at ¶ 6.)  McGill and Edwards also told him that Hartford had

expertise regarding defined benefit plans, insurance policies and related federal income tax matters,

which Dr. Brown states was important to him, as he lacked specialized investment knowledge or a

business background that would have allowed him to evaluate the propriety of the investment

strategy.  (*Id.*)  In 2003, McGill and Edwards introduced Dr. Brown to Ron Braley ("Braley"), an

attorney in Seattle, Washington, and told him that Braley would prepare some of the necessary

documents to establish the Poulsbo Dentistry DBP.  (*Id.* at ¶ 7.)  Braley told Dr. Brown that he was

as an expert in retirement planning and attended many meetings with Dr. Brown, McGill, and

Edwards.  (*Id.* at ¶ 8.)  McGill, Edwards, and Braley represented to Dr. Brown that:"(a) the life

insurance policies to be issued by Hartford were appropriate for use in funding the Poulsbo Dentistry

DBP as a qualified 412(i) plan; (b) these policies provided a permissible death benefit under the

Poulsbo Dentistry DBP; (c) the premiums to be paid on these policies by Poulsbo Children's

Dentistry qualified as a deduction for federal income tax purposes; and (d) the Poulsbo Dentistry

DBP, including the insurance policies that would be used to fund it, complied with federal tax laws and regulations." (*Id.* at ¶ 9.)  No one ever told Dr. Brown that there were risks associated with this type of investment activity or that the IRS might not recognize the tax benefits of the program; rather, McGill, Edwards, and/or Braley advised him that even were the IRS to issue new regulations affecting 412(i) plans, these regulations would not affect the Poulsbo Dentistry DBP, that funding the  plan with Hartford policies would satisfy all existing IRS guidelines, and the plan would be "grandfathered" in under any new regulations.  (*Id.* at ¶ 10.)

In September 2003, based on these representations by McGill, Braley, and Edwards, Dr. Brown agreed to establish the Poulsbo Dentistry DBP.  (*Id.* at ¶ 11.)  On September 3, 2003, in Poulsbo, Washington, he signed an application for a Hartford flexible deferred annuity contract, and on May 20, 2003, signed a 412(i) Plan Disclosure and Acknowledgment Statement that is part of the application materials.  (*See* Decl. of Lenore J. Paoli in Supp. of Hartford's Mot. for Summ. J. at Ex. 3 (Brown deferred annuity contract and Application), Ex. 4 (Brown Disclosure Statement)  (doc. 95).)  The Hartford annuity contract was issued to Poulsbo Dentistry DBP on September 26, 2003. (*Id.*, Ex. 3.)

The Disclosure Statement signed by Dr. Brown was identical to that signed by Mr. MacMillan (*see supra*, at 12).  (*Id.*, Ex. 4 at B34–B35.)  With regard to Hartford's requirement that the participating employer name its tax and/or legal advisor, Poulsbo Dentistry listed Braley.  (*Id.*, Ex. 4 at B35.)  Dr. Brown states that, in setting up the Poulsbo Dentistry DBP, McGill, Edwards, and Braley presented him with many pages of documents and requested his signature on several of them, including the Disclosure Statement.   (Pl.'s Summ. J. App. at Tab 5 (Brown Aff. ¶ 12) (doc. 98).) He further states that no part of the Disclosure Statement was ever negotiated or discussed, and

15

McGill and/or Edwards presented him with a "boilerplate" document that he had to sign to create the Poulsbo Dentistry DBP. (*Id.* at ¶ 13.) Dr. Brown states that Edwards and McGill never told him they were not providing tax or legal advice, nor did they ever inform him he could not rely on their advice and other representations regarding the tax benefits of the Plan. (*Id.*) Dr. Brown states that he was not represented by independent legal counsel in deciding to establish the Poulsbo Dentistry DBP, and Braley was "hand-picked" to serve as counsel by Hartford's agents. (*Id.* at ¶ 14.) Dr. Brown testifies that his "knowledge and sophistication in business matters is limited[]" and he does not hold a degree in law, finance, business or accounting. (*Id.* at ¶ 15.) Prior to opening his dentistry practice, he never owned or managed his own business, and never established or participated in a defined benefit plan. (*Id.*)

### 3. *The Pacific Home Remodeling Defined Benefit Plan*

Noam Maor ("Mr. Maor"), a California resident, is an officer, director and shareholder of Pacific Home Remodeling, Inc. ("Pacific Home"), a California corporation located in Los Angeles, California. (Pl.'s Summ. J. App. at Tab 4 (Maor Aff. ¶ 2) (doc. 98).) In May or June 2003, his wife's uncle, Kenneth Scopp ("Scopp"), whom he has known since 1985, recommended to Mr. Maor and his partner, Yoram Hakimi ("Mr. Hakimi"), that they establish a 412(i) defined benefit plan for Pacific Home, and that all contributions would be tax deductible for Pacific Home. (*Id.* at ¶¶ 3–4.) Scopp introduced Mr. Maor and Mr. Hakimi to Gary Thornhill ("Thornhill"), whom Scopp described as an expert in the area of defined benefit plans. (*Id.* at ¶ 5.) Thornhill suggested that Pacific Home establish the Pacific Home Remodeling Defined Benefit Plan ("PHR DBP"), a 412(i) defined benefit plan funded with special life insurance policies. (*Id.*) Although initially Scopp and Thornhill suggested that the PHR DBP be funded with insurance policies issued by Indianapolis Life

16

Insurance Company, ultimately the PHR DBP was funded with Hartford policies, as recommended by Scopp and Thornhill.  (*Id.*)

Scopp and Thornhill promised that funding the PHR DBP with Hartford life insurance policies  would not only provide certain retirement benefits to Mr. Maor and Mr. Hakimi, but also provide federal income tax deductions to Pacific Home related to insurance premiums paid to Hartford in connection with the defined benefit plan.  (*Id.* at ¶ 6.)  Scopp and Thornhill also told him that Hartford had expertise regarding defined benefit plans and insurance policies, which Mr. Maor testifies was important to him, as he lacked "specialized investment knowledge" that would have allowed him to evaluate the propriety of the investment strategy.  (*Id.*)   Also in the summer of 2003 and throughout 2004, Scopp and Thornhill represented to Mr. Maor that: "(a) the life insurance policies to be issued by Hartford were appropriate for use in funding the PHR DBP as a qualified 412(i) plan; (b) these policies provided a permissible death benefit under the PHR DBP; (c) the premiums to be paid on these policies by Pacific Home ualified as a deduction for federal income tax purposes; and (d) the PHR DBP, including the insurance policies that would be used to fund it, complied with federal tax laws and regulations." (*Id.* at ¶ 7.)  No one ever told Mr. Maor that there were risks associated with this type of investment activity or that the IRS might not recognize the tax benefits of the program; rather, Scopp and Thornhill advised him that the PHR DBP had been approved by the IRS and was, in their words, "risk proof." (*Id.* at ¶ 8.)

In September 2004, based on these representations by Scopp and Thornhill, Mr. Maor agreed to establish the PHR DBP.  (*Id.* at ¶ 9.)  Had he known of the risks associated with the PHR DBP, he would not have created it.  (*Id.*)  The PHR DBP was funded with Hartford life insurance policies, insuring the lives of Mr. Hakimi and Mr. Maor.  On August 4, 2004, in Los Angeles, California, Mr.

Hakimi signed an application for a Hartford life insurance contract, and on September 21, 2004, he signed the Disclosure and Acknowledgment Statement Stag Whole Life in 412(i) or Other Qualified Retirement Plans ("Disclosure Statement"), that is part of the application and overall contract for insurance between Hartford and Mr. Hakimi. (*See* Decl. of Lenore J. Paoli in Supp. of Hartford's Mot. for Summ. J. at Ex. 5 (Hakimi insurance contract, application and Disclosure Statement) (doc. 95).) The Hartford life insurance contract insuring the life of Mr. Hakimi was issued to PHR DBP on September 24, 2004. (*Id.*)

On August 4, 2004, in Los Angeles, California, Mr. Maor signed an application for a Hartford life insurance contract and on September 21, 2004, he signed the Disclosure and Acknowledgment Statement Stag Whole Life in 412(i) or Other Qualified Retirement Plans ("Disclosure Statement"), that is part of the application and overall contract for insurance between Hartford and Mr. Maor. (*See id.*, Ex. 6 (Maor insurance contract, application and Disclosure Statement) (doc. 95).) The Hartford life insurance contract insuring the life of Mr. Maor was issued to PHR DBP on September 24, 2004. (*Id.*)

The Disclosure Statements signed by Mr. Hakimi and Mr. Maor contained the same disclaimer language as the Disclosure Statements signed by Mr. MacMillan, (*see supra,* at 12), and Dr. Brown. (*Id.*, Ex. 5 at C37–C38, Ex. 6 at C76–C77.)[7] With regard to Hartford's requirement that the participating employer name its tax and/or legal advisor, Pacific Home listed Joel Berman as its

---

[7]Mr. Maor and Mr. Hakimi signed the 2004 version of the Disclosure Statement, whereas Mr. MacMillan and Dr. Brown signed the 2003 version. While the disclaimer language pertinent to the Court's analysis is identical, Hartford modified the 2003 Disclosure after the IRS issued its February 2004 Revenue Rulings, to add specific details about IRS modifications regarding the requirements for 412(i) plans to obtain tax advantages, and the requirement that taxpayers who create such plans list them on their tax returns. (*See* Decl. of Lenore J. Paoli in Supp. of Hartford's Mot. for Summ. J., Ex 6 at C79–C80.)

attorney and Simon Feldman as its accountant.  (*Id.*, Ex. 5 at C38, Ex. 6 at C77.)

Mr. Maor states that, in setting up the PHR DBP, Scopp and Thornhill presented him with many pages of documents and requested his signature on several of them, including the Disclosure Statement.  (Pl.'s Summ. J. App. at Tab 4 (Maor Aff. ¶ 10) (doc. 98).)  He further states that no part of the Disclosure Statement was ever negotiated or discussed, and Scopp and Thornhill presented him with a "boilerplate" document that he had to sign to create the PHR DBP.  (*Id.* at ¶ 11.)  Mr. Maor states that Scopp and Thornhill never told him they were not providing tax or legal advice, nor did they ever inform him he could not rely on their advice and other representations regarding the tax benefits of the PHR DBP.  (*Id.*)  Mr. Maor states that he was not represented by independent legal counsel in deciding to establish the PHR DBP and purchase the Hartford policies to fund the plan.  (*Id.* at ¶ 12.)  Mr. Maor states that Scopp and Thornhill told him "there was no need to get outside advisors involved in the matter."  (*Id.*)  He further testifies that he trusted Scopp, as he had known him over twenty years, and at no point did he have reason to question Scopp and Thornhill's representations.  (*Id.*)  Mr. Maor testifies that he has "little knowledge of sophisticated business transactions," and does not hold a degree in law, finance, business or accounting.  (*Id.* at ¶ 13.)  Prior to opening his dentistry practice, he never owned or managed his own business, and never established or participated in a defined benefit plan.  (*Id.*)  Prior to becoming an officer, director and shareholder of Pacific Home, Mr. Maor states that he worked as a security guard and an armored truck driver, and has been involved with a handful of small businesses, but has never created or participated in an defined benefit plan prior to the PHR DBP.  (*Id.*)  His knowledge of 412(i) plans, and "whether it was lawful to take tax deduction for premiums paid on life insurance policies used to fund" the plans came from Scopp, Thornhill and/or Hartford.  (*Id.* at ¶ 14.)

19

## II.

## SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). "[T]he substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. Only disputes about material facts will preclude the granting of summary judgment. *Id.*

The burden is on the summary judgment movant to prove that no genuine issue of material fact exists. *Latimer v. Smithkline & French Lab.*, 919 F.2d 301, 303 (5th Cir. 1990). If the non-movant bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case. Rather, the movant may satisfy its burden by pointing to the absence of evidence to support the non-movant's case. *Id.*; *Little*, 37 F.3d at 1075.

Once the movant has met its burden, the non-movant must show that summary judgment is not appropriate. *Little*, 37 F.3d at 1075 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "This burden is not satisfied with 'some metaphysical doubt as to material facts,' . . . by 'conclusory allegations,' . . . by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little*, 37 F.3d at 1075 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita*, 475 U.S. at 587 (emphasis in original) (quoting FED. R. CIV. P. 56(e)). To determine whether a genuine issue exists for trial, the court must view all of the evidence in the light most favorable to the non-movant, and the evidence must be sufficient such that a reasonable jury could return a verdict for the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000);

20

*Anderson*, 477 U.S. at 248.

## III.

## ANALYSIS

Pacific Life has moved for summary judgment as to all Dr. Pekerol's and Mr. Johnson's fraud-based claims. Pacific Life argues that Dr. Pekerol and Mr. Johnson have failed to raise a genuine issue of material fact that they justifiably relied on representations regarding the tax consequences and legality of their 412(i) plans, in light of explicit disclaimers to the contrary contained in the transactions documents they signed. Specifically, Pacific Life contends that the clear language of the Illustrations signed by Dr. Pekerol and Mr. Johnson establishes that any reliance on alleged representations contrary to the language of these documents was unjustified under controlling law. (*See* Pac. Life Mot. for Summ. J. at 23, 35 (doc. 38); Pac. Life Mot. for Summ. J. Reply at 14–15 (doc. 82); Pac. Life Opp'n to Pl.'s Supp. Resp. at 5, 10–11 (doc. 107).) In response, Dr. Pekerol and Mr. Johnson contend that, based on the affidavits and evidence submitted with their supplemental briefing, issues of fact remain as to whether their reliance was justified, and the Court should therefore deny summary judgment. (*See* Pl.'s Supp. Resp. at 8–17 and App. in Supp. (docs. 98, 99).) Alternatively, Dr. Pekerol and Mr. Johnson request a continuance so that they can conduct discovery in order to present additional relevant evidence to the Court. (*See id.* at 17–21 (doc. 98).)

Similarly, Hartford has moved for summary judgment as to the fraud-based claims of Mr. MacMillan, MacMillan Construction, Poulsbo Dentistry, Dr. Brown, Pacific Home, Mr. Maor and Mr. Hakimi, arguing that these Plaintiffs have failed to raise a genuine issue of material fact that they justifiably relied on representations regarding the tax consequences and legality of their 412(i) plans, in light of explicit disclaimers to the contrary contained in the transactions documents. Hartford

argues that the disclosure statements signed by Mr. MacMillan, Dr. Brown, Mr. Maor and Mr. Hakimi establish that any reliance on alleged representations contrary to the language of these documents was unjustified under applicable law. (*See* Hartford Mot. for Summ. J. Reply at 21–23 (doc. 84); Hartford Opp'n to Pl.'s Supp. Resp. at 1–2 (doc. 105).) In response, these Plaintiffs contend that summary judgment should be denied since, based on the affidavits and evidence submitted with their supplemental briefing, issues of fact remain as to whether their reliance on the representations of Hartford and/or its agents was justified. (*See* Pl.'s Supp. Resp. at 8–17 and App. in Supp. (docs. 98, 99).) Alternatively, these Plaintiffs request a continuance so that they can conduct discovery in order to present the Court with additional relevant evidence. (*See id.* at 17–21 (doc. 98).) Prior to analyzing the parties' arguments, the Court must make the threshold determination as to which state's law governs its analysis.

## A.     Choice of Law

### 1.     *Legal Standard*

Choice of law is a threshold inquiry in diversity jurisdiction cases. *Faloona by Fredrickson v. Hustler Magazine, Inc.*, 799 F.2d 1000, 1003 (5th Cir. 1986) ("At the threshold in this diversity jurisdiction case, we must determine applicable law by applying Texas choice-of-law rubrics.") (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). When sitting in diversity jurisdiction, a federal court must apply the choice of law rules of the forum state, in this case Texas. *R.R. Mgmt. Co. v. CFS La. Midstream Co.*, 428 F.3d 214, 222 (5th Cir. 2005) (citing *Klaxon Co.*, 313 U.S. at 496); *see also Audler v. CBC Innovis, Inc.*, 519 F.3d 239, 248 (5th Cir. 2008) (applying choice-of-law rules of forum state in case filed under Class Action Fairness Act).

Prior to engaging in a choice-of-law analysis, a Texas court first must determine whether

Texas law is, in fact, inconsistent with other potentially applicable law. *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 419 (Tex. 1984). If the laws are not inconsistent, a court need not undertake a choice-of-law analysis, and Texas law will govern the dispute. *See Fraud-Tech, Inc v. Choicepoint, Inc.*, 102 S.W.3d 366, 377–78 (Tex. App.–Fort Worth 2003, pet. denied) ("Before undertaking a choice of law analysis, we look to whether a conflict of law exists. If no conflict exists on the issues, we need not decide which state's laws govern."). Where the potentially applicable laws are inconsistent, however, Texas courts decide choice of law issues by using the Restatement's "most significant relationship" test. *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 727 (5th Cir. 2003) (citing *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000)). Specifically, Restatement (Second) of Conflict of Laws § 148(2) applies in fraud and misrepresentation claims. A six factor test determines which state has the most significant relationship to the occurrence and the parties:

(a)   the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b)   the place where the plaintiff received the representations,

(c)   the place where the defendants made the representations,

(d)   the domicile, residence, nationality, place of incorporation and place of business of the parties,

(e)   the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f)   the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148(2) (1971); *Benchmark Elecs., Inc.*, 343 F.3d at 727 n.4; *Grant Thornton LLP v. Suntrust Bank*, 133 S.W.3d 342, 358 (Tex. App.–Dallas 2004, pet. denied). If two of the above contacts, other than defendant's domicile, state of incorporation or place of business, are located wholly in a single state, then that state's law will usually govern.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 148 cmt. j (1971); *Grant Thornton LLP*, 133 S.W.3d at 358.

### 2.     Assessment of Potentially Applicable State Law

Pacific Life contends that the Court should analyze Dr. Pekerol's and Pekerol P.C.'s fraud-based claims under California law rather than Texas law. Hartford similarly argues that the Court should analyze Mr. Maor's, Mr. Hakimi's, and Pacific Home's fraud-based claims under California law. It is undisputed that these Plaintiffs reside in, or are incorporated in, California, signed the transaction documents in California, and that Pacific Life and Hartford's respective insurance agents met with these Plaintiffs in California and made certain representations concerning the 412(i) plans in California. As an initial matter, the Court must determine whether applicable California law differs from Texas law, and if so, which state's law has the "most significant relationship" to the transaction and parties herein. *See Benchmark Elecs., Inc.*, 343 F.3d at 727; *Duncan*, 665 S.W.2d at 419.

Pacific Life contends that the Court should apply California law in determining whether Dr. Pekerol and Pekerol P.C. could have justifiably relied on representations in the face of disclaimers in the Illustration to the contrary, since application of Texas law would require the Court to consider factors that are irrelevant under California law. Hartford makes identical arguments in support of its position that California law, rather than Texas law, governs the resolution of Pacific Home's, Mr. Maor's and Mr. Hakimi's fraud-based claims. Dr. Pekerol, Pekerol P.C., Pacific Home, Mr. Maor, and Mr. Hakimi (sometimes collectively referred to as the "California Plaintiffs") argue that Pacific Life and Hartford have gone through a complex choice of law analysis for no reason, since the law governing fraud in Texas is the same as California, and the Court should therefore apply Texas law.

24

The Court agrees with Defendants Pacific Life and Hartford that, although California law is in accord with Texas law as to the requisite elements of a fraud claim, and both jurisdictions share in common the requirement that the plaintiff must prove justifiable reliance on the representations made by the defendant, the two states differ as to which factors courts consider significant in assessing whether a party is justified in relying on oral representations that contradict a written disclaimer to the contrary. *Compare Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 61 (Tex. 2008) (Texas law)*; Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997) (Texas law) *with Omni Home Fin., Inc. v. Hartford Life & Annuity Ins. Co.*, 2008 WL 1925248, at *5 (S.D. Cal. Apr. 29, 2008) ("*Omni I*") and *Omni Home Fin., Inc. v. Hartford Life & Annuity Ins. Co.*, 2008 WL 4616796, at **3–4 (S.D. Cal. Aug. 1, 2008) ("*Omni II*") (California law); *Mehta v. Metropolitan Life Ins. Co.*, 2006 WL 3262334, at *4 ( Cal. Ct. App. Nov. 13, 2006) (California law).

In determining whether a party has demonstrated a clear and unequivocal expression of intent to disclaim reliance, Texas courts consider the "totality of the circumstances," which includes, among others, the following factors:

> (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute;
>
> (2) the complaining party was represented by counsel;
>
> (3) the parties dealt with each other in an arm's length transaction;
>
> (4) the parties were knowledgeable in business matters; and
>
> (5) the release language was clear.

*Forest Oil Corp.*, 268 S.W.3d at 60. While all factors need not be satisfied to find a clear and unequivocal disclaimer, the Court determines that a California court would not necessarily examine

as extensive a list of factors as a Texas court. Under California law, "reasonable reliance" ordinarily cannot be shown when written documents contradict alleged oral representations. *See Cohen v. Wedbush, Noble, Cooke, Inc.*, 841 F.2d 282, 287–88 (9th Cir. 1988) (overruled on other grounds by *Ticknor v, Choice Hotels Int'l, Inc.*, 265 F.3d 931 (9th Cir. 2001)). In determining whether reliance was justified, California courts consider factors such as "the sophistication of the mislead [sic] party, the specificity of the written language, and the clarity and length of the relevant documents." *Omni II*, 2008 WL 4616796, at *4 (and cases cited therein).

Having determined that the potentially applicable law of California is inconsistent enough with Texas law to potentially alter the outcome of the Court's resolution of the pending motions, the Court must determine which state's law governs under the Restatement (Second) of Conflict of Laws § 148(2)'s "most significant relationship" test. *Benchmark Elecs.*, 343 F.3d at 727. With regard to Dr. Pekerol's and Pekerol P.C.'s fraud-based claims, the Court agrees with Pacific Life that California law should govern since California has the most significant relationship based on the Restatement Section 148 factors. It is undisputed that Dr. Pekerol is a California resident, that Pekerol P.C. is a California corporation, that Goldinger met Dr. Pekerol in California where he executed the insurance policy application and Illustration, that Goldinger signed the transaction documents as a witness in California, and Pekerol, P.C. took the tax deduction at issue in California. (*See* Pl.'s Summ. J. App. at Tab 8 (Pekerol Aff. ¶ 2) (doc. 98); Pac. Life Summ. J. App. at Ex.'s 2–5 (doc. 96).)

Similarly, the Court agrees with Hartford that, with regard to the fraud-based claims of Pacific Home, Mr. Maor, and Mr. Hakimi, California law should govern since California has the most significant relationship based on the Restatement Section 148 factors. It is undisputed that Mr.

26

Maor and Mr. Hakimi are California residents, that Pacific Home is a California corporation, that Scopp and Thornhill met with Mr. Maor and Mr. Hakimi in California, where they executed the insurance policy application and related disclosures, and Pacific Home took the tax deduction at issue in California.  (*See* Pl.'s Summ. J. App. at Tab 4 (Maor Aff. ¶¶ 2, 10) (doc. 98); Decl. of Lenore J. Paoli in Supp. of Hartford's Mot. for Summ. J. at Ex. 5 (Hakimi insurance contract, application and Disclosure Statement) (doc. 95); *id.* at Ex. 6 (Maor insurance contract, application and Disclosure Statement).)  The Court further notes that in Plaintiffs' motion to transfer venue (which the court has stayed pending determination of the dispositive motions in this case (*see* doc. 89)), Plaintiffs concede that "[n]one of the facts giving rise to this suit occurred in the Northern District of Texas." (Pl.'s Mot. to Transfer at 3 (doc. 67).)  In short, having considered the relevant factors under the Restatement (Second) of Conflict of Laws § 148(2), the Court determines that California is the state with the "most significant relationship" to the fraud-based claims of Dr. Pekerol, Pekerol P.C., Mr. Maor, Mr. Hakimi, and Pacific Home.  *See Benchmark Elecs.*, 343 F.3d at 727.

As to the Plaintiffs in states other than California, Hartford and Pacific Life argue the Court should apply the law of the state where of each these Plaintiffs resides, rather than Texas law. However, although they make this argument, neither Hartford nor Pacific Life provide the Court with adequate briefing of whether the relevant laws of these potentially applicable states are inconsistent with Texas law.  Further, as Plaintiffs correctly point out, in arguing that Wisconsin law should apply to Mr. Johnson and Direct Electric's claims, "Pacific Life does not even claim that a conflict actually exists," and simply "assumes that the law of each plaintiff's home state will govern." (Pl.'s Reply in Supp. of Supp. Resp. at 3 and note 3 (doc. 112).)

The Court has read the cases cited by Pacific Life pertaining to Wisconsin law.  In support

27

of its argument that Wisconsin law differs from Texas law, Pacific Life relies on *Westerfield v. Quizno's Franchise Co., LLC*, 527 F.Supp.2d 840 (E.D. Wis. 2007), where the court granted a franchisor's motion to dismiss, holding that any reliance on the alleged misrepresentations by the franchisee was unjustifiable as a matter of law because the alleged oral representations were "fatally undermined by the express disclosures, disclaimers and non-reliance clauses contained in both the [circular] that each plaintiff received and the Franchise Agreement that each plaintiff signed." (*See* Pac. Life Opp'n to Pl.'s Supp. Resp. at 6 (quoting *Westerfield*, 527 F.Supp.2d at 846–47).) However, the district judge, on a motion to reconsider filed by the franchisee, reversed his decision, concluding that he erred in his previous holding that  Quizno's disclaimers and non-reliance clauses fatally undermined the plaintiffs' fraud claims.  *See Westerfield v. Quizno's Franchise Co., LLC*, 2008 WL 2512467, at *9 (Apr. 16, 2008 E.D. Wis.).  The judge went even further, however, stating that as to the plaintiff's state law claim of fraud, the Wisconsin Supreme Court has determined that "exculpatory clauses are unenforceable on public policy grounds where the alleged harm is caused intentionally or recklessly." *See id.* (and cases cited therein).  The Court is disappointed that counsel for Pacific Life failed to discover and notify this Court that the *Quizno's* decision, in addition to no longer being good law, was reversed on exactly the issue for which Pacific Life cited it.

It is undisputed that Mr. Johnson is a Wisconsin resident, Direct Electric is a Wisconsin corporation, Lake met Mr. Johnson in Wisconsin where he executed the transaction documents, Lake witnessed his signature in Wisconsin, and Direct Electric DBP took the tax deduction at issue in Wisconsin.  (*See* Pl.'s Mot. for Summ. J. App. at Tab 6 (Johnson Aff. ¶¶ 2, 11–12) (doc. 98); Pac. Life Summ. J. App. at Ex. 9.)  These factors are sufficient under Restatement Section 148 to establish that Wisconsin in the state with the "most significant relationship" to the occurrences and

28

parties.  In light of the foregoing, as to Mr. Johnson's fraud-based claims, the Court agrees with Pacific Life that the State of Wisconsin has the most significant relationship based on the Restatement Section 148 factors.  *See Benchmark Elecs.*, 343 F.3d at 727.

As to the governing law to be applied to the Court's analysis of the fraud-based claims of the remaining Plaintiffs, Hartford contends that the Court should apply the laws of the states where Plaintiffs reside or are incorporated; that is, the law of Washington State to the fraud-based claims of Dr. Brown and Poulsbo Children's Dentistry, and the law of the State of Arizona to the fraud-claims of Mr. MacMillan and MacMillan Construction.  The Court disagrees.  Plaintiffs are correct that "Hartford makes no attempt whatsoever to show any conflict between Texas law and the laws of Arizona or Washington."  (*See* Pl.'s Reply. in Supp. of Supp. Resp. at 3 and note 3 (doc. 112).) In its supplemental briefing, Hartford refers the Court back to a footnote in its motion-to-dismiss briefing concerning Arizona and  Washington law.  (*See* Hartford Opp'n to Pl.'s Supp. Resp. at 6 n.14 (citing *Carrel v. Lux*, 420 P.2d 564, 568 (Ariz. 1996); *Dawson v. Withycombe*, 163 P.2d 1034, 1048 (Ariz. Ct. App. 2007); *Williams v. Joslin*, 399 P.2d 308, 308–09 (Wash. 1965)).)  The Court has reviewed these cases, which merely recite the required elements of a misrepresentation claim under Arizona and Washington law.  These cases certainly do not persuade the Court that the resolution of whether Plaintiffs justifiably relied on oral representations contradicted by written disclaimers would be any different under the laws of Arizona and Washington, than under Texas law.  Nor has the Court's own research yielded any difference.  Accordingly, the Court applies the law of the forum state, in this case, Texas, to the fraud claims of  Plaintiffs Robert W. MacMillan, MacMillan Construction Company, Charles R. Brown, DDS, and Poulsbo Children's Dentistry.  *See generally Duncan*, 665 S.W.2d at 419 (before undertaking a choice-of-law analysis, the court "must first

determine whether there is a difference between the laws of New Mexico and Texas on this issue”); *Fraud-Tech,* 102 S.W.3d at 377–78 (“Before undertaking a choice of law analysis, we look to whether a conflict of law exists. If no conflict exists on the issues, we need not decide which state's laws govern.”).

In summary, the Court concludes that California law differs from Texas law on the issue of what factors courts consider significant when considering whether reliance is justified in the face of a disclaimer to the contrary; and that Wisconsin law will likely differ from Texas law (albeit not in the manner represented by Pacific Life). On the other hand, Hartford and Pacific Life have fallen short of demonstrating any significant inconsistencies between Texas law and the laws of Arizona and Washington sufficient to convince the Court that application of those state's laws would be different enough to change the outcome of the Court's analysis. Accordingly, the Court will apply California law to the fraud claims of Dr. Pekerol, Pekerol P.C., Mr. Maor, Mr. Hakimi, and Pacific Home; Wisconsin law to the fraud claims of Mr. Johnson and Direct Electric; and Texas law to the fraud claims of Plaintiffs Robert W. MacMillan, MacMillan Construction Company, Charles R. Brown, DDS, and Poulsbo Children's Dentistry. *See Duncan,* 665 S.W.2d at 419.

**B.      Pacific Life's and Hartford's Motions for Summary Judgment**

**1.      *The California Plaintiffs' Fraud-Based Claims***

Pacific Life and Hartford contend that, under California law, they are entitled to summary judgment on the California Plaintiffs' fraud-based claims, which include their common-law fraud, negligent misrepresentation, and civil conspiracy claims.[8] They argue that under California law,

_____

[8]As stated by the California Supreme Court, “Justifiable reliance is an essential element of a cause of action for fraud and conspiracy to commit fraud.” *Grisham v. Phillip Morris U.S.A., Inc.,* 40 Cal.4th 623, 633

based on the explicit disclaimers in the transaction documents, the California Plaintiffs could not have justifiably relied on representations to the contrary regarding the 412(i) plans and their tax and legal consequences.   In support, Pacific Life and Hartford quote the specific language of the disclaimers and cite the Court to *Omni I* and *Omni II*, *see supra*, at III.A.2.   In *Omni I*, the federal district court, applying California law, held that 412(i) Plan Disclosure and Acknowledgment Statements ("Disclosures") *identical* to the Hartford Disclosures signed by Mr. Maor and Mr. Hakimi in establishing the PHR DBP, and *nearly identical* to the Illustration signed by Dr. Pekerol in establishing the Pekerol DBP, precluded all fraud-based claims based on alleged contrary oral representations.   *See Omni I*, 2008 WL 1925248, at *5.   The *Omni I* court considered two central factors in determining whether the disclosures were enforceable, namely (i) how closely the information in the Disclosures related to the issues in dispute; and (ii) the clarity and length of the Disclosures.   *Id.; see also Omni II*, 2008 WL 4616796, at *4 (considering the sophistication of the mislead party, the specificity of the written language, and the clarity and length of the relevant documents.)   In *Omni I*, the court stated that while "a general integration clause does not make reliance on oral statements automatically unreasonable . . . specific written language directly contradicting alleged oral statements does preclude a showing of reasonable reliance." *Omni I*, 2008 WL 1925248, at *5.   The court in *Omni I* determined that the Hartford Disclosures:

> clearly explained [the *Omni* plaintiffs] should not rely on defendants for legal and tax advice, and they should consult their own legal and tax advisors.   The contents of the disclaimers were specific and by reading them, plaintiffs would have understood defendants were not providing tax advice.

---

(2007) (citation omitted).   Justifiable reliance is also an element of negligent misrepresentation. *Apollo Capital Fund, LLC v. Roth Capital Partners*, 158 Cal. App. 4th 226, 243 (2007).

*See id.* In light of the specificity and clarity of the Disclosures, the *Omni I* court held that the *Omni* plaintiffs "cannot show reasonable reliance on these facts" and granted summary judgment in Hartford's favor. *Id.*

The California Plaintiffs do not argue that *Omni I* and *Omni II* were wrongly decided, or were not based on general principles of California contract law. In response, the California Plaintiffs contend that summary judgment should be denied since, based on the affidavits and evidence submitted with their supplemental briefing, issues of fact remain as to whether their reliance on the representations of Hartford's and Pacific Life's agents was justified. (*See* Pl.'s Supp. Resp. at 8–17 and App. in Supp. (docs. 98, 99).) Specifically, the California Plaintiffs contend that they have raised genuine issues of material fact based on their affidavit testimony that: the Disclosures they signed (or, in the case of Dr. Pekerol, the Illustration) were not negotiated or discussed with them and were "boilerplate documents" that they had to sign to set up their plans; they were not represented by independent advisors when they purchased their policies; they were not told they were waiving any legal rights by signing the Disclosures and/or Illustration; and they only have limited knowledge and sophistication in business matters and no prior experience with defined benefit plans. *See id.*[9] The California Plaintiffs also argue that Internal Revenue Code 412(i) Rider

---

[9]The California Plaintiffs also contend that they have raised genuine issues of material fact precluding summary judgment based on e-mails they have submitted which they argue show that Pacific Life and Hartford, based on feedback solicited from Defendant Economic Concepts, Inc. concerning drafts of the transaction documents, removed certain "red-flag words" such as "tax shelter" from the disclosures, and that Economic Concepts, Inc. convinced Hartford to not require the client's own independent tax or legal advisor to sign off on the disclosure form. (*See* Pl.'s Supp. Resp. at 2-6 and App. in Supp. at 1-30 (docs. 98, 99).) The California Plaintiffs further contend that the e-mails raise fact issues because they demonstrate that the Consultant Defendants convinced Pacific Life to abandon a signature requirement for the client's own tax or legal advisor, and one of the Consultant Defendants remarked that Pacific Life seemed to be giving a great deal of "tax advice/direction" despite a disclaimer in the draft form stating that Pacific Life does not provide "tax or legal advice." (*Id.* at 5 (citing App. at 20-22).) Because the sole issue before the Court is whether

contained in the policy itself creates ambiguity and renders the disclaimers less clear.  (Pl.'s Supp. Resp. at 16.)

Viewing the evidence in the light most favorable to the California Plaintiffs, the Court determines that, in light of *Omni I* and *Omni II*, the affidavit evidence fails to raise a fact issue sufficient to overcome the clear language of the Disclosures and/or Illustration.  That the Disclosures and/or Illustration were not negotiated or discussed, and were presented as "boilerplate," is insufficient to raise a genuine issue of material fact as to the enforcement of the written disclaimers. *See Omni I*, 2008 WL 1925248, at **4–5; *Omni II*, 2008 WL 4616796, at **3–4.  Further, the California Plaintiffs' lack of representation by independent advisors when they purchased their policies does not raise a fact issue.  Each California Plaintiff warranted that he had consulted his tax or legal advisor, and, in the case of the Hartford Disclosures, even identified those tax and/or legal advisors by name.  (*See* Pac. Life App. at 73; Hartford App. at C76–C77, C79–C83.)  Further, Plaintiffs' affidavit testimony that they were not told they were waiving any rights by signing the Disclosures and/or Illustration does not raise a genuine issue of material fact regarding enforcement of the disclaimers.  *See Omni I*, 2008 WL 1925248, at *4 (citing *Cohen*, 841 F.2d at 287–88) (where

---

Plaintiffs could have "justifiably relied" on representations regarding the 412(i) plans when they signed explicit disclaimers to the contrary, the Court determines that the e-mails and other documents submitted by Plaintiffs are irrelevant.  Opinions held by the Consultant Defendants regarding draft forms circulated by the insurance companies, and how the transaction documents may or may not have changed from the initial draft to the final version, have no bearing on whether Plaintiffs could justifiably rely on representations by Hartford and Pacific Life agents based on the explicit language disclaiming such reliance.  Communications between the Consultant Defendants and Pacific Life and/or Hartford regarding the various drafts of the transaction documents would be relevant if the Court were concerned with other elements of a fraud claim, such as concealment or non-disclosure, scienter or knowledge of falsity and intent to induce reliance.  These matters are not before the Court at this time.  In short, the e-mails and prior versions of the transaction documents are irrelevant to the Court's narrow analysis of justifiable reliance, and the Court rejects Plaintiffs' argument that they are sufficient to raise a genuine issue of material fact.

plaintiff could have, through reasonable diligence, ascertained the truth of the matter, arbitration clause upheld despite allegations that plaintiff was told that the contract did not affect any of his legal rights).

Furthermore, Mr. Maor's and Dr. Pekerol's affidavit testimony that they are not sophisticated with regard to tax matters and have no prior experience with defined benefit plans fails to create a genuine issue of material fact. In *Omni I*, the plaintiffs claimed they lacked business sophistication. The *Omni I* court determined that the Disclosures were simple and clear enough to overcome this claim, and that the Omni principals, who claimed lack of business sophistication, were "reasonably sophisticated business people" such that they should have understood the Disclosures. *Omni I*, 2008 WL 1925248, at *5. Similarly in this case, Mr. Maor and Mr. Hakimi are men who have run their own businesses, and have for many years. They are business partners, and Mr. Maor is an officer, director, and shareholder of Pacific Home, a California corporation. (Pl.'s Summ. J. App. at Tab 4 (Maor Aff. ¶ 2) (doc. 98).) The Disclosures they signed were identical to those in *Omni I*, and this court agrees with the court in *Omni I* – Mr. Maor and Mr. Hakimi, as reasonably sophisticated business people, would have understood by reading the two-page Disclosure, that neither Hartford nor its agents was providing tax or legal advice. Further, Dr. Pekerol has a medical degree and operated his own medical practice with employees in West Hollywood, California. (*Id.*, Tab 8 (Pekerol Aff. ¶ 2).) The Illustration he received and signed, although twelve-pages rather than two-pages, was as clear as the Disclosure in *Omni*, and provided:

> (i) Pacific Life was not providing him with tax and legal advice, and he should obtain his own tax and legal advice;

> (ii) For tax purposes, the cash surrender value of his insurance policy may not be the appropriate measure of the value of the policy upon distribution from his § 412(i)

plan;

(iii) Funding more than 50% of his plan with life insurance contracts may result in increased scrutiny by the IRS, and he should obtain his own legal or tax advice regarding that issue; and

(iv) Pacific Life was making no representations to him as to whether his plan would satisfy § 412(i) of the tax code.

(*See* Pacific Life Summ. J. App. Ex. 3, at 57, 61, 71–73.)  Moreover, at page eight of the Illustration, in italics and in a box separate from the text, the Illustration states:

> *Neither Pacific Life nor its representatives offer legal or tax advice. Consult your attorney or tax advisor for complete up-to-date information concerning federal and state laws in this area.*

(*Id.*, Ex. 3 at 72.)  Given Dr. Pekerol's extensive education and business experience, as in *Omni I*, the Court concludes that, given the clarity of the disclaimers in the Illustration, he would similarly have understood that neither Pacific Life nor its agent(s) was providing tax or legal advice.[10]  As to Dr. Pekerol, Mr. Maor, and Mr. Hakimi, the Court concludes that under California law directly on point, any reliance of representations by Pacific Life and/or Hartford's agents contrary to the

---

[10]As previously noted (*see supra*, at note 5), Dr. Pekerol's affidavit testimony that he did not know that Goldinger was a Pacific Life agent is in conflict with this allegations in Plaintiffs' First Amended Complaint, where he alleged that "[i]n reliance upon . . . promises and representations from Pacific Life and its agent, the Pekerol Plaintiffs established the Pekerol DBP, and purchased certain life insurance policies from Pacific Life in order to fund the Pekerol DBP."  (Compl. ¶ 152.)  Dr. Pekerol now states that "[a]t no point during this series of follow-up discussions did Goldinger identify herself as a Pacific Life agent[,]" and he believed he had merely retained her as his attorney to "advise [him] regarding the creation of a defined benefit plan for Pekerol P.C."  (Pl.'s Mot. for Summ. J. App. at Tab 8 (Pekerol Aff. ¶9).)  Under either scenario, Dr. Pekerol has failed to raise a genuine issue of material fact sufficient to defeat summary judgment.  As Pacific Life correctly notes, "if he admittedly did not believe that any representations made to him by Ms. Goldinger were made on behalf of Pacific Life, he is not entitled to any relief against Pacific Life on the basis of any such purported representations, and entry of summary judgment on his claims in favor of Pacific Life is proper."  (*See* Pac. Life Opp'n to Pl.'s Supp. Resp. at 1 (doc. 107).)  Alternatively, based on his allegations in the complaint, Pacific Life is still entitled to summary judgment under California law and *Omni I* and *Omni II,* for the reasons set forth in this memorandum opinion.

35

Disclosures and/or Illustration would be unreasonable under the facts presented.[11]

In short, the Court concludes that under California law, viewing all the evidence in the light most favorable to Plaintiffs, the California Plaintiffs have failed to raise a genuine issue of material fact that they reasonably relied on representations by Hartford and/or Pacific Life agents regarding tax and legal issues related to 412(i) plans. Accordingly, Pacific Life and Hartford are entitled to summary judgment on the California Plaintiffs' claims for fraud, negligent misrepresentation, and civil conspiracy.

### 2. *Thomas A. Johnson's and Direct Electric's Fraud-Based Claims*

As already previously discussed, the Court determines that a Wisconsin court, confronted with the Illustration signed by Mr. Johnson, would most likely determine that, insofar as it disclaims reliance on representations by Pacific Life's agents to the contrary, it cannot be enforced. *See Westerfield v. Quizno's Franchise Co., LLC*, 2008 WL 2512467, at *9 (Apr. 16, 2008 E.D. Wis.) (The Wisconsin Supreme Court has determined that "exculpatory clauses are unenforceable on public policy grounds where the alleged harm is caused intentionally or recklessly."); *see also RepublicBank Dallas, N.A. v. First Wisconsin National Bank of Milwaukee*, 636 F.Supp. 1470, 1473 (E.D. Wisc. 1986) (same); *Anderson v. Tri-State Home Imp. Co.*, 268 Wis. 455, 460 (1955) (same). Even were

---

[11]With regard to the California Plaintiffs' argument that the Rider contained in the Hartford and Pacific Life policies creates an ambiguity as to the disclaimers, the Court rejects this argument. First, the Rider is in a separate document from the two-page Disclosure (in the case of Hartford) and the twelve-page Illustration (in the case of Pacific Life). As already stated, both the Disclosure and the Illustration unambiguously inform the purchaser to seek his own legal and tax advice and provide that there are no guarantees that the purchaser will receive any tax benefits. Moreover, the Rider is unambiguous and nowhere states that the 412(i) plan *will* qualify as a tax-qualified retirement plan, only that the policy is part of a plan "intended to qualify as part of a tax-qualified retirement plan or arrangement that meets the requirements of Code Sections 401(a) and 412(i)." (*See, e.g.*, Pacific Life Summ. J. App., Ex. 3 at 31–32 (Rider to Dr. Pekerol's Pacific Life policy); Hartford Mot. Summ. J. App., Ex. 5 at C23–C24 (Rider to Mr. Hakimi's Hartford policy).)

a Wisconsin court to examine the Illustration that Pacific Life contends entitles it to summary judgment on Mr. Johnson's and Direct Electric's fraud-based claims, such an argument would likely fail, given the unequal bargaining power of the parties, among other factors.  Mr. Johnson testifies in his affidavit that he does not possess a college degree and had little understanding of defined benefit plans.  (Pl.'s Summ. J. App. at Tab 6 (Johnson Aff. ¶ 14) (doc. 98).)   Accordingly, applying Wisconsin law, the Court denies Pacific Life's motion for summary judgment as to Mr. Johnson's and Direct Electric's fraud-based claims.

### 3. Robert W. MacMillan, MacMillan Construction Company, Charles R. Brown, DDS, Poulsbo Children's Dentistry's Fraud-Based Claims

For the reasons already set forth above (*see supra,* at III.A.2.), the Court will apply Texas law in analyzing Hartford's motion for summary judgment as to Robert W. MacMillan, MacMillan Construction Company, Charles R. Brown, DDS, Poulsbo Children's Dentistry's fraud-based claims.

Justifiable reliance is an element of the claims for fraud and negligent misrepresentation.  *See Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001) (fraud); *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) (negligent misrepresentation); *Haase v. Glazner*, 62 S.W.2d 795, 798 (Tex. 2001) (fraudulent inducement); s*ee also Coastal Bank SSB v. Chase Bank of Texas, N.A.*, 135 S.W.3d 840, 842–43 (Tex. App.–Houston [1st Dist.] 2004, no pet.) (fraud, negligent misrepresentation, fraudulent inducement).[12]

---

[12]Although justifiable reliance is not an element of a claim for civil conspiracy, Plaintiffs' civil conspiracy claim hinges on their fraud claim, the offense underlying the conspiracy claim.  *See Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 438 (Tex. 1997) (granting summary judgment on conspiracy claim noting that "allegations of conspiracy are not actionable absent an underlying [tort]"); *Askanase v. Fatjo*, 130 F.3d 657, 676 (5th Cir. 1997) (noting that "because the fraud claim fails[,] the fraud based conspiracy claim must fail also").

Under Texas law, contracting parties may create contractual provisions that disclaim reliance. *See Forest Oil*, 268 S.W.3d at 61; *Schlumberger Tech. Corp.*, 959 S.W.2d at 181. In interpreting the contractual provisions, the court must consider the entire writing and strive to reconcile and "give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (emphasis in original). "The contract and the circumstances surrounding its formation determines whether the disclaimer of reliance is binding." *Schlumberger*, 959 S.W.2d at 179–80. "Generally, reliance on representations made in a business or commercial transaction is not justified when the representation takes place in an adversarial context." *Coastal Bank SSB*, 135 S.W.3d at 843 (citing *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 794 (Tex. 1999)). "A party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party." *Id.*

The Texas Supreme Court has found a clear and specific intent to disclaim reliance when "sophisticated parties, represented by competent legal counsel, included an emphatic particularized disclaimer of reliance in the contract." *Schlumberger*, 959 S.W.2d at 180. Therefore, a disclaimer of reliance contained in a contract can negate a fraud claim's element of reliance as a matter of law. *See Forest Oil Corp.*, 268 S.W.3d at 61; *Schlumberger*, 959 S.W.2d at 179. A merger clause in a contract can also negate reliance. *See Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 571 (5th Cir. 2003); *U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 403 (5th Cir. 2000). If, in addition to a simple merger clause, there is language in a contract stating the contract was "in lieu of any and all prior

or contemporaneous agreements, conditions, or understandings," this would "explicitly contradict the assertion that the parties relied on promises to enter further contracts." *See U.S. Quest Ltd.*, 228 F.3d at 403.

The Texas Supreme Court has recently clarified its holding in *Schlumberger* and set out what it regards as the "most relevant" factors surrounding a contract's formation that demonstrate a clear and unequivocal expression of intent to disclaim reliance. *See Forest Oil Corp.*, 268 S.W.3d at 60–61. The "totality of the circumstances" factors which guided the Texas Supreme Court's holding in *Schlumberger* included:

> (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute;
>
> (2) the complaining party was represented by counsel;
>
> (3) the parties dealt with each other in an arm's length transaction;
>
> (4) the parties were knowledgeable in business matters; and
>
> (5) the release language was clear.

*Forest Oil Corp.*, 268 S.W.3d at 60.  In holding that the disclaimer of reliance refuted the required element of reliance, the Texas Supreme Court reasoned, "[i]f disclaimers of reliance cannot ensure finality and preclude post-deal claims for fraudulent inducement, then freedom of contract, even among the most knowledgeable parties advised by the most knowledgeable legal counsel, is grievously impaired." *Id.* at 61.

Based on the Disclosures signed by Mr. MacMillan and Dr. Brown, taking into account the nature of the transaction and the "totality of the circumstances," and viewing all evidence in the

light most favorable to Plaintiffs, the Court determines that Mr. MacMillan, MacMillan Construction, Dr. Brown and Poulsbo Children's Dentistry have raised genuine issues of material fact regarding their right to rely on representations by Hartford's agents regarding the 412(i) plans sufficient to defeat Hartford's summary judgment motion.  *See Forest Oil Corp.*, 268 S.W.3d at 60–61; *Schlumberger*, 959 S.W.2d at 179–80.  The affidavit testimony of Mr. MacMillan and Dr. Brown shows that none of the terms of the Disclosure were negotiated or discussed and that the transaction documents were presented to them as "boilerplate documents" which they had to sign in order to establish the defined benefit plans.  (Pl.'s Summ. J. App. at Tab 7 (MacMillan Aff. ¶¶ 10–11); *id.* at Tab 5 (Brown Aff. ¶¶ 12-14) (doc. 98).)  Additionally, Mr. MacMillan testifies that Allen and/or Stiles made affirmative representations to him that the documents he was signing were not tax or legal documents, and when he asked them if he should consult MacMillan Construction's accountant they told him it was not necessary.  (*Id.* at Tab 7  (MacMillan Aff. ¶¶ 10-11).)  Further, neither Mr. MacMillan nor Dr. Brown were represented by independent counsel.  (*Id.* at Tab 7 (MacMillan Aff. ¶¶ 10-12); *id.* at Tab 5 (Brown Aff. ¶ 14).)  Dr. Brown testifies that he did not hire independent counsel because Hartford's agents represented to him that Braley would be the attorney to draft the documents, and that Braley was "hand-picked" by Hartford's agents to serve as his counsel.  (*Id.* at Tab 5 (Brown Aff. ¶ 14).)

While the Court agrees with the well-established doctrine that: "[a] party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party[,]" *Coastal Bank SSB*, 135 S.W.3d at 843, consideration of the "totality of the

40

circumstances" reveals that Dr. Brown and Mr. MacMillan were not "sophisticated parties, represented by competent legal counsel," who negotiated at arms-length regarding the disclaimer of reliance in the Disclosures. *See Schlumberger*, 959 S.W.2d at 180. It is undisputed that the transaction at issue, establishing the 412(i) plans funded by life insurance policies, was not adversarial, no independent counsel was present, the terms of the Disclosures were never negotiated or discussed but were presented as "boilerplate," Dr. Brown and Mr. MacMillan had no prior experience in the area of defined benefit plans, and fact issues remain regarding whether the transactions could be considered "arms-length" business transactions. In fact, the only *Schlumberger* factor that weighs in favor of summary judgment is that the language of the Disclosure was clear.

While it argues that the Court should not apply Texas law to these claims, Hartford also makes the alternative argument that if the Court were to apply Texas law and not the laws of Arizona and Washington, the disclaimers in the Disclosures would be upheld, and summary judgment in its favor would still be warranted. (*See* Hartford Opp'n to Pl.'s Supp. Resp. at 5 note 12.) Hartford points to numerous cases interpreting Texas law where the court's have upheld disclaimers which were far less specific than the Disclosures signed by Dr. Brown and Mr. MacMillan. (*Id.* (citing *Armstrong*, 333 F.3d at 571–72; *Jacuzzi, Inc. v. Franklin Elec. Co., Inc.*, 2008 WL 190319, at **3–5 (N.D. Tex. Jan. 20, 2008); *Steinberg v. Brennan*, 2005 WL 1837961, at **5–6 (N.D. Tex. July 29, 2005)).) The Court disagrees with Hartford's position with regard to the disclaimers.

The cases cited by Hartford are not inconsistent with the Court's decision today. As the Hon. Sydney A. Fitzwater noted in *Jacuzzi*, the decisions in *Steinberg* and *Armstrong* upon which

41

Hartford relies:

> do not . . . call into question *Schlumberger*'s requirement that analyzing the enforceability of a reliance disclaimer involves an evaluation of the circumstances surrounding the contract. Rather, these cases suggest that the plaintiff must produce evidence of the *Schlumberger* factors that is sufficient to avoid enforcement of the reliance disclaimer. Thus when a plaintiff fails to present evidence that would render unenforceable a clear and unequivocal reliance disclaimer, it is proper to enter summary judgment dismissing the fraudulent inducement claim.

*Jacuzzi*, 2008 WL 190319, at **4–5. As set forth above, in this instance, Plaintiffs Mr. MacMillan, MacMillan Construction, Dr. Brown and Poulsbo Children's Dentistry have produced sufficient evidence to avoid enforcement of the reliance disclaimers. *See id.* While the Court acknowledges Hartford's position that the Disclosures were highly specific and easy to understand, in light of the affidavit evidence discussed above pertaining to the "totality of the circumstances," the Court concludes that fact issues remain for the jury as to whether these Plaintiffs could have justifiably relied on representation by Hartford's agents directly contradicted by the language of the Disclosures. Accordingly, the Court denies Hartford's motion for summary judgment as to the fraud-based claims of Mr. MacMillan, MacMillan Construction, Dr. Brown and Poulsbo Children's Dentistry.

## C.   Plaintiffs' Rule 56(f) Motion for Continuance to Conduct Discovery (doc. 97)

Plaintiffs have filed a Rule 56(f) motion requesting that, in the event the Court does not deny summary judgment, Plaintiffs be allowed to conduct limited additional discovery to raise additional fact issues related to the pending motions. Defendants Pacific Life and Hartford argue that the requested discovery is not pertinent to the issues before the Court on summary judgment, and that Plaintiffs have already submitted their affidavits pertaining to the establishment of the plans at issue.

42

Federal Rule of Civil Procedure 56(f) states:

> If a party opposing the [summary judgment] motion shows by affidavit
> that, for specified reasons, it cannot present facts essential to justify
> its opposition, the court may:
> (1) deny the motion;
> (2) order a continuance to enable affidavits to be obtained,
> depositions to be taken, or other discovery to be undertaken; or
> (3) issue any other just order.

"The Rule is an essential ingredient of the federal summary judgment scheme and provides a mechanism for dealing with the problem of premature summary judgment motions." *Knight Transportation, Inc. v. Westinghouse Digital Electronics, LLC*, 2008 WL 647783, at *1 (N.D. Tex. March 5, 2008) (Fitzwater, J.) (internal citations omitted). "The continuance authorized by Rule 56(f) is a safe harbor built into the rules so that summary judgment is not granted prematurely." *Id.* (citing *Union City Barge Line Inc. v. Union Carbide Corp.*, 823 F.2d 129, 136 (5th Cir. 1987)). "To obtain a continuance on a motion for summary judgment a party must specifically explain both why it is currently unable to present evidence creating a genuine issue of fact and how a continuance would enable the party to present such evidence." *Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 719–20 (5th Cir. 1999) (internal citation omitted).

Plaintiffs seek discovery that they contend would show that Hartford and Pacific Life:

> (1) required the waiver-of-reliance provisions to be executed as drafted without any
> negotiation or alteration by prospective policyholders; (2) instructed their agents to
> gloss over, ignore, or minimize these provisions in their discussions with prospective
> policyholders; (3) instructed their agents to discourage prospective policyholders
> from getting independent counsel or other professionals involved in discussions
> related to these provisions; (5) had substantial knowledge and experience in matters
> related to section 412(i) plans and these waiver-of-reliance provisions; (6) knew that
> these provisions would be unclear and ambiguous to prospective policyholders; (7)
> drafted and revised these provision with the assistance of the Consultant Defendants
> and with the purpose of stripping them down to make the provisions ambiguous and

43

unclear to prospective policyholders; and (8) considered and rejected alternate language that would have been less ambiguous and unclear.

(*See* Pl.'s Reply in Supp. of Alt. Rule 56(f) Mot. at 6 (doc. 112).)

Much of the discovery Plaintiffs seek requests information already before the Court in the form of the Plaintiffs' affidavits, which the Court viewed as true in analyzing whether summary judgment was warranted under the circumstances.[13]  By way of affidavits filed by the California Plaintiffs, the Court already has before it much of the evidence Plaintiffs seek a continuance to obtain.  For example, it is undisputed that the terms of the Disclosures (or Illustration, in the case of Dr. Pekerol) were never negotiated or discussed with and were presented by Pacific Life's and Hartford's respective agents as "boilerplate documents" Plaintiffs had to sign to establish the defined benefit plans.  Further, by way of affidavit testimony, it is already of record that Defendants had substantial knowledge and experience in matters related to section 412(i) plans and these waiver-of-reliance provisions.  With regard to evidence related to the various draft versions that may have preceded the final version presented to the California Plaintiffs, or the Consultant Defendants' input, as already stated (*see supra*, at note 10), communications between the Consultant Defendants and Pacific Life and/or Hartford regarding the various drafts of the transaction documents would be relevant if the Court were concerned with other elements of a fraud claim, such as concealment or non-disclosure, scienter or knowledge of falsity and intent to induce reliance.  This evidence, however, is irrelevant to the Court's analysis of justifiable reliance.  Additionally, *Omni I*, 2008 WL

---

[13]The Court limits its analysis of Plaintiffs' Rule 56(f) motion to the California Plaintiffs, as the Court has already determined that Hartford's and Pacific Life's summary judgment motions should be denied as to the remaining Plaintiffs.

1925248, at **4–5, and *Omni II*, 2008 WL 4616796, at **3–4 (and California cases cited therein), none of the categories of discovery proposed by Plaintiffs would lead to genuine issue of material fact.

In sum, having determined that the California Plaintiffs have failed to explain how the proposed discovery would create a genuine issue of material fact under California law, the Court denies Plaintiffs' Rule 56(f) Motion for Continuance to Conduct Discovery (doc. 97).

### D.   Plaintiffs' Remaining Claims Against Pacific Life and Hartford

Remaining are Plaintiffs' claims against Pacific Life and Hartford for violations of Chapter 541 of the Texas Insurance Code, the DTPA; violations of the California Business and Professions Code section 17200, and unjust enrichment.[14]  **The Court DIRECTS the parties to submit to the Court no later than Monday, April 6, 2009, a position statement regarding whether the Court should consider these remaining claims on a motion to dismiss or a motion for summary judgment.** Following its review of the parties' respective position statements, a briefing schedule will issue as appropriate.

### IV.

### CONCLUSION

For the reasons set forth herein, the Court **GRANTS in part** and **DENIES in part** Defendant

---

[14]The Court rejects Pacific Life's request that the Court sever any remaining claims brought by Dr. Pekerol and transfer them to the appropriate federal court, in this case, the Central District of California. (*See* Pac. Life Mot. Summ. J. Brief at 41 (doc. 38); Pac. Life Reply at 19-21.)  Such a transfer is unwarranted at this juncture, in light of Dr. Pekerol's and Pekerol P.C.'s claims against other Defendants in related actions pending before this Court (*Berry, et al. v. Bryan Cave LLP et al.*, 3:08-CV-2035), and arising out of the same allegations.  Moreover, the transfer request ignores that a federal court in California would not have jurisdiction, as Dr. Pekerol, Pekerol P.C., and Pacific Life would be non-diverse.

Pacific Life Insurance Company's Motion for Summary Judgment (doc. 38), and **GRANTS in part** and **DENIES in part** Hartford Life and Annuity Insurance Company's Motion for Summary Judgment (doc. 43). Specifically, the Court: **GRANTS** Defendant Pacific Life Insurance Company's Motion for Summary Judgment as to the claims of fraud, civil conspiracy and negligent misrepresentation brought by Plaintiffs Mehmet C. Pekerol, M.D. and Pekerol Mehmet C. Pekerol, M.D. , P.C., and hereby **DISMISSES** these claims **with prejudice**; **DENIES** Defendant Pacific Life Insurance Company's Motion for Summary Judgment as to the claims of fraud, civil conspiracy, and negligent misrepresentation brought by Plaintiffs Thomas A.  Johnson and Direct Electric of Wisconsin; **GRANTS** Hartford Life and Annuity Insurance Company's Motion for Summary Judgment as to the claims for fraud, civil conspiracy and negligent misrepresentation brought by Plaintiffs Yoram Hakimi, Noam Maor, and Pacific Home Remodeling, Inc., and hereby **DISMISSES** these claims **with prejudice**; **DENIES** Hartford Life and Annuity Insurance Company's Motion for Summary Judgment as to the claims for fraud, civil conspiracy, and negligent misrepresentation brought by Plaintiffs Robert W. MacMillan, MacMillan Construction Company, Charles R. Brown, DDS, and Poulsbo Children's Dentistry; and **DENIES** Plaintiffs' Rule 56(f) Motion for Continuance to Conduct Discovery (doc. 97).

SO ORDERED.

Dated: March 26, 2009

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE